*CORRECTED*

2025–1346

---

# United States Court of Appeals for the Federal Circuit

---

Google LLC,

*Plaintiff–Appellant*

v.

Sonos, Inc.,

*Defendant–Appellee*

---

Appeal from the United States District Court for the Northern District
of California in case no. 3:20-cv-03845-EMC, Judge Edward M. Chen

---

## Nonconfidential Opening Brief of Appellant Google LLC

---

Nathan K. Kelley
Jonathan I. Tietz
Perkins Coie LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005
(202) 654–6200
NKelley@perkinscoie.com
JTietz@perkinscoie.com

Jeffrey S. Gerchick
Patrick J. Stafford
Quinn Emanuel Urquhart
   & Sullivan, LLP
1300 I Street, N.W., Suite 900
Washington, D.C. 20005
(202) 538–8000
jeffgerchick@quinnemanuel.com
patrickstafford@quinnemanuel.com

Dan L. Bagatell
Perkins Coie LLP
3 Weatherby Road
Hanover, New Hampshire 03755
(602) 351–8250
DBagatell@perkinscoie.com

David A. Nelson
Quinn Emanuel Urquhart
   & Sullivan, LLP
191 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 705–7400
davenelson@quinnemanuel.com

Patrick D. Curran
Quinn Emanuel Urquhart
   & Sullivan, LLP
111 Huntington Avenue, Suite 520
Boston, Massachusetts 02199
(617) 712–7100
patrickcurran@quinnemanuel.com

Counsel for Appellant Google LLC

April 21, 2025

### Claims 1 and 10 of U.S. Patent No. 7,899,187

1. A method for registering a new device as part of a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system, the method comprising the steps of:

>    receiving domain information corresponding to the domain of devices from a device existing within the domain of devices;

>    providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a *private key* to the new device, wherein the private key is *based on the domain information* and is *utilized by all devices within the domain of devices*; and

>    receiving the private key from the key issuer for use in accessing the protected digital content within the digital-rights management system.

10. An apparatus comprising:

>    communication circuitry receiving domain information from a device existing within a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system;

>    storage for storing the domain information; and

>    logic circuitry for providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a *private key* for use in accessing protected digital content to the apparatus, wherein the private key is *based on the domain information* and is *utilized by all devices within the domain of devices*.

Appx67 (7:60-8:8) (emphasis added); Appx67-68 (8:64-9:10) (emphasis added).

## Certificate of Interest

I certify that the information below is complete to the best of my knowledge.

Date: April 21, 2025          Signature:  /s/Dan L. Bagatell

                              Name:      Dan L. Bagatell

| 1. Represented Entity | 2. Real Party in Interest | 3. Parent Corporations and 10% Stockholders |
|---|---|---|
| Google LLC | none | XXVI Holdings Inc.; Alphabet Inc. |

| 4. Other Legal Representatives | |
|---|---|
| from Quinn Emanuel Urquhart & Sullivan, LLP: | Anne-Raphaelle Aubry*, Lindsay Cooper Hayman*, Nima Hefazi, Patrick T. Schmidt, Sean Taheri, Charles K. Verhoeven*, Brett Watkins, Ognjen Zivojnovic<br><br>* no longer with the firm |

| 5. Related Cases |
|---|
| None |

| 6. Organizational Victims and Bankruptcy Cases |
|---|
| None |

## TABLE OF CONTENTS

Certificate of Interest ............................................................... i

Table of Authorities ................................................................ v

Table of Abbreviations .......................................................... vii

Related Cases ...................................................................... viii

Introduction .......................................................................... 1

Jurisdictional Statement......................................................... 4

Statement of Issues ................................................................ 4

Statement of the Case ............................................................ 6

     A.  The '187 Patent ........................................................ 6

     B.  Google's Infringement Theories ................................ 8

          1.  The Strong-Encryption Theory............................ 9

          2.  The Authentication Theory ............................... 10

     C.  This Litigation ....................................................... 11

          1.  The Claim-Construction Order Rejecting Sonos's Narrow Interpretation of "Private Key" ............................ 12

          2.  The Order Granting Summary Judgment of Non-Infringement under Google's Strong-Encryption Theory ............................ 13

          3.  The Order Granting Summary Judgment of Non-Infringement under Google's Authentication Theory.....18

Summary of Argument........................................................ 20

Standards of Review ........................................................... 24

Argument............................................................................ 24

**Confidential Material Redacted**

I.   This Court should reverse or vacate the summary judgment
     of non-infringement under the Strong-Encryption Theory
     because the district court misconstrued both Google's
     arguments and the claim term "utiliz[ing]" a private key ............ 24

     A.   Google and its expert did not concede that Sonos's
          Controller app is a "device within [the] domain of
          devices" that must "utilize" a private key to access
          protected digital content ............................................................ 24

     B.   A jury is entitled to find that all members of a
          synchronized player group "utilize" the ███████ private
          key because the █████████████ player must decrypt audio
          data with its private key before each player can access
          the protected digital content ...................................................... 31

II.  This Court should reverse or vacate the summary judgment
     of non-infringement under the Authentication Theory
     because the district court construed the claimed "private
     key" too narrowly ..................................................................................... 37

     A.   The claimed "private key" need not control a
          cryptographic algorithm ............................................................ 37

          1.   The claim language supports Google's construction ...... 38

          2.   The specification confirms that a "key" may, but
               need not, control a cryptographic algorithm ................... 40

          3.   The district court improperly elevated extrinsic
               evidence over the intrinsic record ..................................... 45

     B.   There is a genuine dispute of material fact over whether
          the accused authTokens satisfy the "private key"
          limitation ..................................................................................... 48

III. This Court should reverse the district court's holding that a
     private key is "based on" domain information only when the
     domain information dictates which particular key issues ............. 49

**Confidential Material Redacted**

A. A key is "based on" domain information when it is issued as a result of a domain-information input and associated with that domain information ................................. 50

   1. The claim language supports Google's construction ....... 51

   2. The specification also supports Google's construction .. 54

B. There is a genuine dispute of material fact regarding the "based on" limitation under both of Google's infringement theories ................................................. 56

   1. There is a genuine dispute over whether Sonos's private device keys are "based on" the ████ ................ 57

   2. There is a genuine dispute over whether Sonos's authTokens are "based on" the ████ ............................. 58

Conclusion ........................................................................ 61

Addendum

  Final judgment (Appx1-3)

  Order granting in part and deferring in part Sonos's motion for summary judgment of non-infringement of the '187 patent (Appx4-31)

  Order granting remainder of Sonos's motion for summary judgment of non-infringement of the '187 patent (Appx32-59)

  '187 patent (Appx60-68)

Certificate of Compliance with Type-Volume Limitation

Certificate of Authority

Certificate Regarding Confidential Material

Certificate of Service

*Notice Regarding Confidentiality*

Internal technical process information and source code designated by Sonos as confidential under the district court's protective order has been redacted from pages iii-iv, vii, 1-2, 5, 8-11, 14-17, 19, 21-22, 27, 31-33, 36-37, 48-49, 57-60, Appx6, Appx8-9, Appx19, Appx21-23, Appx25, Appx27-30, Appx35, Appx40, Appx51, and Appx56-58 of the public version of this brief and highlighted in <mark>magenta</mark> in the confidential version.

# TABLE OF AUTHORITIES

**Cases**                                                                 **Pages**

*Advanced Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc.,*
    674 F.3d 1365 (Fed. Cir. 2012) ................................................................ 43, 49

*Apple Inc. v. Wi-LAN Inc.,*
    25 F.4th 960, 975 (Fed. Cir. 2022) .............................................. 24

*Bennett Regulator Guards, Inc. v. Atlanta Gas Light Co.,*
    825 F. App'x 773 (Fed. Cir. 2020) ................................................ 46

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.,*
    631 F.3d 1279 (Fed. Cir. 2011) .............................................. 35, 36

*Cioffi v. Google, Inc.,*
    632 F. App'x 1013 (Fed. Cir. 2015) .............................................. 34

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.,*
    438 F.3d 1374 (Fed. Cir. 2006) .................................................. 36

*Genuine Enabling Tech. LLC v. Nintendo Co.,*
    29 F.4th 1365 (Fed. Cir. 2022) .................................................. 46

*Intellectual Ventures II LLC v. Commerce Bancshares, Inc.,*
    682 F. App'x 891 (Fed. Cir. 2017) .............................................. 34

*Lexion Medical, LLC v. Northgate Technologies, Inc.,*
    292 F. App'x 42 (Fed. Cir. 2008) .............................................. 35

*Masimo Corp. v. Sotera Wireless, Inc.,*
    No. 2022-1415, 2023 WL 6307959 (Fed. Cir. Sept. 28, 2023) .................. 52

*Medtronic, Inc. v. Teleflex Innovations S.A.R.L.,*
    70 F.4th 1331 (Fed. Cir. 2023) ................................................61

*On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH,*
    386 F.3d 1133 (Fed. Cir. 2004) ................................................ 47

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ............................................ 37, 44

*Roku, Inc. v. Universal Elecs., Inc.*,
  No. 23-1019, 2024 WL 3042701 (Fed. Cir. June 18, 2024) ...................... 35

*Tegal Corp. v. Tokyo Electron Am., Inc.*,
  257 F.3d 1331 (Fed. Cir. 2001) .................................................... 46

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015) .................................................... 24

*U.S. Ethernet Innovations, LLC v. Acer, Inc.*,
  646 F. App'x 929 (Fed. Cir. 2016) ............................................. 48

**Statutes**

28 U.S.C. § 1295(a) ................................................. 4

28 U.S.C. § 1338(a) ................................................. 4

35 U.S.C. § 101 .................................................. 12

**Confidential Material Redacted**

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Appx____ | joint appendix page ____ |
| DRM | digital-rights management |
| Google | plaintiff–appellant Google LLC |
| ██████ household ████████████ | household internal technical process |
| Sonos | defendant–appellee Sonos, Inc. |
| (*x:y-z*) | column *x*, lines *y* to *z* |
| '187 patent | U.S. Patent No. 7,899,187 |

## Related Cases

No appeal from this civil action has previously been before this or any other appellate court. And Google's counsel are unaware of any pending case that will directly affect or be directly affected by the outcome of this appeal.

**Confidential Material Redacted**

## Introduction

This case involves Sonos's infringement of Google's U.S. Patent No. 7,899,187, which addresses enrollment of new devices in a domain-based digital-rights-management system. A "domain" is a group of devices that are linked to a common account and share access rights to protected digital content. Among other things, the claims require a key issuer to issue the new device a "private key" that is "based on … domain information" such as the domain's name or identifier and "utilized by all devices within the domain of devices" for accessing protected digital content.

Google asserted that the accused Sonos speakers infringe in two ways. Google's Strong-Encryption Theory addressed the scenario in which all players in a Sonos "household" domain, including newly added players, are grouped for synchronized playback and rely on the private key of ▮▮▮▮ ▮▮▮▮ device to access encrypted content. Google's Authentication Theory addressed the scenario in which users register all players in a household/domain to access a third-party music service while adding a new device to the household/domain. In the latter scenario, the third-party service issues an authorization token (private key) linked to the domain information, and all

**Confidential Material Redacted**

players in the household use that ███ authorization token to authenticate themselves when requesting protected content from the service.

The district court granted summary judgment of non-infringement after adding unwarranted limitations to three claim terms at Sonos's behest:

- The court narrowly construed "utiliz[ing]" a private key to require all devices in a domain to utilize the key directly and locally. That construction doomed Google's Strong-Encryption Theory. Properly construed according to its ordinary meaning, "utiliz[ing]" a private key simply requires making use of the key.

- The court jettisoned its original construction of "private key" and read in a new requirement that the key control a cryptographic algorithm rather than functioning as the object of such an algorithm. That construction effectively excluded authorization tokens used in digital-**internal technical process** algorithms like those described in the patent, dooming Google's Authentication Theory. The court should have maintained its

original construction: a "non-public key that is used as an input to a cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be computed."

- The court also ruled that a private key is "based on" domain information only when the domain information is "deterministic" and controls which key issues. Having granted summary judgment on other grounds, the court did not apply that construction to Sonos's products, but Sonos contended that that the new construction compelled judgment of non-infringement. Under the correct construction, a private key is "based on" domain information if it is produced as a consequence of a domain-information input and associated with the domain information.

Along the way, the court also held that Google had conceded non-infringement under the Strong-Encryption theory even though its expert merely provided alternative infringement opinions regarding a fourth limitation.

This Court should reverse the constructions, reverse or vacate the summary judgment of non-infringement, and remand for further proceedings.

## Jurisdictional Statement

The district court had jurisdiction under 28 U.S.C. § 1338(a) because this case arose under the Patent Act. The district court entered final judgment disposing of all remaining claims and counterclaims on December 2, 2024. Appx1-3. Google filed a timely notice of appeal on January 2, 2025. Appx3836-37. This Court has jurisdiction under 28 U.S.C. § 1295(a).

## Statement of Issues

1. Did the district court err in granting Sonos summary judgment of non-infringement under Google's Strong-Encryption Theory on grounds that the accused private key is not "utilized by all devices within the domain of devices" to access protected digital content?

    a. Everyone agreed that the Controller in Sonos systems is a software application, not a playback device that needs access to protected digital content. Although Google's infringement expert testified that the Controller could be considered a "device" within Sonos's "domain of devices," he did so for purposes of a different limitation—and even then he offered an alternative infringement opinion under the assumption that the Controller was *not* a "device" within the "domain of devices." He never testified that the Controller was a "device" within the "domain of devices" that must utilize

– 4 –

**Confidential Material Redacted**

a private key to access protected digital content, and Google consistently maintained that the Controller was *not* such a device. Did the district court err in granting summary judgment on grounds that Google and its expert conceded away their infringement case?

    b. When a Sonos player group is configured for synchronized playback, all players in the group rely on a ▮▮▮▮▮▮▮▮ player to access audio data with its private key on their behalf. Could a reasonable jury find that all group members "utilize" that private key to access the audio data?

2. Sonos did not dispute that its authorization tokens are both an input to the algorithm used to access protected digital content and used as private keys in a cryptographic algorithm. Did the district court err in granting Sonos summary judgment under Google's Authentication Theory on grounds that the accused tokens are not "private keys" as a matter of law?

3. The claims require the private key to be "based on" domain information. Google showed that the accused keys are issued as a consequence of domain-information input and associated with that information. Did the district court err in holding that a private key is "based on" domain information only when the domain information dictates which key issues?

## STATEMENT OF THE CASE

### A.    The '187 Patent

U.S. Patent No. 7,899,187 is entitled "Domain-Based Digital-Rights Management System with Easy and Secure Device Enrollment." Appx60. The patent issued to Motorola Mobility, Inc. in 2011 based on an application filed in 2002. *Id.* Google acquired the patent when it acquired Motorola Mobility in 2012.

The '187 patent addresses problems in applying digital-rights management (DRM) techniques to "domains" of devices. DRM systems aim to prevent piracy of digital works such as music and videos and to enable owners of intellectual-property rights in such works to obtain fair compensation from those who use them. Appx64 (1:14-24). Domains are sets of devices that share rights associated with a common account for use in accessing protected digital content. *See* Appx67 (7:60-64) (preamble of claim 1). In a domain-based DRM system, a user pays for the right to play a song or other work on any device within the domain, not just a particular device.

Domain-based DRM systems are convenient for users, but the '187 patent identified two problems with such systems. First, manually registering multiple devices into a domain could be cumbersome. Second, registering

non-local devices raised security issues. Appx64 (1:39-47).

The '187 patent addressed these concerns by teaching to add new devices to an existing domain by first having the new device obtain "domain information" such as the domain name or an identifier from a nearby device that is already in the domain, and then having the new device complete its registration by contacting a "key issuer" outside the domain to obtain a "private key" that devices within the domain can "utilize" to access protected digital content. *Id.* (1:65-2:42).

Claim 1 recites a method for registering a new device into a domain:

> 1. A method for registering a new device as part of a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system, the method comprising the steps of:
>
>> receiving domain information corresponding to the domain of devices from a device existing within the domain of devices;
>>
>> providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices; and
>>
>> receiving the private key from the key issuer for use in accessing the protected digital content within the digital-rights management system.

**Confidential Material Redacted**

Appx67 (7:60-8:8).

Claim 10 is the corresponding apparatus claim and lacks the lengthy preamble of claim 1:

> 10. An apparatus comprising:
>
> communication circuitry receiving domain information from a device existing within a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system;
>
> storage for storing the domain information; and
>
> logic circuitry for providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key for use in accessing protected digital content to the apparatus, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices.

Appx67-68 (8:64-9:10).

## B.    Google's Infringement Theories

Sonos makes and sells wireless audio players that are typically connected in subnetworks that Sonos calls "households." For example, a user may place Sonos speakers in various rooms in a home and connect all of them to the [internal technical] household network, thereby giving each speaker access to playlists and information associated with the user's account. Each household has a unique household [internal technical process]). Appx2683-84 ¶ 108.

**Confidential Material Redacted**

Google asserted two distinct infringement theories regarding the software Sonos devices use to add a new player to a household.

### 1.    The Strong-Encryption Theory

Google's Strong-Encryption Theory focused on the software located on each accused Sonos player that adds the player to an existing household.

Under Sonos's ███████ protocol, the player being added obtains the household's ████ from another player already in the household, either directly or indirectly via Sonos's Controller app. Appx2685-90 ¶¶ 113-122. The new player then uses the ████ to register with Sonos's registration service, which supplies a "private device key" that can be used to access music streams from Sonos or from third-party music services. Each Sonos player receives its own private device key. The registration service also supplies a device ████ that contains the public key tied to the private device key, the player's serial number, the ████ and the user's Sonos ID. Appx2690-91 ¶¶ 123-126.

Users may group players within a Sonos household for synchronous playback. In that case, the grouped devices all rely on the private key of the group's "████ device (sometimes called its "channel source") to ac-

cess and decrypt audio content received from a music service. The [REDACTED: internal technical process] [REDACTED: internal te] distributes decrypted audio data to the other group members for playback. Appx2685 ¶ 112; Appx2859-61 ¶¶ 379-380.

Google contended that the devices within a Sonos household are a "domain," that the associated [REDACTED: internal technical pro] is "domain information," and that the [REDACTED: internal technical pro] may be obtained from another Sonos player already in the domain. Google also contended that Sonos's registration service is the "key issuer" and that the private device key issued by that service during registration constitutes a "private key" "based on the domain information." Google further contended that when a player group is configured for synchronized playback, the [REDACTED: internal technical] "private key" (the [REDACTED: internal technical process] key) is "utilized by all devices within the domain of devices" to access protected digital content. *E.g.*, Appx8-9; Appx2718-53 ¶¶ 169-225; Appx2782-89 ¶¶ 259-268; Appx2802-07 ¶¶ 280-289; Appx2808 ¶ 291; Appx2813-25 ¶¶ 295-309; Appx2839-62 ¶¶ 327-381; Appx2913-17 ¶¶ 459-468; Appx2928-53 ¶¶ 482-550.

### 2.    The Authentication Theory

While adding a Sonos player to an existing household, a user may register all players in the household to access a third-party music service. In that case, the player sends the [REDACTED: internal technical pro] to the third-party service, which then issues

**Confidential Material Redacted**

an "authToken" linked to the ▮▮▮▮ All players in the household then use

that ▮▮ authToken to authenticate themselves when requesting protected

content from the service. Appx2704-15 ¶¶ 152-161.

Google again contended that the devices in a Sonos household consti-

tute the claimed "domain," that the associated ▮▮▮ is "domain infor-

mation," and that the ▮▮▮ may be obtained from another Sonos player

already in the household/domain. But under this theory, Google contended

that the third-party service serves as the "key issuer," that the authToken is

a "private key" that is "based on the domain information," and that all play-

ers in the household ("all devices within the domain of devices") "utilize"

that ▮▮ "private key" to access protected content from the third-party ser-

vice. *E.g.*, Appx8; Appx34-35; Appx2718-82 ¶¶ 170-258; Appx2789-2801

¶¶ 269-279; Appx2807-08 ¶ 290; Appx2809-13 ¶¶ 292-294; Appx2825-39

¶¶ 310-326; Appx2862-913 ¶¶ 382-458; Appx2917-28 ¶¶ 469-481.

## C.   This Litigation

Google filed a patent-infringement complaint against Sonos in June

2020, Appx1001-28, and filed an amended complaint two months later,

Appx1029-58. Over the course of several years, the case narrowed down to

Google's contention that Sonos infringed claims 1, 3, 4, 10, and 12 of the '187 patent.[1]

Although the district court initially construed the claims in Google's favor, it later granted summary judgment of non-infringement after issuing three supplemental claim constructions.

### 1.    The Claim-Construction Order Rejecting Sonos's Narrow Interpretation of "Private Key"

Early on, the district court issued an order construing three claim terms in the '187 patent. Appx2206-33. After concluding that the claim language itself sufficiently defined "domain information" and rejecting Sonos's argument that the "logic circuitry" of claim 10 was indefinite, Appx2211-16, the court addressed the scope of the "private key" recited in all asserted claims.

Sonos contended that the applicants engaged in lexicography that limited their invention to public-key cryptography techniques in which private keys are used only for decrypting data or generating digital signatures. Appx1912-15. Google pointed out, however, that the passage on which Sonos

---

[1] The district court concluded that the claims of a second patent were invalid under 35 U.S.C. § 101, Google withdrew a third patent, and the PTAB canceled claims of the two other patents following *inter partes* reviews. *See* Appx1-3 (final judgment). This appeal addresses only the '187 patent.

relied merely addressed a preferred embodiment and that the specification specifically pointed out that other techniques such as symmetric (single-key) techniques and broadcast key encryption could be used as alternatives. Appx1092-95; Appx2158-60; *see* Appx67 (7:52-57).

The district court agreed with Google and construed "private key" as a "non-public key that is used as an input to a cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be computed." Appx2216-20.

### 2. The Order Granting Summary Judgment of Non-Infringement under Google's Strong-Encryption Theory

After discovery, Sonos moved for summary judgment of non-infringement on numerous grounds. Appx2234-64.

As to Google's Strong-Encryption Theory, Sonos raised two arguments regarding the limitation requiring the private key to be "utilized by all devices within the domain of devices." Sonos first contended that Google's infringement expert had identified Sonos's Controller app as a "device existing within the domain of devices," yet the Controller does not use a private device key to access protected content because it does not receive and play back music. Appx2253-54. Sonos further contended that its playback devices do

– 13 –

**Confidential Material Redacted**

not "utilize" the ██████ private device key because each device is assigned its

own private key. Sonos acknowledged that when a group of playback devices

is configured to play back synchronously, a ██████ private key is used to de-

crypt the audio data for each group member. Sonos contended, however, that

only the ██████████████ device where the decryption occurs "utilizes" that pri-

vate key and that all other playback devices are mere beneficiaries.

Appx2254-56. Sonos separately argued that its accused private device keys

were not "based on" the ██████ that Google identified as "domain infor-

mation." Appx2259-63.[2]

In response, Google contended that Sonos at most raised genuine is-

sues of material fact. Google explained that Sonos's Controller is a software

app, not a playback device within the domain of devices, and thus does not

need a private key to access protected content. Appx2622-23. Google also ar-

gued that when a Sonos player group operates in synchronized-play mode,

the playback devices in that group all "utilize" the ██████ private domain key

---

[2] Sonos also made a fourth argument limited to the method claims: that
Google had no evidence of actual use. Appx2257-58. The district court did
not reach that issue, however, and this brief does not discuss it because it
does not affect the issues on appeal.

**Confidential Material Redacted**

(the ███████ key) to access protected content. Google pointed out that

the claims do not require storing the ██████ key on each device, only "uti-

liz[ing]" the ████ key—making practical use of it. Appx2623-26. Google also

explained that Sonos's private device keys are "based on" domain infor-

mation because the █████ is an input used in generating each private device

key and the █████ and the private key are bound together. Appx2627-28.

As to the Authentication Theory, Sonos sought summary judgment on

three grounds. Sonos first contended that the accused players do not infringe

the method claims because the preamble of those claims recites registering a

new device into a domain of devices, whereas Google's theory addressed reg-

istering for a new third-party music service. Appx2243-45. Sonos next argued

that its authTokens are not "private keys" because they are used as a "data"

input to a cryptographic algorithm rather than a "key" input. Appx2245-48.

Sonos further argued that Google had no evidence that authTokens are

"based on" ██████ Appx2248-50.

Google countered those assertions too. As to the preamble of claim 1,

Google cited expert testimony that Sonos devices are programmed to authen-

ticate third-party content providers on a household-wide basis as part of the

Case: 25-1346    Document: 22    Page: 26    Filed: 05/15/2025
**Confidential Material Redacted**

process of adding a new player to a household. Appx2618-22. As to the "private key" limitation, Google contended that the claims do not require inputting the private key into a cryptographic algorithm and that, in any event, authTokens are input into cryptographic algorithms in which they are ███████ and shared across the household. Appx2611-13. Google further argued that Sonos was relying on an artificially narrow construction of "based on" and that authTokens are "based on" "domain information" because the ███████ is an input to the token-generation algorithm and each token is associated with a specific household. Appx2613-18.

The district court granted summary judgment of non-infringement under Google's Strong-Encryption Theory and deferred ruling on Google's Authentication theory. Appx4-31.

As to the Strong-Encryption theory, the court relied on two alternative grounds. It first posited that Google had identified Sonos's Controller app as a "device within the domain of devices" yet acknowledged that the Controller does not utilize a private key to access audio data because it is not a playback device. Appx28-29. Alternatively, assuming the "domain of devices" consisted of playback devices, the court held that during synchronized play-

**Confidential Material Redacted**

back the non-[internal technical process] players do not "utilize" any private key and instead merely receive "passive benefit" from the [internal technical process] use of its private key. Appx29. In so ruling, the court construed "utiliz[ing]" a private key as requiring direct, local decryption and rejected Google's reliance on a broader, ordinary-meaning construction ("to make use of" or "turn to practical use or account"). *Id.*

The court deferred ruling on Google's Authentication theory. It first addressed Sonos's argument that authTokens (the asserted "private keys") are not "based on" the [internal technical pro] (the asserted "domain information"). Rejecting Google's construction of "based on" ("produced in consequence of"), the court held that the patent required a "deterministic" relationship in which the domain information must "inform *which* key is issued, not just that *some* key is issued." Appx13-17. But because that construction was new, the court invited further briefing applying it to the facts. Appx17-18.

The court also requested further briefing on whether authTokens qualify as "private keys." Although it had previously construed the term "private key," it identified a latent dispute over whether a "private key" must be a "key" input to a cryptographic algorithm, as opposed to a "data input." Appx18-20.

Turning the preamble of the method claims, the court identified a genuine dispute of fact over whether Sonos's private device keys are issued as part of the process of registering new devices into a domain of devices. The court held that Google presented sufficient evidence that infringement occurs when a new device registers for a new third-party music service while registering into an existing domain of devices and receiving an authToken from the music service. Appx20-26.

### 3. The Order Granting Summary Judgment of Non-Infringement under Google's Authentication Theory

The parties filed supplemental briefing regarding the "private key" and "based on" limitations under Google's Authentication Theory of infringement. Appx3407-21 (Sonos); Appx3485-98 (Google); Appx3605-24 (Sonos rebuttal); Appx3773-80 (Google rebuttal).

Sonos contended that the claimed "private key" must be "a cryptographic key that is used as a key input (rather than as the data input) to a cryptographic algorithm," and that summary judgment of non-infringement followed from that construction. Appx3412-18. Google responded that Sonos's construction was too narrow because cryptographic algorithms in-

**Confidential Material Redacted**

clude authentication and ▇▇▇▇ algorithms and keys may be data inputs in those algorithms. Google further contended that Sonos's authTokens serve as private keys in Sonos's ▇▇▇▇ and ▇▇▇▇ algorithms. Appx3489, Appx3494-98; *see also* Appx3778-80.

Sonos additionally contended that there was no evidence that its authTokens are "based on" ▇▇▇▇ under the court's narrow construction of "based on." Appx3419-21. Google countered that Sonos's own documents showed that authTokens are "based on" ▇▇▇▇ because third-party music services check to see whether an authToken exists for a household and generate a new token/key only if there is none. Appx3491-94; *see also* Appx3775-77.

The district court granted summary judgment of non-infringement, holding that (a) a "private key" must be "a non-public cryptographic key that is used as the key input (rather than solely as the data input) to a cryptographic algorithm)," and (b) Sonos's authTokens are not "private keys" because they are used only as data inputs to ▇▇▇▇ and ▇▇▇▇ algorithms, not as keys controlling such algorithms. Appx32-59. Having disposed of the Authentication theory on that basis, the court declined to address infringement of the "based on" limitation. Appx58 n.13.

## Summary of Argument

**I. The summary judgment of non-infringement under Google's Strong-Encryption Theory should be reversed or vacated because the district court misconstrued both Google's arguments and "utiliz[ing]" a private key.**

A. The district court erred in holding that Google and its expert conceded this theory away. Sonos's Controller is a software application used to control playback by Sonos players; it does not play back music itself. Google's expert distinguished between Sonos players, which must utilize a private key to access protected content, and the Controller, which does not access protected content and thus needs no key. The expert gave alternative opinions about whether the Controller is a part of the domain for purposes of a different limitation addressing where a new device must obtain domain information from, concluding that the limitation was satisfied either way. But he did not opine, and Google did not contend, that the Controller is a "device within the domain of devices" that must utilize the private key to access protected content. At most, Sonos identified ambiguous testimony on which it may cross-examine the expert at trial.

**Confidential Material Redacted**

B. The district court misconstrued "utilized by all devices within the domain of devices" to require direct, local use by each device, and it mischaracterized Google's infringement theory as relying on "passive benefit." Google's argument was, and is, that when a household of Sonos players is grouped for simultaneous playback, all of them rely on the ▮internal technical process▮ device's private key to access protected content and thereby utilize that key. Nothing in the claims or specification requires direct utilization of a key or that the protected content be accessed at a particular place or in a particular way. "Passive benefit" was a red herring. Google simply and correctly urged that "utiliz[ing]" should be given its plain and ordinary meaning: making use of or turning to practical use. This Court has repeatedly rejected efforts to impose direct- and local-use requirements, and Google raised a triable issue of material fact under the correct construction.

**II. The summary judgment of non-infringement under the Authentication Theory should be reversed or vacated because the district court's reconstruction of "private key" imported an unwarranted limitation.**

The district court initially, and correctly, construed "private key" as "[a] non-public key that is used as an input to a cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be

**Confidential Material Redacted**

computed." The claim language does not support an additional requirement that the "private key" control the cryptographic algorithm rather than functioning as the object of a cryptographic algorithm. And the specification supports Google's view that "private keys" may include authentication and authorization keys such as authorization tokens used in digital-█████████ algorithms as well as keys that control data encryption or decryption. In holding otherwise, the district court improperly relied on extrinsic evidence to narrow the construction contrary to the broader usage in the specification. And Google raised a triable issue of fact as to whether the accused authorization tokens qualify as "private keys" under the correct construction.

**III. The district court erred in holding that a private key is "based on" domain information only when the domain information dictates which key issues.**

The intrinsic evidence and ordinary English usage support Google's construction that a private key is "based on" domain information when the key issues as a consequence of a domain-information input and is associated with the domain information. The claim language confirms that the domain information need only be *a* factor in the issuance of the private key, not determinative of which key issues. If the applicants had wanted to require the

private key to determine the content of the domain information, they would have included such a limitation; they instead chose the looser phrase "based on." Contrary to the district court's suggestion, Google's construction does not read out any claim language. The specification confirms that the key issuer just needs to select a private key associated with the domain information in consequence of receiving of that information. The district court's further requirement that the content of the domain information determine the content of the key would reduce security, contrary to a key goal of the patent.

Google raised a genuine dispute of material fact under both of its infringement theories. Under the Strong-Encryption Theory, Sonos's private keys are "based on" domain information because they are generated in response to a request that includes that information and are associated with the domain identifier and other variables once issued. Under the Authentication Theory, Sonos's authorization tokens are "based on" domain information because that information is used to determine whether to issue a new key or a previously generated key. Extensive evidence supported that inference, including the facts that (a) Sonos players obtain authorization tokens by calling a function that takes domain information as an input, (b) Sonos requires the authorization tokens to be household-specific, and (c) third-

party providers store associations between the tokens and the domain infor-

mation.

## Standards of Review

This Court reviews summary judgments under the law of the regional

circuit, in this case the Ninth Circuit, and the Ninth Circuit reviews a grant

of summary judgment *de novo. Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 974

(Fed. Cir. 2022).

Claim construction is a matter of law reviewed *de novo*, except for sub-

sidiary factual issues regarding extrinsic evidence, which are reviewed for

clear error. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326-27 (2015).

## Argument

**I.   This Court should reverse or vacate the summary judgment of non-infringement under the Strong-Encryption Theory because the district court misconstrued both Google's arguments and the claim term "utiliz[ing]" a private key**

The district court granted summary judgment of non-infringement

under the Strong-Encryption Theory on two grounds. Both were erroneous.

### A.   Google and its expert did not concede that Sonos's Controller app is a "device within [the] domain of devices" that must "utilize" a private key to access protected digital content

The district court first erred in ruling that Google conceded that

Sonos's Controller app is a device within the claimed domain of devices that must, but does not, utilize a private key to access protected digital content. Appx28-29.

Everyone agreed that Sonos's Controller app is not a playback device itself, but instead a *software* application that runs on a mobile phone or other computing device and is used to *control* playback by Sonos players. The district court recognized as much in its summary-judgment ruling. Appx8-9 n.3 ("The Sonos App, i.e., 'Controller' is an application that is downloaded to a device, such as a mobile phone, used to control audio playback across a Sonos system, i.e., a set of Sonos players/speakers" (citing Appx2681-82 ¶ 105)). Sonos's User Guide confirms that the Controller is "the software provided by Sonos to control music from Sonos players." Appx2681 ¶ 105 (quoting SONOS-GVS-00002260).

Google's expert, Dr. Sherman, identified the accused Sonos players as "'187 Accused Instrumentalities" that can "play music wirelessly across multiple rooms," and he distinguished them from the Controller software used to control those devices. *See, e.g.*, Appx2681 ¶ 105; Appx2682 ¶ 107 (referring to communications between "[t]he Controller and '187 Accused Instrumentalities"); Appx2685 ¶ 113 (explaining that "a new '187 Accused

– 25 –

Instrumentality receiv[es] household setting from the Controller"). Dr. Sherman's diagram of Sonos households similarly distinguished the accused players from the Controller app that controls how the players play back:



Appx2683 ¶ 107.

Dr. Sherman based his description on a similar description of Sonos's system in one of Sonos's patents:



Appx2721-22 ¶¶ 175-176 (describing Figure 3A of Sonos's '951 patent and distinguishing Controller 308 from Zone Player devices 302, 304, 306).

Dr. Sherman accordingly testified that the set of playback devices in a Sonos household constitutes the "domain of devices" that access protected digital content and that the ████ constitutes the corresponding "domain information." Appx2738-39 ¶ 197. Dr. Sherman reached that opinion by applying the ordinary meaning of "domain information" "in the context of an *existing domain of devices which can access protected digital content.*" *Id.* (emphasis added).

Dr. Sherman distinguished the playback devices that access protected digital content from the Controller, which is not a device that can access protected digital content regardless of whether it is classified as within the household/domain. *Id.*; *see also* Appx2685-91 ¶¶ 113-126 (describing the process for joining an existing household in terms of a "new player," an "existing player," and the "Controller"). Excluding the Controller from the "existing domain of devices which can access protected digital content" comported with Sonos's own recognition that the Controller "never plays or even receives music (encrypted or otherwise)." Appx2253.

To be sure, Dr. Sherman occasionally referred to the Controller as a "device" within the household/domain, but that is the terminology that Sonos itself used in its '951 patent, which generically referred to the Controller as a "device" even though it is actually a software application. When Dr. Sherman described Figure 3A showing the Sonos household, he quoted portions of the '951 patent that collectively refer to zone players 302, 304, and 306 and Controller 308 as "devices 302, 304, 306, and 308." Appx2721-22 ¶175 (quoting '951 patent (8:61-9:6)).

Dr. Sherman's occasional references to the Controller as a "device" were not admissions that the Controller is "a device within the domain of devices" that must "utilize" a private key under Google's '187 patent. Dr. Sherman consistently identified the Sonos players that access protected content as "'187 Accused Instrumentalities," and he did not include the Controller as a "'187 Accused Instrumentality." *See, e.g.*, Appx2739 ¶198 (explaining that "the '187 Accused Instrumentalities receive[] household ID (i.e., domain information) corresponding to the domain of devices (i.e., household) from a device (i.e., the Controller or '187 Accused Instrumentality) within the domain of devices (i.e., member of the household)");

Appx2808 ¶ 291 (explaining that "the domain of devices refers to the user's household comprising the '187 Accused Instrumentalities").

The district court erred by focusing on Dr. Sherman's use of the word "device" without considering his full analysis. As Google's counsel explained during the hearing, "the [C]ontroller, itself, never accesses protected digital content" and therefore "won't utilize a key to access the private digital content." Appx3379 (24:13-18). The district court acknowledged that point at the hearing. *Id.* (24:19-21). In its summary-judgment ruling, however, it oversimplified Dr. Sherman's opinion when it repeatedly cited his statement that "the Controller … is part of the household (i.e., domain of devices)." Appx28-29 (citing Appx2744 ¶ 206).

Sonos's summary-judgment motion similarly relied on Dr. Sherman's agreement during his deposition that his opinion was that "a Sonos [C]ontroller is also part of the claimed domain of devices." Appx2253 (citing Appx2381 (39:12-15)). That testimony also did not preclude infringement under the Strong-Encryption theory because Dr. Sherman did not include the Controller among the '187 Accused Instrumentalities that play back music.

Dr. Sherman's testimony that Sonos's Controller is a "device within the domain of devices" addressed the separate limitation requiring a newly

added device to receive domain information "from a device existing within the domain of devices." Appx67 (7:65-67). Dr. Sherman presented two alternative theories why that limitation was satisfied. He first opined that even though the Controller is not a '187 Accused Instrumentality, it is still a member of the Sonos household and therefore "a device existing within the domain of devices." Appx2744-45 ¶¶ 206, 208. But he alternatively opined that if the Controller were *not* considered a "device existing within the domain of devices," then Sonos's accused products still infringe because the Controller receives the domain information from another Sonos player within the domain "before providing it to a new '187 Accused Instrumentality." *E.g.*, Appx2745-46 ¶ 209. In neither scenario is the Controller a playback device that needs to access protected digital content with a private key.

At most, Sonos and the district court identified an ambiguity and supposed inconsistency in Dr. Sherman's use of the terms "device" and "device within the domain of devices." Sonos may be entitled to cross-examine Dr. Sherman regarding that testimony. But Dr. Sherman and Google did not concede that Sonos's Controller software is a "device within the domain of devices" that must utilize a private key to access protected content. And Google's infringement argument did not depend on the Controller being a

"device existing within the domain of devices" that supplies domain infor-
mation to a newly registering player.

The district court thus erred in granting summary judgment of non-
infringement based on Google's supposed concessions.

**B.    A jury is entitled to find that all members of a synchronized
player group "utilize" the ▊▊▊ private key because the
▊▊▊ player must decrypt audio data with its private key
before each player can access the protected digital content**

The district court's alternative basis for granting summary judgment
of non-infringement under Google's Strong Encryption Theory depended on
an overly narrow construction of the phrase "utilized by all devices within
the domain of devices." The district court did not affirmatively construe that
phrase. Instead, it mischaracterized Google's infringement theory as requir-
ing "utilizing" to cover receiving a "passive benefit" and proceeded to reject
an argument that Google had not made.

The parties and their experts largely agreed on how Sonos players op-
erate when grouped for synchronous playback. In that mode, the grouped
players all play protected digital content that has been accessed with a ▊▊▊
private key stored on whichever player is ▊▊▊ the synchronized
playback. Appx2685 ¶ 112; Appx2859-61 ¶¶ 379-380; *see also* Appx9 (district

**Confidential Material Redacted**

court citing Appx2701-04 ¶¶ 147-151). Thus, even though every Sonos player has its own private key that may be used to access protected digital content when it is *not* synchronized with other players, only the ██████████ private key is used when protected digital content is accessed by multiple players that *are* operating synchronously. Infringement requires nothing more.

The district court held otherwise by focusing on where music decryption takes place in Sonos systems. Appx29 (reasoning that when Sonos players play music synchronously, "only ██ [Sonos] device uses the private key to decrypt music and transmits the decrypted music to the remaining devices"). But the independent claims of the '187 patent merely require that the private key be "for use in accessing the protected digital content." *E.g.*, Appx67 (8:6-8) (claim 1). They are agnostic to where and precisely how the decryption process takes place.

In the preferred embodiment described in the '187 specification, a "private key" decrypts a "content extraction key" rather than the protected content itself. Appx66 (6:58-60). The protected content is then decrypted with the "content encryption key." *Id.* (6:59-61). Sonos's system works similarly: a private key is used to decrypt a "content key," and that "content key" is then used to decrypt the content. Appx2859-61 ¶¶ 378-379.

– 32 –

The district court's statement that "only ▮ device uses the private key to decrypt music" when Sonos players are grouped for playback was both mistaken and irrelevant. The statement was mistaken because Sonos's private key does not decrypt music itself; it decrypts a content-extraction key that decrypts the music. More importantly, the statement was irrelevant because the claim language simply requires the private key to be "for use in accessing the protected content" and does not impose any restrictions on how such access is accomplished. Appx67 (8:3-8). In the '187 claims, a private key is "utilized" when a device *makes use* of it in the process of accessing protected digital content.

Contrary to the district court's suggestion, Google did not equate "utilizing" with obtaining "passive benefit." "Passive benefit" came up in Dr. Sherman's deposition when Sonos's counsel posed a hypothetical about riders on a bus, and Dr. Sherman referred to the benefit the riders get from the driver's use of the bus's ignition key. Appx2389-90 (85:17-86:2). The obvious flaw in Sonos's hypothetical was that riders do not drive buses, whereas synchronized Sonos players all access protected digital content. Moreover, Dr. Sherman stated in the same discussion that he "would *not* characterize" "utilized" as meaning "benefited from." Appx2390 (86:9-15)

(emphasis added) (explaining that he applied the plain and ordinary meaning of "utilize").

As Google explained in its opposition to Sonos's motion for summary judgment, "utiliz[ing]" should be given its plain and ordinary meaning, which includes "mak[ing] use of" or "turn[ing] to practical use." Appx2624 (citing Appx3278-82 (dictionary definitions)). Those definitions do not require direct, local utilization, and they do not exclude indirect or remote utilization. Properly understood, "utilizing" is a generic term that covers all manners of making use of or turning to practical use.

Although this Court has not construed "utilizing" in previous cases, it has construed more specific terms such as "analyzing," "web browsing," "sensing," and "identifying," and it has repeatedly refused to limit them to particular ways of performing those functions when the claim language recites no such limitations. For example, in *Intellectual Ventures II LLC v. Commerce Bancshares, Inc.*, the Court explained that "the permissible ordinary usage of 'analyzing data' is not limited to direct raw-data analysis" and instead covers "analyzing information about the data"—directly or indirectly. 682 F. App'x 891, 894 (Fed. Cir. 2017) (non-precedential). In *Cioffi v. Google,*

*Inc.*, the Court held that claimed "web browser process" did not require direct access to website data; indirect access sufficed. 632 F. App'x 1013, 1018 (Fed. Cir. 2015) (non-precedential). In *Lexion Medical, LLC v. Northgate Technologies, Inc.*, the Court likewise held that a limitation requiring "sensing the temperature of gas" covered both direct and indirect temperature measurement. 292 F. App'x 42, 49 (Fed. Cir. 2008) (non-precedential). And in *Roku, Inc. v. Universal Electronics, Inc.*, the Court held that claim language reciting connection data that "functions to identify" a function did not require the connection data *alone* to identify the function. No. 23-1019, 2024 WL 3042701, at *2 (Fed. Cir. June 18, 2024) (non-precedential).

The district court's cramped interpretation of "utiliz[ing]" is also inconsistent with this Court's precedent regarding "use" of a patented system. In *Centillion Data Systems, LLC v. Qwest Communications International, Inc.*, the district court held that customers did not "use" the system at issue because part of the system was located remotely and was physically possessed by another entity. 631 F.3d 1279, 1284 (Fed. Cir. 2011). But although this Court agreed with the district court that that "use" requires a party to "use each and every element of a claimed system," it made clear that "use" does *not* require direct, physical control, only that the components were made to

"work for their patented purpose." *Id.* (cleaned up). Just as the customers in *Centillion* "used" remote system components, all players in a Sonos household "utilize" the ▉▉▉ private key to access protected digital content even though only the ▉▉▉ physically possesses that private key.

The district court's ruling here also defies the principle of claim differentiation, which presumes that an independent claim is not limited to features specified in a dependent claim. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006). Dependent claim 6 adds to claim 1 the step of "utilizing the private key to decrypt a second encryption key, the second encryption key utilized to decrypt digital content." Appx67 (8:31-32). Claim 1 is necessarily broader, not just as a matter of claim differentiation, but also because it uses language specifying that the private key is "for use in accessing the protected digital content." *Id.* (8:6-7). Claim 1 thus requires that all devices in the domain of devices "utilize" the ▉▉▉ private key "for use in accessing the protected digital content." The scope of that limitation is broader than the specific actions described in the specification and required by claim 6, and it necessarily covers other manners of utilization. Neither the district court nor Sonos recognized the full breadth of claim

**Confidential Material Redacted**

1, and neither identified a persuasive reason for excluding indirect utilization.

Because the '187 claims cover both directly and indirectly "utilizing" a private key to access protected digital content, the district court erred in granting summary judgment on the ground that non-[internal technical process] players do not directly utilize the [internal technical process] player's private key.

## II. This Court should reverse or vacate the summary judgment of non-infringement under the Authentication Theory because the district court construed the claimed "private key" too narrowly

The district court also erred in rejecting Google's Authentication Theory on grounds that an authorization token cannot be a "private key." Importantly, Google's infringement theories were independent, and this Court may reverse or vacate on one regardless of whether it affirms on the other.

### A. The claimed "private key" need not control a cryptographic algorithm

Neither party has suggested that the applicants engaged in lexicography or disclaimer in drafting the claims to require a "private key." The meaning of "private key" is therefore the meaning that a person of ordinary skill in the art would ascribe to that term after reading the patent. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) (en banc). The district court,

however, flipped the interpretive script. It started with extrinsic evidence about "private keys" outside the context of the specification and asked whether that extrinsic evidence covered Google's construction. It considered the specification only after that, and only to confirm that the specification was consistent with the understanding it drew from the extrinsic evidence.

Concluding that "extrinsic evidence supports this reading," the district court construed a "private key" as a "non-public cryptographic key that is used as the key input (rather than solely as the data input) to a cryptographic algorithm," and ruled that a "cryptographic key refers to a string of characters that is designed to control a cryptographic algorithm." Appx56. But extrinsic evidence must yield to intrinsic evidence when the two conflict, and the court failed to appreciate that the extrinsic evidence it credited contradicted the specification and proceeded to impose additional requirements that the intrinsic evidence does not support.

### 1.    The claim language supports Google's construction

The district court initially construed "private key" to mean "[a] non-public key that is used as an input to a cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be computed." Appx2216-20. That construction was both correct and sufficient. In

the context of these claims, "any input into a cryptographic algorithm," including "authorization and authentication keys," can serve as a "private key," as long as the input is necessary to compute the output of the cryptographic algorithm. *See* Appx38 (reciting Google's construction).

The claim language does not support imposing additional requirements. The phrase "private key" requires that the key be non-public and indicates that it provides access, but by its terms it neither requires the private key to be "designed to control a cryptographic algorithm nor forbids the private key from "function[ing] as the object" of such an algorithm. *Contra* Appx56.

 The surrounding claim language also supports Google's construction. Claim 1 requires the "private key" to be issued "based on the domain information," to be "utilized by all devices within the domain of devices," and to be "for use in accessing the protected digital content within the digital-rights management system." Appx67 (8:4-8). Those limitations align with Google's construction, in which private keys may include authentication and authorization keys such as authorization tokens.

Sonos contended below that Google's construction was meaningless because almost anything can be an input to an algorithm. *See, e.g.*, Appx3614.

The district court likewise suggested that Google's construction allowed "using virtually any data as an input." Appx51. But those assertions ignored the related limitations and the district court's original claim construction, both of which limit the private key to inputs designed to allow access to content. Google's construction did not read the "private key" limitation out of the claims.

### 2.    The specification confirms that a "key" may, but need not, control a cryptographic algorithm

The district court's narrow construction improperly read limitations from some embodiments in the specification into the claims and improperly read other embodiments out of the claims.

The district court's amended construction required a "private key" to control the encryption or decryption functions of a cryptographic algorithm. Appx56. But the specification uses the term more broadly, explaining, via examples, that private keys may be used not only for controlling encryption or decryption of data, but also for generating or verifying digital signatures:

> The private key is used for *either* decrypting data *or generating digital signatures* and the public key is used for either encrypting data or verifying digital signatures.

Appx64 (2:47–49) (emphases added). The district court's revised construction demands that a private key *control* a cryptographic algorithm and not be its *object*. Appx56. But that accounts only for the first example above—"decrypting" or "encrypting" data, a process in which data is the object and another input controls the encryption. The revised construction ignores the second example. In that example, the digital signature is the result of the algorithm, not its object, and the signature is "generat[ed]" by multiple inputs to a cryptographic algorithm, not just the one that controls the algorithm.

Encryption involves transforming data into an unreadable form, and decryption reverses that transformation. *See* Appx2656. In those cases, the encrypted data is the object of the cryptographic algorithm.

In contrast, digital-signature and verification algorithms work by generating a signature—using, for example, an authorization token (the object) and a key that controls encryption of that token. They then use the encrypted signature and a different key as inputs to a verification algorithm. Appx43-44 (district court concluding that the signature comprises "the hashed and encrypted piece of data"); Appx2217 (district court concluding that "sign-[ing] a digital signature" is "a form of encryption"); Appx3846 (29:13–14, 31:2–5) (Sonos's counsel: "[W]hen you encode a digital signature, what

you're doing is you're encrypting it. … [I]t is used to either sign a digital signature, which is a form of encryption …."); Appx3512-13 ¶¶ 29-30.

In contrast to an encrypted message, a signing-and-verification process succeeds only if both inputs are correct. *See* Appx44 (explaining verification process). A signature or verification algorithm thus takes *two* inputs to "generate" the signature: the input that *controls* the algorithm and the input that is the *object* of the algorithm. *See, e.g.*, Appx19; Appx2657. The phrase "generating signatures" (causing the result, a signature) is broader than the phrase "encrypting" or "decrypting" data (acting on the object, data). If the applicants had intended the district court's narrow construction, the specification would have focused narrowly on controlling a cryptographic algorithm's action on an object, using language such as "encrypt an authorization token." And because generating a signature involves encrypting data, the specification's reference to generating a signature would be redundant if the district court's revised construction were correct.

Google's construction comports with the specification's inclusion of digital-signature algorithms because it covers things like authentication tokens that are used to generate a signature even though they themselves do not encrypt or decrypt data or otherwise control the cryptographic algorithm

involved. *See, e.g.*, *Advanced Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1374–75 (Fed. Cir. 2012) (declining to require a "perforated barrier" to contain punched holes, despite extrinsic evidence about meaning of "perforated," where the specification also disclosed an embodiment made from wires; reversing summary judgment of noninfringement predicated on the overly restrictive construction).

Nothing in the '187 specification evinces any intent to limit the claimed "private key" to a key that controls an encryption or decryption process. Such a limitation is not necessary for the invention to work. And the specification nowhere says that data input into a cryptographic algorithm and necessary for the algorithm to compute its output cannot qualify as a "private key."

The district court's contrary analysis focused on other examples in the specification and mistakenly treated them as limiting rather than illustrative. The court cited passages describing keys used for encrypting and decrypting data, rather than signing and verification. *See, e.g.*, Appx48-49 ("Per this passage, the DRM key encrypts and decrypts ...." (citing Appx65-66 (4:53-56, 6:57-62)); *id.* ("Namely, the DRM key controls encryption/decryp-

tion … [and] [t]he content encryption key … controls the encryption/decryp-

tion of content." (citing Appx65-66 (4:53-56, 6:57-62)). And it interpreted

those passages as limiting the scope of the claimed "private key." *See, e.g.*,

Appx48 ("Thus, the passage indicates that the DRM key functions as the re-

quired key that controls the DRM algorithm; it encrypts/decrypts a piece of

data …."); Appx49 ("The specification is thus consistent with Sonos's posi-

tion that … a data input—that *solely* functions as the object of such an algo-

rithm and does not control the algorithm—is not a key."). But as discussed

above, other passages *do* address generating or verifying a signature.

It is a bedrock principle that claims are not limited to disclosed embod-

iments, even if the specification describes only one embodiment. *Phillips*,

415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent

describes only a single embodiment, the claims of the patent must be con-

strued as being limited to that embodiment."). Moreover, the '187 specifica-

tion expressly points out that the claimed invention is *not* limited to the

disclosed embodiments. Appx67 (7:42–46) ("While the invention has been

particularly shown and described with reference to a particular embodiment,

it will be understood by those skilled in the art that various changes in form

and details may be made therein without departing from the spirit and scope of the invention.").

The intrinsic evidence thus supports Google's broader construction and does not support imposing the additional limitations Sonos urged and the district court adopted.

### 3.    The district court improperly elevated extrinsic evidence over the intrinsic record

The district court improperly used extrinsic evidence as its starting point to import limitations that were not grounded in the intrinsic record and that improperly narrowed the specification's disclosure.

The court started its analysis with extrinsic evidence. Appx41-43. It began by looking at examples of references to "keys" in background literature, concluding that they must "control[] the algorithmic function," Appx41. The court later relied heavily on the fact that the cited extrinsic evidence did not include definitions labeling an authentication token as a "private key." The court ran through a series of dictionary definitions addressing keys used in encrypting or decrypting messages. Appx50. It also looked to extrinsic evidence to see whether usage there matched Google's construction exactly.

Appx51-56 (discussing the OAuth 2.0 Authorization Framework and Kerberos protocol). But in so doing, the court used the extrinsic evidence to narrow the meaning of "private key" contrary to the broader usage in the specification, which includes keys used in generating signatures.

This Court has repeatedly warned against relying on extrinsic evidence "to limit the claim scope in a manner not contemplated by the intrinsic record." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1375 (Fed. Cir. 2022). In *Genuine Enabling*, the district court construed the term "input signal." *Id.* at 1374. The "input signal" had been properly limited based on the intrinsic record to those "of audio or higher frequency." *Id.* Citing extrinsic evidence about what a person of ordinary skill in the art would have understood, the district court went further and limited the term to signals above 500 Hz. *Id.* This Court concluded that it was error to read the term more narrowly than the intrinsic record when the intrinsic record itself did not clearly refer to a 500 Hz cutoff. *Id.* at 1374–75.

Likewise, in *Bennett Regulator Guards, Inc. v. Atlanta Gas Light Co.*, this Court rejected an attempt to use extrinsic evidence to limit a claim term to a particular kind of regulator known as a Fisher regulator when the specification did not support such narrowing. 825 F. App'x 773, 778 (Fed. Cir. 2020).

And in *Tegal Corp. v. Tokyo Electron America, Inc.*, this Court rejected an attempt to use extrinsic evidence (a physics textbook) to narrow the scope of "glow discharge" to a particular range of current when "[n]either the claims, the specification, nor the prosecution history even suggest[ed] that the claimed plasma [was] limited to the particular range of current" in that reference. 257 F.3d 1331, 1345 (Fed. Cir. 2001).

The district court also erred in concluding that the testimony of Google's expert, Dr. Sherman, supported Sonos's construction. Appx50-51. According to the court, both sides' experts agreed that a key is a string of characters designed to control the algorithm. Appx41. But Dr. Sherman said no such thing. His testimony was consistent with Google's construction and with the specification's disclosure that a cryptographic key may be used not only for encryption, but also for "computing a digital signature." Appx1192 ¶ 56. The court cited Dr. Sherman's testimony that "if you don't know the key, you cannot compute [the algorithm's] output," Appx51 (quoting Appx3429 (16:5–9)), but there was no dispute about that requirement, and the court's original construction already imposed it.

In any event, even if Dr. Sherman's testimony was ambiguous, the court erred in elevating it over the intrinsic record. *See, e.g., On-Line Techs.,*

**Confidential Material Redacted**

*Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1139 (Fed. Cir. 2004) (vacating construction of "substantially spherical … surface" term that excluded toroids where the specification referred to toroids, despite extrinsic evidence that a toroidal surface differs mathematically from a spherical surface); *U.S. Ethernet Innovations, LLC v. Acer, Inc.*, 646 F. App'x 929, 933–35 (Fed. Cir. 2016) (refusing to read a minimum storage capacity into a "buffer memory" claim term because the claims and specification did not impose that limitation; rejecting expert testimony to the contrary).

## B.    There is a genuine dispute of material fact over whether the accused authTokens satisfy the "private key" limitation

Under the correct construction, there is a genuine dispute of material fact regarding whether Sonos's authTokens operate as "private keys" in Sonos's AppLink authentication method. As the district court recognized, the evidence must be viewed in Google's favor at the summary-judgment stage, and "there is circumstantial evidence in the record that the [accused] [a]uthToken may be cryptographically ▮▮▮▮ and ▮▮▮▮ Appx57-58 (citing Appx19); *see* Appx2756-58 ¶¶ 232-234.

An authToken qualifies as a "private key" in at least two ways. First, an unsigned authToken is non-public and input into a ▮▮▮▮ algorithm

with a private "device key" to generate a [internal technical process] authToken that cannot be generated without both inputs. Appx3534-35 ¶¶ 78-81; *see also* Appx3532-34 ¶¶ 74-76 (citing code). Second, the [internal technical process] authToken is also a private key because it is input into the [internal technical process] algorithm, and [internal technical process] cannot be performed without it. Appx3535-37 ¶¶ 82-85; Appx2756-58 ¶¶ 232-234 (citing code).

In short, the district court's grant of summary judgment depended on its mistaken construction of "private key," and summary judgment was improper under the correct, broader construction. The summary judgment should therefore be reversed. *See Advanced Fiber*, 674 F.3d at 1376.

## III. This Court should reverse the district court's holding that a private key is "based on" domain information only when the domain information dictates which particular key issues

Although the district court ultimately granted summary judgment of non-infringement of the "utilized" and "private key" limitations, it construed the "based on" limitation in Sonos's favor, and Sonos contended that it was entitled to summary judgment of non-infringement of that limitation as well. Because Sonos is likely to re-urge the same arguments on remand, this Court should clarify that the district court also erred in construing "based on."

– 49 –

Case: 25-1346    Document: 22    Page: 60    Filed: 05/15/2025

**A.    A key is "based on" domain information when it is issued as a result of a domain-information input and associated with that domain information**

Claim 1 of the '187 patent requires

> providing the domain information to a key issuer, …
> causing the key issuer to issue a private key to the
> new device, wherein the private key is *based on* the
> domain information.

Appx67 (8:1–5) (emphasis added); *see also* Appx68 (9:4–9) (claim 12: "causing the key issuer to issue a private key for use in accessing protected digital content to the apparatus, wherein the private key is *based on* the domain information" (emphasis added)).

At the *Markman* stage, Sonos did not propose to construe "based on." *See* Appx13. But when Sonos moved for summary judgment, its arguments relied on a new, deterministic construction that required the content of the domain information to determine *which particular* private key is generated. Appx14; Appx2260-63. Google, in contrast, argued that a private key only needed to be produced in consequence of the domain information. Appx2616-17; Appx13-14.

The district court adopted Sonos's construction over Google's, holding that "[i]t is not enough that the key be produced 'in consequence' of the

domain information" and that the domain information must be "used to *determine which key is issued in the first instance*." Appx17 (emphasis added). That construction was erroneous.

### 1.    The claim language supports Google's construction

The claim language and its context confirm that the domain information need only be *a factor* in the issuance of the private key, not determinative of which key issues.

The district court and Sonos focused on the words "based on" in isolation, disregarding the context in which they appear: "providing the domain information to a key issuer, … causing the key issuer to issue a private key to the new device, wherein the private key is based on the domain information." Appx67 (8:1-5). In context, "based on the domain information" refers not just to the key but also to the process by which the key is issued.

Even apart from that context, the construction was inconsistent with ordinary English usage of "based on." For example, legal briefs typically make arguments "based on" the record. Those arguments are associated with the content of the record, but the record evidence would not determine *exactly which* arguments appear in the brief. Likewise, the popularity of a novel such as *The Count of Monte Cristo* may prompt a studio to create a

movie "based on" it. No one would think that the novel exactly determined the content of the movie. The studio could take substantial liberties so long as they were associated. Years later, another studio might do a remake also "based on" the novel, and the two films could have substantial differences.

The claim language and context do not dictate the narrow deterministic relationship that Sonos advanced and the district court adopted. If the applicants had intended to require the private key to be determined by the specific content of the domain information, they would have written the claims that way. They instead used the looser phrase "based on." The district court also erred to the extent it suggested that the domain information must be the *only* factor determining the private key. Such a limitation is inconsistent with the broad claim language. *See Masimo Corp. v. Sotera Wireless, Inc.*, No. 2022-1415, 2023 WL 6307959, at *2 (Fed. Cir. Sept. 28, 2023) (citing broad plain meaning of "based on" and rejecting narrow construction of "based on" that would have excluded additional bases).

The district court reasoned that Google's definition would "render additional language in the claim superfluous," Appx16-17, but it would not. The district court inserted into the claim language the phrase "issued in consequence of *providing the* domain information," Appx14 (emphasis added),

rather than "issued in consequence of the domain information" as Google proposed:

> A method for registering a new device as part of a domain of devices ... comprising the steps of ... providing the domain information to a key issuer ... causing the key issuer to issue a private key to the new device ... wherein the private key is [issued in consequence of providing the domain information].

Appx13-14 (brackets in original; emphasis omitted). From there, the court reasoned that providing the domain information *already* "caus[ed] the key issuer to issue a private key." Appx14. But that was not Google's proposed construction. "Based on" requires that the private key issue in consequence of the domain information itself, not in consequence of *providing* it. *See* Appx2616-17.

Under Google's construction, there is no superfluity because the surrounding claim language does not recite the "based on" relationship. An illustration shows why. Suppose a system returned the same private key to all users upon receiving any domain information. That would constitute "providing the domain information to a key issuer" and "causing the key issuer to issue a private key," but it would not constitute issuing a private

key that is "based on the domain information." Conversely, suppose a system created a new key for each unique domain information from a preexisting list of domain information, but issued a private key only upon a separate manual request from a system administrator. That would satisfy Google's construction of "based on" but not additional requirement of "providing the domain information to a key issuer" and "causing the key issuer to issue a private key." Google's construction reads nothing out.

### 2.    The specification also supports Google's construction

The specification discusses an exemplary key issuer 105 that uses a secure authentication protocol to ensure that an issued key is not sent to the wrong domain when a new device wants access. Appx65 (4:12-20). That protocol includes an exchange of domain information. *Id.* (4:24-28). Before issuing a key, key issuer 105 "checks the domain information" that was exchanged. *Id.* (4:30). If the domain information is already associated with a key, "key issuer 105 looks up that domain's DRM public/private key pair in a database" and issues the associated key to the device. *Id.* (4:33-35). If the domain information indicates that the domain is new, "key issuer 105 creates a new DRM public/private key pair," *id.* (4:30-33), and issues the newly associated key to the device, *id.* (4:39-41).

The specification thus makes clear that "causing the key issuer to issue a private key …, wherein the private key is based on the domain information" means that the key issuer issues a private key that is associated with the domain information: the selection of the key is in consequence of the domain information. Beyond an association between the key and the domain, the specification imposes no requirements about how the particular key is chosen. For instance, the specification does not detail anything further about the key-creation process for a new domain other than that the issuer "creates *a* new … key pair." *Id.* (4:30-33) (emphasis added). The specification does not describe using the content of the domain information to specify which new key issues. And even if it did, the specification makes clear that the examples provided are not limiting. Appx67 (7:42-45).

Moreover, there is no reason to require a key issuer that is creating a new key to use the content of the domain information to determine exactly which new key issues. Doing so would only *reduce* security. A private key has the advantage of being both secret and arbitrary. *See, e.g.*, Appx1433 ¶ 82, Appx1435 ¶ 88 (Sonos's expert: a private key "has to be kept secret to ensure the security of the cryptosystem," and the system's security "depends on … uncertainty as to the value of the private key"); Appx2655 ¶ 50 (Google's

expert explaining that a key is a "randomly generated sequence of bits"). Linking the content of the private key to a non-arbitrary, not-necessarily-private input would undermine both of those properties and would be inconsistent with the purposes articulated in the patent: "implement[ing] secure measures" and "help[ing] prevent piracy." Appx65 (4:12-13). And there would be no apparent benefit. The patent criticizes prior-art systems that "allow[ed] devices to be enrolled into a domain by simply obtaining a user's domain information" and warned of insecurities if a user can "simply typ[e] in the domain information." Appx67 (7:17-24). If the domain information determined exactly which key issued in the first instance, similar trouble would result. The same logic explains why IT departments tell users not to include their usernames or personal details in their passwords.

The district court's construction thus imposes a limitation that the specification does not require and that runs contrary to what the specification teaches.

**B.    There is a genuine dispute of material fact regarding the "based on" limitation under both of Google's infringement theories**

Regardless of whether this Court adopts Google's or Sonos's construction of "based on," genuine disputes of material fact preclude summary

judgment under both of Google's infringement theories.

### 1. There is a genuine dispute over whether Sonos's private device keys are "based on" the ██████

In response to Sonos's summary-judgment motion on the Strong Encryption Theory, Google explained that Sonos's private device key (the "private key") is "based on" Sonos's ██████ (the "domain information") because the private device key is generated in response to a request that includes the ██████ Appx2627-28. The district court did not reach this issue, Appx27-30, and summary judgment was unwarranted.

When a Sonos player registers into a household, it downloads a private device key and a ██████ from the registration service. Appx2813-25 ¶ 295. Google presented source code and documentation confirming that the ██████ is used to generate the private device key and that the two are bound together. Appx2813-28 ¶¶ 295-309; *see also* Appx2691 ¶¶ 124-126 (explaining the process). The source code showed, for example, that the private device key is generated in response to a "prepare registration" request from the Controller to the registration service and that the function that generates that request includes the ██████ as an input. Appx2815-16 ¶ 297. Sonos's system

**Confidential Material Redacted**

also checks whether a [internal technical process] containing a private device key already exists or a new [internal technical process] is required, Appx2816-18 ¶ 298, and it returns a private key that it associates with the [internal technical pro] and other variables, Appx2821 ¶ 301. Dr. Sherman identified the lines of source code on which he relied for each part of the process. Appx2815-22, Appx 2823-25 ¶¶ 297-303, 307-308.

That evidence suffices for a reasonable jury to find that the private device key is "based on" the [internal technical pro] regardless of whether "based on" is given an associational or causal construction. Sonos disagreed, citing its own expert's interpretation of the source code, Appx2259-63; Appx3347-49, but that at most created a battle of the experts for the jury to resolve. Sonos also argued that its private device key are not "based on" the [internal technical pro] because different devices in a household may have different private device keys. Appx2259-60. But that argument ignores that the claims do not require the private key to be based *solely* on the domain information.

> **2.    There is a genuine dispute over whether Sonos's authTokens are "based on" the [internal technical]**

In response to Sonos's summary-judgment motion on the Authentication Theory, Google explained that Sonos's authTokens (the private keys)

**Confidential Material Redacted**

are "based on" Sonos's ███████ (the domain information) because the do-

main information is used to determine whether to issue a new key (for a new

household) or a previously generated key (for an existing household).

Appx3492-94; Appx3775-77. The district court did not reach this issue,

Appx58 n.13, and summary judgment was unwarranted.

In testifying that the accused products satisfy the "based on" limita-

tion, Dr. Sherman relied on both Sonos's software and Sonos documentation

describing the functionality Sonos requires of third-party music providers.

Although Google did not have source code from third-party providers, it pre-

sented circumstantial evidence from which a reasonable jury could and

likely would infer that third-party music providers issue authTokens "based

on" the ███████ provided:

*Sonos players obtain authTokens by calling a function that takes the* ███████

*as an input.* Sonos's source code shows that devices call a ███source code███

███source code███ function to get an authToken for a device. Appx3657 (74:22-75:4); *see*

*also* Appx3520-21 ¶ 52; Appx2696 ¶ 136. That function takes the ███████ as an

input, and it is logical to infer that the outputs of a function are based on the

inputs. Appx2696 ¶ 136; Appx3520-24 ¶¶ 52, 54, 56.

*Sonos requires authTokens to be household-specific.* Sonos's documentation explains that third-party providers must follow its requirements, and it indicates that an authToken is specific to an ███████ Appx3657 (75:17-22). A user may connect to multiple households, and in that case each household will have a different authToken. *Id.* (77:7-9); Appx3524-25 ¶ 57. To achieve that result, the third-party provider must ensure that the authToken for each household is unique. Appx3657 (77:4-15).

*Third-party providers store associations between authTokens and* ███████ Sonos's documentation indicates that all devices within a household share the ████ authToken for a given third-party provider. Appx3657-58 (77:18-79:2). Logically, a third-party provider must track household-to-authToken associations so that it can return the ████ key for a given ████ *Id.* Dr. Sherman also cited a **source code** function that returns the current authToken, again necessitating an association between the authToken and the ███████ Appx3658 (78:16-24, 79:16-80:6).

Taken together, that evidence is enough for a reasonable jury to find that Sonos's third-party authentication process checks the ████ and returns either a new authToken or an existing, associated one, Appx3526-27 ¶ 59, thus "providing the domain information to a key issuer, … causing the

key issuer to issue a private key to the new device, wherein the private key is based on the domain information." That evidence suffices regardless of whether "based on" requires an associational or causal relationship between the private key and the domain information. Sonos argued that Google lacked *direct* evidence of each third party's process and that key issuance could operate in another way. But those arguments went to the *persuasiveness* of Google's evidence and must be left for a jury to consider. *See Medtronic, Inc. v. Teleflex Innovations S.A.R.L.*, 70 F.4th 1331, 1340 (Fed. Cir. 2023) (circumstantial evidence suffices).

## Conclusion

This Court should reverse or vacate the judgment of non-infringement and remand for further proceedings.

Respectfully submitted,

Quinn Emanuel Urquhart & Sullivan, LLP

Perkins Coie LLP

/s/David A. Nelson

/s/Dan L. Bagatell

David A. Nelson

Dan L. Bagatell

Counsel for Appellant Google LLC

– 61 –

**ADDENDUM**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GOOGLE LLC, | Case No. 3:20-cv-03845-EMC |
| Plaintiff, | **[PROPOSED]** **FINAL JUDGMENT** |
| v. | |
| SONOS, INC., | |
| Defendant. | |

Pursuant to Federal Rule of Civil Procedure 58, Plaintiff Google LLC ("Google") and Defendant Sonos, Inc. ("Sonos") (collectively, "the parties"), by and through their respective undersigned counsel of record, and subject to the approval of the Court, hereby stipulate and agree to entry of final judgment as follows:

WHEREAS, Google previously asserted that Sonos infringed claims of U.S. Patent No. 8,583,489 ("'489 patent"), U.S. Patent No. 7,899,187 ("'187 patent"), U.S. Patent No. 7,065,206 ("'206 patent"), U.S. Patent No. 10,140,375 ("'375 patent"), and U.S. Patent No. 10,229,586 ("'586 patent");

WHEREAS asserted claims 1-11 and 13-20 of the '375 patent and asserted claims 1-5, 7-12, 14-16, and 18, 20 of the '586 patent were found invalid, cancelled by the U.S. Patent and Trademark Office ("PTO"), and the PTO's judgments were affirmed by the Federal Circuit in May 2024 (for the '586 patent) and June 2024 (for the '375 patent);

WHEREAS the Court previously dismissed Google's cause of action of infringement related to the '206 patent with prejudice and Sonos's defenses without prejudice (Dkt 107);

WHEREAS Google's claims for infringement of U.S. Patent No. 8,583,489 were dismissed under Rule 12(b)(6) with prejudice on the grounds that the patent is subject-matter ineligible under 35 U.S.C. § 101 (*see* Dkt. 60);

WHEREAS the Court granted Sonos's motion for summary judgment of non-infringement as to claims 1, 3, 4, 10, and 12 of the '187 patent pursuant to Google's Strong Encryption Theory on May 7, 2024 (*see* Dkt. 206); and

WHEREAS the Court granted Sonos's motion for summary judgment of non-infringement as to claims 1, 3, 4, 10, and 12 of the '187 patent pursuant to Google's Authentication Theory of Infringement on October 2, 2024 (*see* Dkt. 228);

NOW, THEREFORE, the parties hereby jointly stipulate and agree, subject to the approval of the Court, to the following concerning Google's outstanding claims and Sonos's outstanding defenses:

1. Judgment is entered for Sonos and against Google that the '187 patent is not infringed.

[PROPOSED] FINAL JUDGMENT

**Appx2**

2. Google's claims of infringement of the '375 patent are dismissed with prejudice and Sonos's defenses related to the '375 patent are dismissed without prejudice.

3. Sonos's motion for judgment on the pleadings for dismissal of the '375 patent under 35 U.S.C. § 101 (D.I. 127) is denied as moot.

4. Google's claims of infringement of the '586 patent are dismissed with prejudice and Sonos's defenses related to the '586 patent are dismissed without prejudice.

Taxable costs will be addressed by separate order. Each party shall bear its own attorneys' fees.

IT IS SO ORDERED

DATED: December 2, 2024

The Honorable Edward M. Chen
United States District Court Judge

Appx3

[PROPOSED] FINAL JUDGMENT

1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   GOOGLE LLC,                          Case No.  20-cv-03845-EMC

8              Plaintiff,                **FILED UNDER SEAL**

9        v.                              **ORDER GRANTING IN PART AND
                                         DEFERRING IN PART DEFENDANT'S**
10  SONOS, INC.,                         **MOTION FOR SUMMARY
                                         JUDGMENT**
11             Defendant.

12                                       Docket No. 185

13

14                    I.      **OVERVIEW**

15          This case involves three patents that Plaintiff, Google, LLC ("Google") accuses Defendant

16  Sonos, Inc. ("Sonos") of infringing.  Defendant Sonos has moved for summary judgment as to

17  non-infringement of one of the three patents at issue in the suit: the '187 patent.  *See* Docket Nos.

18  184 (Defendant's Unsealed Motion for Summary Judgment ("Mot.")), 185 (Sealed Motion for

19  Summary Judgment).  Google opposes this motion and argues that infringement is, at a minimum,

20  a triable issue.  *See* Docket Nos. 189 (Plaintiff's Unsealed Opposition to Defendant's Motion for

21  Summary Judgment ("Opp.")), 191 (Sealed Opposition).

22          Based on the undisputed evidence in the record, and in viewing this evidence in favor of

23  the nonmoving party, Google has not offered sufficient evidence to support a jury finding that the

24  accused products infringe under the Strong Encryption Theory of infringement.  As to the

25  Authentication Theory, in light of further claims construction issues raised herein, the Court finds

26  further briefing is warranted.  Accordingly, the Court **GRANTS** Sonos's motion for summary

27  judgment of non-infringement regarding the Strong Encryption Theory, and **DEFERS** ruling in

28  full as to the Authentication Theory of infringement, pending further briefing as described herein.

United States District Court
Northern District of California

**Appx4**

## II.   FACTUAL BACKGROUND

A.   '187 Patent and Accused Products

Google is the owner of U.S. Patent No. 7,899,187, titled "Domain-Based Digital-Rights Management System with Easy and Secure Device Enrollment," ("the '187 patent"), which was issued by the United States Patent and Trademark Office ("USPTO") on March 1, 2011.  *See* Docket No. 108 (Claims Construction Order) at 1-2 (citing Docket No. 107 ¶ 21).

The patent provides a way for users with multiple media players to obtain access to protected content (*e.g.*, songs provided by streaming services like Pandora or Spotify) while ensuring the content remains protected from copying or unauthorized access.  *See* '187 patent, 1:14-37.  This is done through a digital rights management system ("DRM system") that oversees a domain of devices (as opposed to individual devices standing alone) that shares a common user account.  Claims Construction Order at 1-2; '187 patent, Abstract at 1:26-29.  The patent describes arranging media players and devices into said domain, and also, describes providing the devices in that domain with a private key that the devices can use to access the DRM-protected content.  *See* '187 patent, Abstract.

To illustrate: when a new device joins the domain, it obtains domain information from an existing device within the domain.  *Id.* at 2:2-6.  The new device then provides that domain information to a "key issuer" that is not within the domain.  *Id.*  The external key issuer, in response provides the new device with the shared private key of the domain.  *Id.*  Claims 1 and 10 recite a method and device directed to this process.  *See* Appendix of Claims, '187 Patent.  The purpose of the '187 patent is to address the problem of confidentiality and security of protected digital content.  *Id.*  There are two problems with conventional DRM systems.  First, "a user faces the potentially cumbersome task of registering all of his devices into a domain."  Claims Construction Order at 1-2 (citing '187 Patent, 1:40-42).  Second, "the security of content in a domain is potentially threatened if users can remotely register devices into a domain over a long distance."  *Id.* (citing '187 Patent, 1:42-45).  Thus, the patent states that "a need exists for domain-based digital-rights management with easy and secure device enrollment that increases the security of content."  *Id.* (citing '187 Patent, 1:45-48).

2

**Appx5**

**Confidential Material Redacted**

1    To this end, the '187 patent describes the issue, and the manner in which the patent

2    addresses the concern:

3    
> It is much easier for a user if [the digital-rights management]
> information can be obtained directly from a device that is already in
4    
> the domain. However, merely allowing a new device to obtain
> domain information from an existing device is not sufficiently
5    
> secure for enrolling the new device into the domain. Security is
> greatly enhanced if the new device then needs to send this DRM
6    
> information to a trusted server (i.e., a key issuer) to complete its
> enrollment into the domain. With this approach, the key issuer can
7    
> actively enforce domain enrollment and help improve security.

8    '187 Patent, 2:24-33.

9    Google alleges infringement against a number of Sonos devices that are referred to as

10   "players" or "player devices."[1]  *See* Sherman Rpt. ¶ 73.  Sonos's players allow users to play music

11   in their home and to control the speakers through a smartphone or other computer.  Opp. at 2.

12   Players that are part of a common subnet (such as a WiFi network) can be placed into a

13   "household."  Sherman Rpt. ¶ 108.  Multiple players in a household can be grouped together to

14   play music synchronously (*e.g.*, in the living room and kitchen).  *Id.* ¶¶ 110-12.

15   B.   <u>Theories of Infringement</u>

16   Google sets forth two theories of infringement: the "Authentication Theory" wherein

17   Google accuses the process by which Sonos Players interacts with a third-party music service

18   (*e.g.*, Spotify) permitting the players to access the third-party digital content (*e.g.*, play music);

19   and the "Strong Encryption Theory" which relates ████████████████████████████████████

20   ████████████████████████████    *See* Opp., Ex. 4, (Sherman Dep. Tr.) at 45:21-46:12.  The

21   claims in the '187 patent at issue are as follows:

22   

23   
> 1. A method for registering a new device as part of a domain of
> devices, which share rights associated with a common account, for
24   
> use in accessing protected digital content within a digital rights
> management system, the method comprising the steps of:

25   
> receiving domain information corresponding to the domain

26   _____

27   [1] The accused players include the Sonos One, One SL, Play:1, Play:3, Five, Play:5, Arc,
     Playbar, Playbase, Beam, Move, Connect:Amp, Amp, Connect, and Port. Opening Expert Report
28   of Alan T. Sherman ("Sherman Rpt.") ¶ 73.

United States District Court
Northern District of California

3

of devices from a device existing within the domain of devices;

providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices; and

receiving the private key from the key issuer for use in accessing the protected digital content within the digital-rights management system.

3. The method of claim 1 wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving domain information for the device existing within a domain of devices, all devices within the domain sharing account information.

4. The method of claim 1 wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving the domain information over a short range link.

10. An apparatus comprising:

communication circuitry receiving domain information from a device existing within a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system;

storage for storing the domain information; and

logic circuitry for providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key for use in accessing protected digital content to the apparatus, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices.

12. The apparatus of claim 10 wherein the domain of devices share account information.

'187 Patent, 7:1-9:10.

1. <u>Authentication Theory</u>

Google argues the process of adding a music service to a Sonos household infringes upon the '187 patent.  Specifically, Google discusses claim 1 of the '187 patent which described "[a] method for registering a new device as part of a domain of devices," wherein a "key issuer" provides a "private key to the new device, wherein the private key is based on the domain

4

**Appx7**

**Confidential Material Redacted**

information is utilized by all devices within the domain of devices." '187 patent, claim 1.

Google's Authentication Theory of infringement can be summarized as follows. *See* Sherman Rpt. ¶¶ 108-112, 138, 153, 155, 238, 246. A Sonos "Household," is a group of speakers on a shared network, via WiFi, that shares a unique household identification ("HHID" or "household ID"). *Id.* ¶ 108. To register the third-party music service (like Spotify) with the household, a Sonos device in the household (i.e., a Sonos speaker or player[2]) sends a "getDeviceAuthToken" request to a third-party music service which is a message including the household ID, among other information. *Id.* ¶¶ 153, 155, 238, 246. The third-party music service sends back an "AuthToken" to the registering Sonos speaker device, that is later used to communicate with the third-party music provider; the Sonos speaker uses the AuthToken to obtain access to the music service. *Id.* ¶¶ 153, 155. Google alleges that this process infringes claim 1 of the '187 patent as: the "Household" is akin to the "domain of devices,"; the third-party music provider is the "key issuer,"; the "AuthToken" is the private key provided by the third-party music provider; and the household ID is the domain information that the private key is "based on."

Sonos seeks summary judgment finding non-infringement under the Authentication Theory, arguing: (1) the "AuthToken" is not a "private key"; (2) the AuthToken is not "based on" the household ID; and (3) the preamble of claim 1 ("A method for registering a new device as part of a domain of devices . . . ") is not performed because the registration process occurs in a manner deemed insecure by the patent. *See* Mot. at 5-7.

2. <u>Strong Encryption Theory</u>

Google also argues that the Sonos product registration process, ████████████ ████████████████████████████████████████████████████ infringes the '187 patent. This is referred to as the "Strong Encryption Theory."

When a user buys a new Sonos player the user must set up the player onto a network and register the play using the Sonos App, also known as the "Controller."[3] ███████████

_____
[2] The Sonos devices at issue are referred to interchangeably throughout this order as a Sonos "speaker" or "player." Both terms refer to a Sonos device that plays music and other audio.

[3] The Sonos App, i.e., "Controller" is an application that is downloaded to a device, such as a

**Confidential Material Redacted**

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ██████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 ███████████████████████████████████████████████

6 ████████████████████████████████  ████████████

7 ████████████████████████████████████████████

8 ██████████████████████████████████████████

9 ████████████████████████████████████████████████

10 ████████  ██████████  ████████████████████████████

11 ██████████████████████████████████████  ████████ .

12        Sonos players are also able to be formed into groups so that they can play media across

13 different rooms in a synchronized manner.  A group of players will have one player designated as

14 a "group coordinator."  *Id.*  ¶ 112.  When a group of players wants to play encrypted content

15 together, ████████████████████████████████████████████████████

16 ████████████████████████████████████████████

17 █████████████████████████████████████████ .  *Id.* ¶¶ 147-151.

18        As to this theory, Sonos argues summary judgment in its favor is appropriate because: (1)

19 the private key is not "utilized by all devices within the domain of devices"; (2) the private key is

20 not "based on" the domain information; and (3) the preamble for method claims 1, 3, and 4 is not

21 performed.  *See* Mot. at 14.

22

23 _____

24 mobile phone, used to control audio playback across a Sonos system, i.e., a set of Sonos
players/speakers.  *See* Sherman Rpt. ¶ 105 (citing SONOS-GVS-00005565 at 5568; SONOS-GVS-00001379 at 1383).

25 [4] ████████████████████████████████████████████████

26 ██████████████████████████████████████████████████

27 ████████████

28 [5] ██████████████████████████████████████████████

**Appx9**

### III.    LEGAL STANDARD

A.    Summary Judgment

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A dispute is genuine if it could reasonably be resolved in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it could affect the case outcome.  *Id.*  The burden of establishing the absence of a genuine issue of material fact lies with the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The Court must view the evidence in the light most favorable to the non-movant. *Anderson*, 477 U.S. at 255.   Ultimately, "[s]ummary judgment is appropriate when it is apparent that only one conclusion as to infringement could be reached by a reasonable jury." *TechSearch, L.L.C v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) (citations omitted). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

B.    Claim Construction

The Court previously construed terms in the '187 patent but the parties now dispute the meaning of the terms "private key," "based on," and "utilize" which the Court did not previously construe.  *See* Docket No. 6-15 (construing terms "domain information," "Logic Circuitry," and "Private Key" as used in the '187 patent).[6]

Claim construction is a question of law, although it may contain factual underpinnings. *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1357 (Fed. Cir. 2016).  "The purpose of claim construction is to 'determin[e] the meaning and scope of the

---

[6] Though the parties do not expressly request additional claim construction, they now dispute the meaning of the terms.  *See, e.g.*, Mot. at 12; Opp. at 8-11; Reply at 6-7.  As a general matter, construing the terms of the claims is appropriately done by the judge and not the jury.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  A district court may construe claims, as needed, in the context of a summary judgment motion.  *See id.* at 981; *see also Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (finding the district court impermissibly delegated to jury the task of determining scope of claim by instructing jury to give terms plain and ordinary meaning where parties actively disputed terms' scope).

United States District Court
Northern District of California

7

**Appx10**

patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)).

It is a bedrock principle of patent law that "the claims of a patent define the invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). The words of a claim are generally given their "ordinary and custom meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); *see also Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed."). The inquiry into how a person of ordinary skill in the art interprets the claim term "provides an objective baseline from which to begin claim interpretation." *Phillips*, 415 F.3d at 1313. A person of ordinary skill reads the claim term "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

In some cases, the ordinary meaning of claim language, as understood by a person of skill in the art, may be "readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. But other times the parties may use claim language idiosyncratically, and the Court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," such as "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quoting *Innova*, 381 F.3d at 1116).

Courts first look to intrinsic evidence because "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* The context in which a claim term is used can be highly instructive, as can "[o]ther claims of the patent in question, both asserted and unasserted." *Id.* "Differences among claims can also be a useful guide in understanding the

8

United States District Court
Northern District of California

meaning of particular claim terms." *Id.* But claims must also be read "in view of the specification," which is always "highly relevant to the claim construction analysis" and is often "dispositive." *Id.* at 1315 (internal quotations omitted); *see also Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) ("the specification 'is always highly relevant to the claim construction analysis") (quoting *Phillips*, 415 F.3d at 1315). However, generally, the specification of a claim represents just one embodiment of the claim and does not limit the scope of the claim to this one embodiment. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). In addition to consulting the specification, courts should consider "the patent's prosecution history," which is "of primary significance in understanding the claims." *Markman*, 52 F.3d at 980. However, the Federal Circuit has cautioned that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

Finally, courts may consider extrinsic evidence, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317-18. However, extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (internal quotation omitted).[7]

## IV.    **DISCUSSION**

Sonos moves for summary judgment of non-infringement as to Claims 1, 3, 4, 10, and 12 of the '187 patent. Google argues that summary judgment is not proper because there is, at a minimum, a genuine dispute of material fact regarding infringement of each claim.

---

[7] Under 35 U.S.C. § 112(f), a patentee may express a claim in terms of "means or step[s] for performing a specified function *without* the recital of structure, material, or acts in support thereof." 35 U.S.C. § 112(f). Where the term "means" is absent from a claim term, there is a presumption that § 112(f) does not apply. *Williamson v. Citrix Online*, LLC, 792 F.3d 1339, 1348 (Fed. Cir. 2015). A party can overcome this presumption by a preponderance of the evidence by showing that the claim term fails to recite a "sufficiently definite structure" or recites a "function without reciting sufficient structure for performing that function." *Id.* The term "means" is absent from the disputed claim terms here, and neither party argues 35 U.S.C. § 112(f) applies. Accordingly, application of 35 U.S.C. § 112(f) is not considered herein.

9

**Appx12**

As explained above there are two theories of infringement. As to the Authentication Theory, Sonos argues there are two claim elements missing as to the accused products and that the preamble of the claim is not performed. Specifically: (1) there is no "private key" utilized; (2) the private key, to the extent it exists, is not "based on" domain information; and (3) the preamble of the claim is not performed. As to the Strong Encryption Theory, Sonos argues that: (1) the private key is not "utilized by all devices within the domain of devices,"; (2) the key is not "based on" the domain information; and (3) there is no evidence the preamble of the method claims (Claims 1, 3, 4) are performed. The Court addresses each argument below.

A.    Authentication Theory

1.    Is the private key "based on" the domain information?

Sonos argues that summary judgment is appropriate in its favor because the purported private key is not "based on" the domain information—a required element of the patent claim.[8] See Mot. at 10-12 (citing '187 Patent claims 1, 10). Specifically, claim 1 describes:

> A method for registering a new device as part of a domain of devices . . . comprising the steps of . . . providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key to the new device, **wherein the private key is based on the domain information** and is utilized by all devices within the domain of devices.

'187 Patent, claim 1 (emphasis added).

a.    Construction of the term "based on."

To determine whether summary judgment is appropriate, it is first necessary to address the parties' competing definitions of the term "based on." See Mot. at 12; Opp. at 8-11; Reply at 6-7. The term "based on" was not construed during the Court's claim construction process. See Docket No. 108 (Claim Construction Order) at 6-15 (construing terms "domain information," "Logic Circuitry," and "Private Key" as used in the '187 patent).

Google argues that the key need only be produced "in consequence of" the domain

---

[8]  If any limitation of the claim at issue is not met Google's claim of infringement fails as a matter of law. *Bayer AG.*, 212 F.3d at 1247.

United States District Court
Northern District of California

1     information.  Opp. at 11-12.[9]   Sonos, on the other hand, argues that "based on" requires

2     something more than consequence, but rather that the domain information must be used in

3     selecting *which* key is issued.  Reply at 6-7.  Each party points to intrinsic evidence to construe the

4     claim, including language of the claim itself and the patent specification.  *See* Opp. at 11-12;

5     Reply at 6-7.  Both agree that the prosecution history does not provide meaningful guidance on the

6     subject.  *See, e.g.*, Opp. at 12; Reply at 6-7.

7         Claim 1 of the '187 patent reads:

8             A method for registering a new device as part of a domain of
             devices . . . comprising the steps of . . . **providing the domain**

9             **information to a key issuer** . . . **causing the key issuer to issue a**
             **private key to the new device** . . . **wherein the private key is**

10           **based on the domain information**.

11     '187 patent, claim 1; *see also* claim 10.

12         Considering this language, to read the term "based on" as referring to one thing being

13     produced in consequence of the other would render the surrounding language of the claim

14     repetitive, as the '187 patent already stated that the domain information is to "cause the key issuer

15     to issue a private key."  *Id.*   Claim terms should not be construed "in a way that renders them

16     void, meaningless or superfluous."  *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir.

17     2021); *see also SimpleAir, Inc. v. Sony Ericsson Mobile Communs. AB*, 820 F.3d 419, 429 (Fed.

18     Cir. 2016) ("'interpretations that render some portion of the claim language superfluous are

19     disfavored'") (quoting *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed.

20     Cir. 2004)).  To substitute Google's proposed construction, the claim would read as follows:

21             A method for registering a new device as part of a domain of
             devices . . . comprising the steps of . . . **providing the domain**

22             **information to a key issuer . . . causing the key issuer to issue a**
             **private key to the new device** . . . **wherein the private key is**

23           **[issued in consequence of providing the domain information]**.

24     '187 Patent, claim 1 (emphasis added and Google's proposed construction substituted).  The

25     resulting superfluity of surrounding language suggests that "based on" does not mean "in

26

27

28    [9] Google also, in a perfunctory manner, offers a slightly different definition: that the AuthToken
     and household ID must be "associated with" one another.  Opp. at 12.

**Appx14**

United States District Court
Northern District of California

1    consequence of."

2          The parties next point to the following portion of the claim specification to support their

3    respective positions:

> [The] key issuer **105** will grant equipment **101** a DRM certificate
> and a DRM private key, allowing equipment **101** to obtain rights to
> digital content from rights issuer **103**. In order to obtain the DRM
> certificate and the DRM private key, user equipment **101** and key
> issuer **105** must first execute a secure authentication protocol
> utilizing a unit certificate and unit private key that was installed on
> the equipment by the manufacturer. Domain information, such as the
> domain name, private domain password and desired domain action
> (e.g., create a new domain, register into an existing domain, leave a
> domain, etc.), is also exchanged during the protocol.
>
> Key issuer **105** authenticates the unit certificate (belonging to
> equipment **101**) and then checks the domain information. **If the
> domain information indicates that equipment 101 is being added
> to a new domain, key issuer 105 creates a new DRM
> public/private key pair. If equipment 101 is being added to an
> existing domain, key issuer 105 looks up that domain's DRM
> public/private key pair in a database.**

Opp. Ex. A '187 Patent at 4:15-41 (emphasis added).  This specification does not comport with

Google's definition of "based on," meaning "produced in consequence of."  This is apparent

because the specification explains "if the domain information indicates that equipment is being

added to a new domain, key issuer creates a new DRM public/private key pair." *Id.*  And when

the domain information indicates that the domain already exists—which is most relevant to the

Patent at issue, *see* '187 Patent Claim 1 ("[a] method for registering a new device as part of a

domain of devices")—the key issuer *looks up* that domain's DRM public/private key pair in a

database," to issue the key.  *Id.* (emphasis added).  In other words, the contents of the domain

information inform the key that is issued—either a new key is issued if the domain information

shows the domain does not yet exist, or if the domain information shows an existing domain, the

domain information is used to "look up," i.e., find a particular key in the database.  Accordingly,

the specification describes a deterministic rather than any kind of causal relationship; the domain

information is used to inform *which* key is issued, not just that *some* key is issued.

          Google alternatively, and briefly, argues that the domain information and key need only be

"associated with" one another, as evidenced by the specification's reference to the domain

**Appx15**

United States District Court
Northern District of California

information and key being stored together in a database. Opp. at 12 (citing Ex. A '187 Patent at 4:15-41) ("If equipment 101 is being added to an existing domain, key issuer 105 looks up that domain's DRM public/private key pair in a database."). Thus, Google argues that because a device may be granted access to content by validating that the AuthToken (the purported key) is "associated with the household"—this shows that one is "based on" the other. *See* Opp. at 12. But as explained above, the specification describes a deterministic relationship between the domain information *and the key that is issued*; the former is used to "look up" the latter. It is not enough that the two are stored together, or otherwise "associated" after the key is issued for validation purposes; the specification contemplates that the domain information informs *which key* is given to the device in the first instance. Google's definition is thus not congruent with the specification it cites in support of that definition.

It is true that a specification of a claim may reflect just one embodiment of the claim and may not limit the scope of the claim to this one embodiment. *Thorner*, 669 F.3d at 1365. But the specification is not irrelevant. Indeed, claim terms must be construed in context of the patent specification; a claim specification "is always highly relevant to the claim construction analysis … it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. And the specification at issue is particularly important for the '187 patent. The patent's purpose is to improve security of domain rights management systems when enrolling devices into a domain. *See, e.g.*, Appendix of claims; '187 Patent, 1:45-48 ("A need exists for domain-based digital-rights management with easy and secure device enrollment that increases the security of content."). The patent describes that a primary source of security afforded by the patent is through the third-party key issuing process—which is the subject matter of this specification. *See id.* at 2:24-30 ("Security is greatly enhanced if the new device then needs to send this DRM information to a trusted server (i.e., a key issuer) to complete its enrollment into the domain."). As such, the manner in which a key issuer provides the key—discussed in the above specification—is particularly informative in understanding the patent and its terms. Sonos's construction of "based on" is wholly consistent with the clearly stated purpose of the patent of improving security. It also is consistent with and confirms the text of the claim language.

1    Given that Google's first definition, "in consequence of" would render additional language

2    in the claim superfluous, and that the specification of the claim that each party points to as being

3    controlling comports with Sonos's definition of the term, the Court adopts Sonos's proposed

4    definition.  It is not enough that the key be produced "in consequence" of the domain information,

5    or that the two are "associated" in the sense that they are stored together.  Rather the domain

6    information must be somehow used to determine which key is issued in the first instance.

7                    b.    Evidence that the key is "based on" the domain information.

8    The purported key is the AuthToken.  *See* Mot. at 10-11; Opp. at 8-13.  And the purported

9    domain information is the household ID.  *See id.*  Thus, to satisfy this limitation of the claim the

10   AuthToken must be "based on" the household ID.  '187 patent, claim 1 ("A method for registering

11   a new device as part of a domain of devices . . . wherein the private key is based on the domain

12   information.").  Per the above construction, the household ID must inform *which* AuthToken is

13   issued to a device when enrolling into a domain of devices.

14   The Court invites a second round of summary judgment briefing, and if necessary, limited

15   discovery to determine if there is sufficient evidence in the record to raise a triable issue as to

16   whether the key is "based on" the domain information per the Court's construction of the term.

17   Google's brief is not clear as to whether evidence in the record establishes the requisite

18   relationship between the key and domain information—likely because it did not have the benefit

19   of the Court's claim construction at time of briefing.  For example, Google describes that there is

20   an associational relationship between the domain information and key in that one is used to

21   validate the other, post-hoc, and that one may be bound with the other in a representative capacity.

22   *See* Opp. at 9-11.  But Google does not expressly argue that the domain information informs

23   which key is issued in the first instance.  *See id.*  Importantly, Google's expert Dr. Sherman does

24   not expressly opine that the domain information informs *which key* is issued in the first instance,

25   either.  *See* Sherman Rpt. ¶¶ 292 (describing that the key "represents" the household in that there

26   is one key assigned to the household), 293 (describing that the key is provided in response to

27   receiving the domain information), 294 (describing that the household ID is used to validate the

28   AuthToken by storing the two together and associating one with the other).

United States District Court
Northern District of California

14

**Appx17**

1    Indeed, much of Google and Dr. Sherman's argument rests on establishing that the key is

2    produced "in consequence of" the household ID being sent to the issuer or that one is subsequently

3    "associated with" the other, post-hoc, for validation purposes.  *See, e.g.*, Opp. at 9 (citing Sherman

4    Rpt ¶¶ 292-294 ("As Dr. Sherman has explained, the generating of the AuthToken by receiving

5    the household ID and using it as an input, as well as associating the household ID with the

6    AuthToken, all show the AuthToken is 'based on' the household ID.").  Further, Google argues

7    that "[t]he specification does not require that the private key is generated using the domain

8    information. The prosecution history likewise does not require generating the private key using the

9    domain information." Opp. at 12 (internal citations omitted).

10    However, Dr. Sherman cites to a portion of Sonos's developer page (which functions to

11    instruct third parties how to use Sonos's API and interact with its devices) that *might* support the

12    existence of the requisite relationship—depending on how it is interpreted.  Sherman Rpt. ¶ 292

13    (citing https://developer.sonos.com/build/content-service-add-features/addauthentication/add-

14    browser-authentication/ ("[I]f a user connects to more than one Sonos household, your service

15    must use a different token to represent that user-household combination.")).

16    Due to the ambiguity in Dr. Sherman's report, which does not explicitly opine as to

17    whether the domain information is used to determine *which key* is issued in the first instance (but

18    speaks only to a "representative" relationship), but in light of this evidence that might suggest a

19    deterministic relationship, further briefing is required.  The Court permits Sonos to file a second

20    summary judgment motion narrowly addressing whether there is a triable issue regarding the

21    "based on" element of the claim now that the term has been construed.

22        2.    Does the AuthToken constitute a "private key"?

23    The '187 patent describes a process wherein a key issuer "issue[s] a private key to the new

24    device, wherein the private key is based on the domain information and is utilized by all devices

25    within the domain of devices."  *See* '187 patent, claim 1.   During the claims construction process

26    the Court construed "private key" to mean "[a] non-public key that is used as an input to a

27    cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be

28    computed." Dkt. No. 108 at 11.  The parties agree that for Google to prevail, the AuthToken must

United States District Court
Northern District of California

**Confidential Material Redacted**

constitute a "private key" as used in the '187 patent and as construed by this Court. *See* Mot. at 7-
10; Opp. at 6-8.   However, the Court likewise requires further briefing to adjudicate this issue.

Determining this issue requires further claim construction of the term "private key," not
fully briefed by the parties.  There appears to be at least some evidence that the AuthToken is
input into a cryptographic algorithm; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mot. at 9-10.   Google does
not squarely address this argument in its opposition. *See* Opp. at 6-8.

Sonos's theory is intuitively attractive. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

However, Sonos's proposed reading of the term "private key" requires further construction
of the term beyond what was addressed in this Court's claims construction order. *See* Docket No.
108 at 11-15.  At that time, the Court was only asked to determine whether the purported key must
be used in a symmetrical cryptographic technique, i.e., encryption or signing algorithms, or
whether using the key in an asymmetric cryptographic technique, such as a hashing algorithm,

United States District Court
Northern District of California

16

1    would be sufficient.  *See* Dkt. No. 108 at 12-14.  It was in this context that the Court adopted the

2    present definition of "private key."  Specifically, the Court rejected Sonos's proposed, narrower

3    definition—requiring symmetrical key techniques ("A non-public key used for either decrypting

4    data or generating digital signatures," *id.* at 11), and instead adopted Google's broader

5    construction ("A non-public key that is used as an input to a cryptographic algorithm designed

6    such that, without the key, the output of the algorithm cannot be computed," *id.*).  In other words,

7    the Court did not consider *which input* in the cryptographic algorithm the purported key must be,

8    but only opined as to the *type of the cryptographic algorithm*  (*e.g.*, hashing, encrypting, or

9    signing) that satisfies the limitation. *See id.* at 11-14.

10         Yet, given the posture of the case (motion for summary judgment), the parties did not fully

11   brief the claims construction issue in the filings, such as by providing intrinsic or extrinsic

12   evidence in support of their reading of the terms.  Because the construction issue was not fully

13   joined, the Court invites further briefing on the issue.  The parties are permitted to address this

14   narrow issue within the second round of summary judgment briefing.

15         3.    Do the accused product perform the preamble of the claims?

16         Regardless of the outcome of further briefing as to the "private key" and "based on" claim

17   elements, the Court holds that the authentication theory claim is narrowed as follows.

18         Sonos argues that Sonos's accused devices do not infringe the method claims (claims 1, 3,

19   and 4) because the preamble of claim 1 is not satisfied.  Mot. at 5-7.  The parties agree that the

20   preamble argument applies *only* to claims 1, 3, and 4 (the "method claims") and not claims 10 and

21   12 (the "apparatus claims").  *See* Mot. at 25 (chart summarizing argument for each claim).  Thus,

22   this issue relates only to claims 1, 3, and 4.

23         The "preamble of claim 1" or "preamble" is shorthand used by the parties to reference the

24   method described in claim 1, and incorporated into claims 3 and 4:

25              A method for registering a new device as part of a domain of
                devices, which share rights associated with a common account, for
26              use in accessing protected digital content within a digital rights
                management system, the method comprising the steps of:
27

28                   receiving domain information corresponding to the domain
                     of devices from a device existing within the domain of

**Appx20**

**Confidential Material Redacted**

devices;

providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices; and

receiving the private key from the key issuer for use in accessing the protected digital content within the digital-rights management system.

'187 Patent, Claim 1.  The parties agree that the preamble is limiting as to the method claims.  *See* Docket No. 66 at 1.  The parties disagree whether, under Google's authentication theory, the accused Sonos players perform the method described in the preamble, and specifically, whether a "key issuer" "issu[es] a private key to the new device" as part of the "method for registering a new device as part of a domain of devices."  *See* Mot. at 5-7;  Opp at 13-17;  Reply at 7-10.



.  *See id.*  Google's position is that its expert has opined that the preamble of the claim is performed by the accused devices and accordingly, the Court should find that this is a factual dispute to be ruled upon at trial.  *See* Opp. at 14-16.  Further, Google asserts that in the specific configuration whereby an accused device is added to a pre-existing household that has not yet registered a third-party music service, the AuthToken will be received in a manner that is not deemed insecure by the patent (the "AppLink configuration").  *Id.* (citing Sherman Rpt. ¶¶ 170-193).  For ease and clarity, the Court refers to all other registration configurations of a device and music service aside from the AppLink configuration as the "standard configuration."

        a.    <u>Standard configuration</u>

The preamble of the claim is not satisfied per the standard configuration, according to undisputed evidence in the record.

United States District Court
Northern District of California

**Confidential Material Redacted**

United States District Court
Northern District of California

1  Based upon the opinion of Dr. Sherman, Google's own expert, ███████████████

2  ████████████████████████████████████████████████████████

3  ███████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ███████████████████  ████████████████████████████████

6  ████████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████

8  ████████████████████████████████████

9    ██████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████

14    ███████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  █████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ███████████

19                    ████████████████████████████████████████

20                    ███████████████████████████████████████████

21                    ████████████████████████████████████████████

22                    ██████████████████████████████████████████████

23                    ███████████████████████████████████████████

24                    ████████████████████████████████████████████

25                    ████████████████████████████████████████████████

26                    ████████████████████████████████████████████

27                    ████████████████████████████████████████████

28

**Appx22**

**Confidential Material Redacted**

1    *Id.* (emphasis added).

2    ███████████████████████████████████████████████████ is precisely the

3    method of authentication that the patent disparages as being non-secure:

4          **It is much easier for a user if this DRM information can be**
           **obtained directly from a device that is already in the domain.**
5          **However, merely allowing a new device to obtain domain**
           **information from an existing device is not sufficiently secure for**
6          **enrolling the new device into the domain**. Security is greatly
           enhanced if the new device then needs to send this DRM
7          information to a trusted server (i.e., a key issuer) to complete its
           enrollment into the domain. With this approach, the key issuer can
8          actively enforce domain enrollment and help improve security.

9
     '187 patent, 2:24-28; 7:32-37 (emphasis added). And further:
10
11         Additionally, the use of key issuer 105 greatly improves security.
           **For example, if a key issuer were not used then devices would**
12         **need to share their DRM private keys and issue DRM**
           **certificates. Hackers would have an easier time breaching the**
13         **Security of Such a system since they have physical access to their**
           **devices and can tamper with the hardware to try and create**
14         **false DRM certificates**. In the preferred embodiment of this
           invention, the key issuer is a trusted entity that is not physically
15         accessible to the users to the DRM system. Hackers may attempt to
           breach the security of the key issuer, but since it cannot be
16         physically attacked, security is improved.

17   *Id.* at 7:30-41 (emphasis added).  The level of security afforded in sharing the AuthToken is vital

18   because the central purpose and primary justification of the '187 patent is its improvement of

19   security of domain rights management systems.  *See, e.g.*, Appendix of claims; '187 Patent, 1:45-

20   48 ("A need exists for domain-based digital-rights management with easy and secure device

21   enrollment that increases the security of content.").  Accordingly, this process, which is done in a

22   manner that the patent identifies as inferior, and rejects in favor of its own, more secure method,

23   cannot satisfy the preamble.

24         Two foreign courts have come to the same conclusion in determining whether Sonos's

25   method of adding a new music service or its process of registering new devices satisfies the

26   limitations found in the '187 patent.  *See generally*, Mot. Ex. E, Final Ruling by the First Regional

27   Court in Munich dated June 23, 2021 ("Munich Ruling"); and Ex. F, Judgment by the First

28   Instance Court of Paris, 3rd Chamber, dated March 8, 2022 ("Paris Judgment").  Though not

United States District Court
Northern District of California

20

1    binding, these opinions lend further support for the outcome here.

2            The Munich ruling addressed the same patent held by Google, the same accused Sonos

3    products, under the same theory of infringement. *See* Munich Ruling at 3-4.  And the respondent

4    offered highly similar arguments to those being considered here. *Id.* at 10.  Specifically, the

5    respondent argued that the registration process cannot satisfy the claim because in that process the

6    player does not receive an AuthToken from an external music service provider, but from a player

7    already installed in the network. *Id.*  That process, the respondent argued, does not realize the

8    improved security of the DRM patent, by using an external key issuer when the device is

9    registered. *Id.*  The Munich court accepted these arguments. *See id.* at 28-29.  To this end, the

10   court recognized that according to the patent, a new device must receive a private key from an

11   external key issuer, and not by way of sharing by devices already registered in the domain. *Id.* at

12   28.  The court explained that "sharing the private key between devices within the domain is to be

13   specifically avoided" per the patent. *Id.*  Ultimately "Plaintiff failed to show the functionality of

14   the contested embodiments in the functional and causal context according to the patent of adding a

15   new device for use of digital content available in a domain." *Id.* at 34.

16           The Paris Judgment also considered the same patent and accused Sonos products. *See*

17   Paris Decision at 5, 6-8.  Sonos argued there that there is no infringement because "when a new

18   SONOS speaker is added to an existing domain or household, it does not receive authentication

19   information from an external key issuer." *Id.* at 16.  The court ruled in favor of Sonos, crediting

20   its argument that the claim limitation had not been satisfied. *Id.* at 17.  Accordingly, the court

21   reasoned "Google's claims can only be rejected." *Id.* at 18.   And although Google attempts to

22   distinguish these cases due to their narrower construction of the term "private key," than what is

23   used here, *see* Opp. at 16, Google does not explain, nor does the Court see in its review, any

24   distinguishing aspects of these opinions when it comes to this separate stage of the analysis (i.e.,

25   relating to whether the preamble of the claim is performed).  Thus, for the reasons identified by

26   this Court, as echoed by foreign courts, the accused products do not perform the preamble of the

27   claim based on the evidence in the record under the default configuration.

28   //

United States District Court
Northern District of California

21

**Appx24**

**Confidential Material Redacted**

b.     The "AppLink" configuration

Google separately argues that the preamble of the claim is performed under a distinct method of registration and authentication.  Specifically, in the circumstance wherein a new Sonos device is registered to a pre-existing domain of devices, the domain of devices has not yet registered a third-party music service, and the new device registers the music service at the same time.  *See* Opp. at 15-16.  Google endeavors to support the existence of this unique configuration by citing to paragraphs 170-193 of Dr. Sherman's expert report.  But those paragraphs do not describe or reference this sort of registration configuration.[10]

However, Google also points to additional evidence in the record supporting that the precise configuration outlined by Google is performed by the accused products and that it is done in a way that is covered by the patent.  Specifically, Google cites to paragraphs 152-161 of Dr. Sherman's expert report and paragraphs 99-103, 121-123 of Sonos's expert, Dr. Wicker's report (these paragraphs of Dr. Wicker's report were also raised at oral argument by Google's counsel).  Paragraphs 152-161 of Dr. Sherman's report describes two authentication methods, "AppLink" and "DeviceLink," which are methods of authentication via mobile device or web browser, that can be used when a user adds a Sonos device to a household.  Sherman Rpt. ¶¶ 152-161.  Both processes contemplate that the device authenticates itself with a third-party music service by calling for and presumably receiving an AuthToken to be issued to the device by that third-party music service.  *See id.* █████████████████████████████████████

████████████████████████████████████████

████  And this portion of Dr. Sherman's report is supported, as Dr. Sherman bases his

_____

[10] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████ .

22

United States District Court
Northern District of California

1   explanation of these two methods upon excerpts of the Sonos Developer, Sonos Music API, which

2   functions to instruct third parties how to use the API.  *See id.*

3          A portion of the report from Dr. Wicker, Sonos's expert, also supports the conclusion that

4   this is one configuration of authentication that takes place and may typically occur as part of a

5   device registration user flow.  Specifically, Dr, Wicker provides screenshots exemplifying the

6   method of setting up a new Sonos device in a household, which include both the secure

7   registration process, *Id.* ¶¶ 99-103, and that occurs alongside the AppLink authentication method

8   to register a music service (there, Spotify), *Id.* ¶¶ 121-123.  The user flow screenshots identified

9   by Dr. Wicker, and the excerpts of Sonos's API regarding "AppLink" and "DeviceLink" reviewed

10  by Dr. Sherman, constitute circumstantial evidence that users engage in a contemporaneous

11  process whereby a user registers a device within a household, and registers with a music service

12  whereby the third-party music service issues an AuthToken.  This evidence in the record is not

13  definitive on the issue, as it is not entirely clear how contemporaneous the two events are.

14  However, this evidence is sufficient to raise a genuine dispute of fact as to whether the preamble is

15  performed by the accused products in this circumstance, making summary judgment inappropriate.

16  *Anderson*, 477 U.S. at 255 at 248-49; *Tinnus Enterprises*, 846 F.3d at 1204-05.[11]

17         Thus, there is a triable issue as to whether the preamble is performed, but only by the

18  "AppLink" configuration of the Sonos devices.  This limits claims 1, 3, and 4 ("method claims")

19  but not 10 and 12 ("apparatus claims").

20         In conclusion, the Court **DEFERS in part** ruling upon summary judgment of non-

21  infringement regarding the authentication theory.  The method claims, 1 3, and 4 are only viable

22  under the "AppLink" configuration.  The Court issues no ruling at this time as to Apparatus

23

24  [11] Though this argument was not made in its briefs, Sonos asserted at oral argument that the
    AppLink configuration cannot be used to satisfy the preamble of the claim because this process
25  was not identified by Google's expert in his report as the basis for opining that the preamble is
    performed.  *See* Sherman Rpt. ¶¶ 170-193 (describing the netstart protocol as the basis for his
26  opinion that the method described in claim 1 is performed and omitting discussion of the AppLink
    configuration).  But Sonos failed to raise this argument in its reply brief, notwithstanding Google's
27  citation to the "AppLink" process in its opposition papers.  *See* Opp. at 4 (citing Wicker Rpt. ¶¶
    99-103, 121-123).  Accordingly, the Court does not preclude Google's theory.  *See, e.g., Zamani
28  v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (finding a district court need not consider untimely
    arguments).

United States District Court
Northern District of California

23

**Confidential Material Redacted**

1   Claims 10 and 12.

2       Regarding the "based on" and "private key" claim elements, the Court invites a second

3   round of briefing addressing two issues. First, whether there is sufficient evidence in the record to

4   support a jury finding the domain information informs *which key* is issued; i.e., is the key "based

5   on" the domain information? And second, what is the proper construction of the term "private

6   key" is: may the key be any input into a cryptographic algorithm, include the input that is

7   modified by the algorithm, or must it be the input that prompts the modification to occur?

8       The parties are to meet and confer and propose a briefing schedule to the Court within one

9   week of the issuance of this order. The parties should also determine if additional, limited

10  discovery is needed.

11  B.   <u>Strong Encryption Theory</u>

12  ███████████████████████████████████████████████████

13  ██████████████████████████████████████████████

14  ████████████████████

15  ██████████████████████████████████████████

16  ███████████████████████████████████████████

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ██████████████████████████████████████████████████

20  █████████████████████████████████████████

21  ███████████████   ██████████████████████████

22  █████████████████████████████████████████████████

23  ██████████████████████████████████████████

24  ████████████████████████████████████████████████

25  █████████████████████████████████████████

26  █████████████████████. *Id.* ¶ 328.

27      Sonos players are also able to be formed into groups so that they can play media across

28  different rooms in a synchronized manner. A group of players will have one player designated as

24

**Confidential Material Redacted**

1   a "group coordinator." *Id.* ¶ 112. ████████████████████████████████

2   ███████████████████████████████████████████████████████████

3   ███████████████████████████████████████████████████████████

4   ██████████████████████████████████████████. *Id.* ¶¶ 147-151.

5        As to this theory, Sonos argues it is entitled to summary judgment because: (1) the private

6   key is not "utilized by all devices within the domain of devices"; (2) the private key is not "based

7   on" the domain information; and (3) the method for method claims 1, 3, and 4 is not performed.

8   *See* Mot. at 14.

9        1.   <u>Is the private key is utilized by all devices in the domain of devices?</u>

10       Claim 1 of the '187 Patent, which the parties do not dispute is limiting as to all claims,[12]

11  requires that the private key be "utilized by all devices within the domain of devices." '187

12  Patent, claim 1.  Based on the undisputed evidence in the record, and in viewing this evidence in

13  favor of the nonmoving party, Sonos is entitled to summary judgment as to non-infringement

14  under the strong encryption theory of the '187 patent because the private key is not "utilized" by

15  *all* of the devices in the domain of devices.

16       ██████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████████

18  ███████████████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████

23  ███████████████████████████████████████████████

24  ███████████████████████████████████████████████████████████

25  ███████████████████████████████████████████████████████████

26  ███████████████████████████████████████████████████████████

27  _____

28  [12] Namely, Method Claims 1, 3, and 4 and Apparatus Claims 10 and 12.

United States District Court
Northern District of California

25

**Confidential Material Redacted**

1 ████████████████████ ██████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ████

4      ████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████

7 ██████████████████. The definition of the term "utilize" that Google argues for, i.e., "passive

8 benefit from," is not supported by intrinsic or extrinsic evidence in the record. *See, e.g.*, Ex. A

9 ('187 patent) 7:30-37, 2:24-28 (contemplating active use of). Indeed, Google's primary evidence

10 does not expressly support its position. Specifically, the dictionary definition offered by Google

11 defines the term as "to make use of" or "turn to practical use or account." *See* Opp. at 19 (citing

12 *Merriam-Webster Dictionary*, 11th Ed. (2003)). This definition does not expressly contemplate a

13 passive benefit; in any event, extrinsic evidence is to be given less weight relative to other

14 evidence in claims construction. *See Phillips*, 415 F.3d at 1315-17.

15      Google's doctrine of equivalents argument as to this claim limitation likewise fails. Under

16 the doctrine of equivalents accused products, even if not literally infringing, must be shown to

17 perform "substantially the same *function* in substantially the same *way*, to achieve substantially

18 the same *result*." *Virnetx, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1322 (Fed.Cir.2014)

19 (emphasis added). However, Google's expert offers only a conclusory assertion that the doctrine

20 of equivalents applies, without addressing the function, way, and result test. *See* Sherman Rpt. ¶¶

21 376-381. Such conclusory opinions do not satisfy the evidentiary burden. *See, e.g.*, *Quintal*

22 *Research Grp., Inc. v. Nintendo of Am., Inc.*, 2015 WL 4396464, at *13 n.10 (N.D. Cal. July 17,

23 2015) (Alsup, J.) (conclusory statement in expert report alone insufficient to raise genuine dispute

24 of fact as to substantiality test). And though Dr. Sherman provided some additional detail in his

25

26 ───────────────────

[13] Dr. Sherman repeats this opinion multiple times, stating that "to the extent Sonos contends there
27 is no literal infringement because the Controller is not a device existing within the domain
devices, the '187 Accused Instrumentalities still meet the limitation under the doctrine of
28 equivalents." *Id.* ¶ 209; *see also* ¶ 558 (similar).

**Appx29**

United States District Court
Northern District of California

**Confidential Material Redacted**

deposition, Mot. Ex. C (Sherman Dep. Tr.) at 88:7-89:10, he does not address whether there is substantial similarity, notwithstanding the differences in how the accused products and Google's patented products utilize private keys. This is important, because a core aspect of security taught by the patent is that each device obtains a private key. *See, e.g.*, '187 Patent, 1:42-458 (explaining "a need exists for domain-based digital-rights management with easy and secure device enrollment that increases the security of content"); *Quintal*, 2015 WL 4396464, at *13 n.10.

Accordingly, Sonos is entitled to summary judgment as to the Strong Encryption Theory on this basis alone. *See Bayer AG.*, 212 F.3d at 1247 (finding that if any limitation of the claim is not met, infringement is negated as a matter of law).

## V.      CONCLUSION

The Court requires further briefing to determine whether Sonos is entitled to summary judgment regarding infringement of the '187 Patent under the Authentication Theory. The term "based on" requires more than an associational or causal relationship; it requires a deterministic relationship between the domain information and the key that it issued. The parties are permitted to submit a second round of summary judgment briefing taking into account this construction of the claim. Likewise, the parties are to submit additional briefs as to how the term "private key" should be construed. Regardless of the outcome of this further briefing, the Court holds that method claims 1, 3, and 4 are significantly narrowed; only the "AppLink configuration" arguably performs the method described in the patent.

Further, the Court grants summary judgment of non-infringement as to the Strong Encryption Theory. The patent requires that the private key be utilized by all devices in the domain. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████. Accordingly, a jury could not find the "utilize" element is met.

//

**Appx30**

United States District Court
Northern District of California

1    Thus the Court **GRANTS in part and DEFERS in part** ruling upon Sonos's motion for

2  summary judgment, Docket No. 185.  The Court finds non-infringement of the '187 patent

3  pursuant to the Strong Encryption Theory. The Court defers ruling in full as to non-infringement

4  of the '187 patent pursuant to the Authentication Theory pending additional briefing, though

5  holding that claims 1, 3, and 4, are necessarily narrowed to the "AppLink" configuration.  The

6  parties shall stipulate on a schedule for a second round of briefing on motions for summary

7  judgment which shall address only on the issues identified herein.

8    The Clerk of Court is directed to file this order provisionally under seal.  The parties'

9  sealing proposal is to be filed within one week of the date of this order.  This order disposes of

10  Docket No. 185.

11

12    **IT IS SO ORDERED**.

13

14  Dated: May 7, 2024

15

16  _____
   EDWARD M. CHEN
   United States District Judge

Northern District of California
United States District Court

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GOOGLE LLC,

          Plaintiffs,

   v.

SONOS, INC.,

          Defendants.

**FILED UNDER SEAL**

Case No.  20-cv-03845-EMC

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Docket Nos. 185, 212

This case involves three patents that Plaintiff, Google, LLC ("Google") accuses Defendant Sonos Inc. ("Sonos") of infringing.  Defendant Sonos moved for summary judgment as to non-infringement of one of the three patents at issue in the suit: the '187 patent.[1]  Dkt. No. 185.  Google pursued two theories of infringement as to the '187 Patent: the Strong Encryption theory and Authentication theory.  On May 7, 2024, the Court granted Sonos's motion for summary judgment of non-infringement regarding the Strong Encryption theory.  Dkt. No. 206 (hereinafter "MSJ Order").   As to the Authentication Theory, the Court held that supplemental briefing was required, and deferred ruling on this issue.  *See id.*

The Court requested additional briefing regarding two issues: (1) the proper construction of the term "private key," and whether there is a triable issue under that construction; and (2) whether there is a triable issue that the claimed private key is "based on" the Sonos household ID, as the term "based on" was construed by the Court in its May 7, 2024, order.  *See* MSJ Order at 10-16.  Presently before the Court are the parties' supplemental cross briefings as to those questions, and thus, the propriety of summary judgment for the Authentication Theory of

---

[1] The parties represented at oral argument before this Court that the two patents aside from the '187 Patent at issue in the present motion have been invalidated in a separate proceeding.

1    infringement.  Dkt. Nos. 212 ("Mot."), 215 ("Opp."), 220 ("Sonos Reply"), 223 ("Google Reply").

2            For the reasons discussed below, the Court finds that the proper construction of the term

3    **"private key" as used in the '187 Patent refers to a non**-public cryptographic key that is used as the

4    key input (rather than solely as the data input) to a cryptographic algorithm.  A "cryptographic

5    **key"** is a string of characters designed to control a cryptographic algorithm.  Google has not

6    proffered evidence to show that the accused AuthToken is a private key as that term is construed

7    herein.  Thus, the Court **GRANTS Sonos's motion** for summary judgment.

8                                    I.        **BACKGROUND**

9    A.     The '187 Patent

10           Google is the owner of U.S. Patent No. 7,899,187, titled "Domain-Based Digital-Rights

11   **Management System with Easy and Secure Device Enrollment,"** (the "'187 Patent").  *See* Dkt. No.

12   108 (hereinafter "Claims Construction Order") at 1-2 (citing Dkt. No. 107 ¶ 21).  The Patent

13   provides a way for users with multiple media players to obtain access to protected content (*e.g.*,

14   songs provided by streaming services like Pandora or Spotify) while ensuring the content remains

15   protected from copying or unauthorized access.  *See* '187 Patent, 1:14-37.  This is done through a

16   **digital rights management system ("DRM system") that oversees a** domain of devices (as opposed

17   to individual devices standing alone) that shares a common user account.  Claims Construction

18   Order at 1-2; '187 Patent, at 1:26-29.  The Patent describes arranging media players and devices

19   into said domain and describes providing the devices in that domain with a private key that the

20   devices can use to access the DRM-protected content.  *See* '187 Patent, Abstract.

21           To illustrate: when a new device joins the domain, it obtains domain information from an

22   existing device within the domain.  *Id.* at 2:2-6.  The new device then provides that domain

23   **information to a "key issuer" that is not within the domain.**  *Id.*  In response, the external key

24   issuer provides the new device with the shared private key of the domain.  *Id.*  That private key

25   enables the new device to have access to the DRM-protected content.  Claims 1 and 10 recite a

26   method and device directed to this process.  *See* **Appendix of Claims; '187 Patent.**

27           **The purpose of the '187** Patent is to address the problem of confidentiality and security of

28   protected digital content.  *See* Claims Construction Order at 1-2.  There are two problems with

United States District Court
Northern District of California

2

conventional DRM systems.  First, "a user faces the potentially cumbersome task of registering all of his devices into a domain." *See id.* (citing '187 Patent at 1:40-42).  Second, "the security of content in a domain is potentially threatened if users can remotely register devices into a domain over a long distance." *Id.* (citing '187 Patent at 1:42-45).  The Patent states that "a need exists for domain-based digital-rights management with easy and secure device enrollment that increases the security of content." *Id.* (citing '187 Patent at 1:45-48).  At the core of the Patent is the issuance of a private key to each device within the domain from a key issuer outside the domain.  *See id.*

B.    Sonos's Accused Products

Google alleges infringement against several Sonos devices that are referred to as "players" or "player devices."[2]  *See* Dkt. No. 185-4, Opening Expert Report of Alan T. Sherman ("Sherman Op. Rpt.") ¶ 73.  Sonos's players allow users to play music in their home (*e.g.*, through a speaker) and to control the speakers through a smartphone or other computer.  Players that are part of a common subnet (such as a WiFi network) can be placed into a "household." *Id.* ¶ 108.  Multiplate speakers in a household can be grouped together to play music synchronously (*e.g.*, in the living room and kitchen).  *Id.* ¶¶ 110-12.

C.    Authentication Theory of Infringement

The Authentication Theory of Infringement asserted by Google involves the process by which Sonos Players interacts with a third-party music service (*e.g.*, Spotify) which provides the players with access to the third-party digital content (*e.g.*, play music).  *See* Dkt. No. 191, Ex. 4 (Sherman Dep. Tr.) at 45:21-46:12.  Most relevant, Claim 1 of the '187 Patent provides:

> A method for registering a new device as part of a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital rights management system, the method comprising the steps of:  receiving domain information corresponding to the domain of devices from a device existing within the domain of devices;  providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices; and

---

[2] The accused players include the Sonos One, One SL, Play:1, Play:3, Five, Play:5, Arc, Playbar, Playbase, Beam, Move, Connect:Amp, Amp, Connect, and Port. Sherman Op. Rpt. ¶ 73.

**Appx34**

United States District Court
Northern District of California

**Confidential Material Redacted**

receiving the private key from the key issuer for use in accessing the protected digital content within the digital-rights management system.

Google argues the process of adding a music service to a Sonos household infringes upon the '187 Patent.  Specifically, Google discusses claim 1 of the '187 patent which described "A method for registering a new device as part of a domain of devices," wherein a "key issuer" provides a "private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices." '187 Patent, claim 1.

A Sonos "Household," is a group of speakers on a shared network, via WiFi, that shares a unique household identification ("HHID").  To register the third-party music service with the household, a Sonos device in the household sends a "getDeviceAuthToken" request to a third-party music service; that message request includes the HHID among other information.  It is not entirely clear on the record how the AuthToken is used by the third-party music service; Google did not pursue third-party discovery. ███████████████████████████████████

████████████████████████████████████████████████████████

████ *See* Sherman Op. Rpt. ¶¶ 232-234.  Nothing in the records suggests otherwise.

The below chart summarizes Google's theory of infringement:

| '187 Patent Claim Element | Google's Infringement Theory for Accused Devices |
|---|---|
| A method for registering a new device as part of a *domain of devices* . . . comprising the steps of . . . | The Sonos Household is the "domain of devices" |
| providing the *domain information* to a *key issuer* . . . | The third-party music service is the "key issuer," and the Household ID is the "domain information" |
| **causing the key issuer to issue a *private key* to the new device,** | **The AuthToken is the "private key"** |
| **wherein the private key is *based on the domain information*** | **The AuthToken is "based on" the Household ID** |
| and is *utilized by all devices* with the domain of devices. | The AuthToken is used to access and play content from the third-party music service |

4

At issue in the present set of briefings is **the proper construction of the term "private key,"** whether there is a triable issue that the **"AuthToken"** in the Sonos system **constitutes a "private key"** as that term is properly construed.  Also at issue is whether there is a triable issue whether the **AuthToken is "based on"** the household identification.  *See generally* Mot.; MSJ Order at 10-16.

## II.     LEGAL STANDARDS

### A.     Claim Construction

Claim construction is a question of law, although it may contain factual underpinnings. *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1357 (Fed. Cir. 2016).  "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'"  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)).

**It is a bedrock principle of patent law that** "the claims of a patent define the invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). **The words of a claim are generally given their "ordinary and custom meaning," which is** "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); *see also Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed."). **The inquiry into how a person of ordinary skill in the art interprets the claim term** "provides an objective baseline from which to begin claim interpretation." *Phillips*, 415 F.3d at 1313.  A **person of ordinary skill reads the claim term** "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

In some cases, the ordinary meaning of claim language, as understood by a person of skill **in the art, may be** "readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.  But other times the parties may use claim language idiosyncratically, and the

5

United States District Court
Northern District of California

Court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," such as "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quoting *Innova*, 381 F.3d at 1116).

Courts first look to intrinsic evidence because "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* The context in which a claim term is used can be highly instructive, as can "[o]ther claims of the patent in question, both asserted and unasserted." *Id.* "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." *Id.* But claims must also be read "in view of the specification," which is always "highly relevant to the claim construction analysis" and is often "dispositive." *Id.* at 1315 (internal quotations omitted); *see also Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) ("the specification 'is always highly relevant to the claim construction analysis") (quoting *Phillips*, 415 F.3d at 1315). However, generally, the specification of a claim represents just one embodiment of the claim and does not limit the scope of the claim to this one embodiment (unless it is apparent that the embodiment was meant to constitute the only embodiment of the claim to the exclusion of other embodiments) . *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). In addition to consulting the specification, courts should consider "the patent's prosecution history," which is "of primary significance in understanding the claims." *Markman*, 52 F.3d at 980. However, the Federal Circuit has cautioned that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

Finally, courts may consider extrinsic evidence, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317-18. Extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (quotations omitted).

6

1    B.    Summary Judgment

2          Summary judgment is proper where the pleadings, discovery, and affidavits show that

3    there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as

4    a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine if it could reasonably be resolved in

5    favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact

6    is material if it could affect the case outcome.  *Id.*  The burden of establishing the absence of a

7    genuine issue of material fact lies with the moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

8    322-23 (1986).  The Court must view the evidence in the light most favorable to the non-movant.

9    *Anderson*, 477 U.S. at 255.  Ultimately, "[s]ummary judgment is appropriate when it is apparent

10   that only one conclusion as to infringement could be reached by a reasonable jury." *TechSearch,*

11   *L.L.C v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) (citations omitted). "If any claim

12   limitation is absent from the accused device, there is no literal infringement as a matter of law."

13   *Bayer AG v. Elan Pharm. Rsch. Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

14                              **III.    DISCUSSION**

15   A.    Claim Construction: Private Key

| **Prior Construction** | **Google construction** | **Sonos Construction** | **Adopted Construction** |
|---|---|---|---|
| A "private key" is "a non-public key that is used as an input to a cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be computed." Dkt. No. 108 at 11. | A "private key" is "any input into a cryptographic algorithm." Opp. at 7. It includes "authorization and authentication keys" | A "private key" is a non-public cryptographic key that is used as the key input (rather than as the data input) to a cryptographic algorithm. | A "private key" is a non-public cryptographic key that is used as the key input (rather than *solely* as the data input) to a cryptographic algorithm. |

23         As noted above, the '187 patent covers a process wherein a key issuer "issue[s] a **private**

24   **key** to the new device, wherein the private key is based on the domain information and is utilized

25   by all devices within the domain of devices." '187 Patent, claim 1 (emphasis added).  Google's

26   Authentication Theory of Infringement in this case requires that the accused AuthToken

27   constitutes a "private key" within the meaning of the '187 Patent.  At issue therefore is the

28   construction of the term "private key."

7

**Appx38**

United States District Court
Northern District of California

1       This Court previously construed "private key" as "[a] non-public key that is used as an

2   input to a cryptographic algorithm designed such that, without the key, the output of the algorithm

3   cannot be computed." Dkt. No. 108 at 11. This construction was rendered in the context of the

4   parties' dispute as to whether: (1) the '187 Patent's scope is limited to cryptographic techniques

5   involving public-key cryptography as described in the Patent's specification, or (2) the Patent's

6   scope is broader. Dkt. No. 108 at 11 (Claim Construction Order). Public-key cryptography is

7   defined by the Patent as: "[a] [c]ryptographic technique that uses a pair of keys, a public and a

8   private key. The private key is used for either decrypting data or generating digital signatures and

9   the public key is used for either encrypting data or verifying digital signatures." *Id.* (citing '187

10  Patent at 2:42-49). Sonos argued that the Patent's scope was limited to the asymmetric, public-

11  key cryptographic technique described in that specification. *See id.* Google, on the other hand,

12  argued that the Patent's scope covered both asymmetric and symmetric cryptographic techniques,

13  along with techniques beyond encryption and decryption including *e.g.*, "message authentication

14  codes, key expansion, pseudorandom number generation, and sharing of secrets." *Id.* at 12 (citing

15  Dkt. No. 67 (Google Claim Construction Brief at 12)).

16      The Court held that the specification describing asymmetric, public-key cryptography was

17  not limiting to the claim but exemplified only one preferred embodiment. *Id.* at 15. The Court

18  reasoned that the public-key cryptography specification described *asymmetric*, public-key

19  cryptography, wherein both the sender and recipient of information have their own public private

20  key and use that key to encrypt, decrypt, sign, or verify data. *Id.* at 14 (citing '187 Patent at 4:42-

21  56, 3:51-62). However, the Court recognized that the Patent included the disclaimer that "[o]ne of

22  ordinary skill in the art would recognize that alternate methods of securing the DRM system are

23  possible using *symmetric* key techniques or broadcast key encryption techniques." *Id.* at 14-15

24  (quoting '187 Patent at7:54-57) (emphasis added). Symmetric key techniques utilize the same key

25  for both encryption of plain text (sending message) and decryption of cipher text (received

26  message). *See id.* Thus, the Court held that the specifications describing asymmetric, public-key

27  cryptography were not limiting to the claim but exemplified only one preferred embodiment. *Id.*

28  at 15. In short, the Court held that the '187 Patent's scope was not limited to asymmetric public-

8

**Confidential Material Redacted**

1  key cryptographic techniques.  Thus, it adopted Google's proposed construction of the term

2  "private key," to mean "[a] non-public key that is used as an input to a cryptographic algorithm

3  designed such that, without the key, the output of the algorithm cannot be computed."  *Id.* at 11-

4  15.

5      Subsequently, Sonos moved for summary judgment of non-infringement, arguing, *inter*

6  *alia*, that a reasonable jury could not find the accused AuthToken is a private key.  Dkt. No. 185 at

7  7-10.

8      *See*

9  Dkt. No. 189 at 8.  Google's theory is depicted below:

17  *See id.*; Sherman Op. Rpt. ¶ 53 (red annotation added).

21      Dkt. No. 185 at 9-10.

22      The Court determined that its prior construction of the claim term, rendered in a different

23  context, did not address this specific issue and that adjudication of the pending summary judgment

24  motion required further construction of "private key."  MSJ Order at 11-14.  Specifically, while

25  the prior construction order addressed the types of cryptographic algorithms covered by the '187

26  Patent, it did not address which inputs into any such cryptographic algorithms constituted the

27  claimed "private key."  *See id.*  The Court thus asked the parties to submit supplemental briefs

28

*United States District Court*
*Northern District of California*

9

**Appx40**

1    addressing the question: "is a private key any input into a cryptographic algorithm including the

2    input that is modified by the algorithm, or must it be the input that prompts the modification to

3    occur?" *Id.*

4            1.    <u>Background</u>

5            Before turning to the dispute at bar it is useful to understand the difference between

6    "keyed" and "non-keyed" cryptographic techniques.  According to Dr. Sherman, Google's expert,

7    some cryptographic algorithms require a key ("keyed cryptographic algorithms"), while other

8    algorithms do not require a key ("unkeyed cryptographic algorithms").  *See* Dkt. No. 216, Ex.1,

9    Supplemental Expert Report of Alan T. Sherman ("Sherman Supp. Rpt.") ¶ 22.  The parties agree

10   that for keyed algorithms, which require a key input, the required key controls the operation of that

11   algorithm.  *Id.* ¶ 24.[3]  The Court refers to this input as the keyed algorithm's required key.

12   Literally speaking, this required key is a string or sequence of characters, usually pseudo-

13   randomly generated, that is designed to work with a given algorithm and which controls the

14   algorithmic function.  *See* Sherman Op. Rpt. ¶ 50; Mot., Ex. U (Sherman 3/8/21 Dep.) at 16:5-9.

15   Below are some examples of cryptographic techniques to illustrate how keys are used.

16           **Encryption and decryption algorithm (keyed).**  In an encryption algorithm, a sender

17   encrypts a message from plaintext (a readable message) to ciphertext (obfuscated, unreadable text)

18   using a required key, and sends the enciphered message to the receiver, that decrypts that message

19   using a required key.  *See* Sherman Op. Rpt. ¶¶ 51-52.  There are both symmetric and asymmetric

20   versions of this process.  *Id.*  In the symmetric scenario, the same required key is used to encrypt

21   and decrypt the message.  *Id.* ¶ 51. In the asymmetric scenario, different required keys are used to

22   encrypt and decrypt the message.  *Id.* ¶ 52.  In the asymmetric model, the required keys work in a

23   pair; the message encrypted by the recipient's public required key (which it shares with everyone)

24   can only be decrypted using the recipient's private required key (which is only known to the

25   recipient).[4]  These techniques are depicted below:

26   _____

27   [3] Google refers to this as the "specified" or "named" key input.  Sherman Supp. Rpt. ¶ 24.

28   [4] *See* Digital Signatures and Certificates, geeksforgeeks.org (Last updated June 26, 2024)
     https://www.geeksforgeeks.org/digital-signatures-certificates/# (cited by Dr. Sherman at Sherman

                                          10



*Id.* ¶ 51 (symmetric).



*Id.* ¶ 52 (asymmetric).   The keys depicted on either side of the above diagrams are the **algorithm's** required keys; the keys are a string of characters that controls the encrypting and decrypting algorithm.  *See* Sherman Supp. Rpt. ¶ 24.

**Hash functions (non-keyed).**  Hashing is one technique that does not require a key input. Specifically, a hash function is a publicly known mathematical function that transforms a piece of data of any arbitrary length into a fixed-**length string of characters, "like compressing a large balloon into a compact ball."**  *Cryptography ⸺ Hash Functions*, TutorialsPoint (available at https://www.tutorialspoint.com/cryptography/cryptography_hash_functions.htm) (cited by Dr. Sherman at Sherman Op. Rpt. ¶ 54).  Literally speaking, the hash function is a calculation, and there are different types of commonly used hash functions.  *See id.* (SHA-1 (Secure Hash Algorithm 1)).  It is useful for security because it is a one-way function, meaning it is impossible

Op. Rpt. ¶ 53) (describing public and private key pairs).

United States District Court
Northern District of California

11

**Appx42**

to figure out the original message from its hash value.  *See id.*  It is also deterministic; the input will always result in the same output, and no two inputs are known to result in the same output. *Id.*  A hashing function technique is depicted below:



Sherman Op. Rpt. ¶ 54.  In the hashing technique depicted, a sender hashes data, and then sends both the hashed data and the raw data to the receiver.  *See id.*  The receiver will hash the raw data using the same hashing function as the sender.  *Id.*  If the computed hash matches the received hash data, then the receiver has verified the that the data was sent by the intended sender and not modified in transit.  *See id.*  There is no required key in this cryptographic technique as depicted since there is no algorithm to be controlled by a required key input; it is an unkeyed technique. *See id.*[5]

   **Digital signature algorithm (keyed).**  Another keyed cryptographic technique is digital signing.  In this protocol, a piece of data (which can be virtually any piece of data)[6] is entered into the signing algorithm, along with a private required key input.  *Id.*  The data input is hashed[7] and

---

[5] Note that there are also keyed hash functions, that use a required key.  *See* Sherman Supp. Rpt. ¶¶ 22-24.

[6] Dkt. No. 195, Ex. K (Sherman Dep.) at 102:16-103:16 (explaining that any digital data can be encrypted); Mot. at 5 ("[A] cryptographic algorithm is not designed to work only with a particular data input. Rather, such algorithms can be used with virtually any data input, allowing the algorithm to, e.g., encrypt, decrypt, or digitally sign whichever data or message is input.").

[7] To restate: "[a] hash function in cryptography is like a mathematical function that takes various inputs, like messages or data, and transforms them into fixed-length strings of characters. Means the input to the hash function is of any length but output is always of fixed length. This is like compressing a large balloon into a compact ball." *Cryptography – Hash Functions*, TutorialsPoint (available at https://www.tutorialspoint.com/cryptography/cryptography_hash_functions.htm) (cited by Dr. Sherman at Sherman Op. Rpt. ¶ 54).

**Appx43**

United States District Court
Northern District of California

then encrypted using the sender's private required key; the signature is comprised of the hashed

and encrypted piece of data. *Digital Signatures and Certificates*, geeksforgeeks.org (last updated

June 26, 2024) https://www.geeksforgeeks.org/digital-signatures-certificates/# (cited in Sherman

Op. Rpt. ¶ 53). The signer next sends the data and the signature to the recipient. *Id.* The receiver

uses the verification algorithm to verify the authenticity of the data. *Id.* To do this, the

verification algorithm **decrypts the signature using the sender's public required key,**[8] revealing the

hashed version of the data input. *Id.* The verification algorithm also hashes the raw data that was

sent to it. *Id.* If the decrypted hash value from the signature matches the hash value of the raw

data, that recipient knows that the raw data sent to it was from the sender and not some other

source, and that the data was not modified in transit. *Id.* The data has been verified. This is

depicted below:



Sherman Op. Rpt. ¶ 53. Again, the key depicted on either side of the above diagram is the

required key. *See* Sherman Supp. Rpt. ¶ 24. The required keys are strings of characters that

control the algorithm: the required key input **(signer's private key)** controls the encryption of the

hashed data input by the signing algorithm, and the required key input **(signer's public key)**

controls the decryption of the signed data input by the verification algorithm. *See* Sherman Supp.

Rpt. ¶ 24.

---

[8] Note that the signature that was encrypted with the sender's private named key can only be decrypted with the private key's public named key pair. Digital Signatures and Certificates, geeksforgeeks.org (Last updated June 26, 2024) https://www.geeksforgeeks.org/digital-signatures-certificates/# (emphasis added) (cited by Dr. Sherman at Sherman Op. Rpt. ¶ 53).

13

2. <u>Dispute</u>

With this background in mind, the Court turns to the dispute at bar. Again, this Court previously construed "private key" as "[a] non-public key that is used as an input to a cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be computed." Dkt. No. 108 at 11. In the present filings, the parties agree that the term "private key" refers to a keyed algorithm's required key, *i.e.*, a string or sequence of characters that controls the algorithm. *See* Mot. at 7; Opp. at 5-9. To exemplify:



Sherman Op. Rpt. ¶ 53 (red annotation added). Again, the parties agree the highlighted icon (the keyed algorithm's required key input) is a "private key." *See* Mot. at 7; Opp. at 5-9. But Google argues for a definition which also includes within its scope **data inputs** into cryptographic algorithms, including, in particular, authentication or authorization keys. Google explains:

> A cryptographic key can be used in two ways as an input to a cryptographic algorithm. First, the key can be used as a specified key (i.e., a "named" key) if the algorithm requires an input key. . . . For example, a signature algorithm can take a specified or named key as the specified key input, and that specified key input controls the operation of the signature algorithm, i.e. that specified key input is used to sign the data being operated on. . . . **Second, for any algorithm, with or without a specified input key, a key can be a data input to the algorithm. . . . For example, a verification algorithm can take an authentication or authorization key as the data input and a separate verification key as the specified key.**

Sherman Supp. Rpt. ¶ 39 (emphasis added). As far as examples of such authentication or authorization keys, Dr. Sherman provides: "There are many examples of commonly used authentication and authorization keys. For example, passwords are used to control access to computer systems. Launch keys control the ability to launch nuclear missiles. Application

14

**Appx45**

1    Interface (API) keys control the ability of software to make calls to certain commands in a

2    software package. Authentication keys enable systems to verify the identity of the holder of the

3    authentication key." *Id.* ¶ 32.

4    Ultimately, Google's position is illustrated below, where **both** highlighted inputs (data and

5    Private Key) would fall under the definition of a "private key":



13   Sherman Op. Rpt. ¶ 53 (red annotation added).

14   Sonos on the other hand, argues that the term "private key" refers to a non-public

15   cryptographic key that is used as the *key* input (rather than as the *data* input) to a cryptographic

16   algorithm. Mot. at 2. It describes a cryptographic key as a string of characters designed to *control*

17   a cryptographic algorithm. *Id.* at 4. Put differently, Sonos argues that the term refers only to a

18   required key input to a cryptographic algorithm, not the data input. *See id.* at 2-4.

19          3.    Construction of "private key"

20   For reasons set forth below, the Court finds that the term "private key" as used in the '187

21   Patent is a non-public cryptographic key that is used as the key input (rather than *solely* as the data

22   input) to a cryptographic algorithm. A "cryptographic key," is a string of characters designed to

23   control a cryptographic algorithm.

24   To support its position, Sonos explains that that there is a "well-known distinction between

25   the cryptographic keys that control cryptographic algorithms and the data upon which those

26   cryptographic algorithms act." Mot. at 7. To this end, according to Sonos:

27

28

**Appx46**

United States District Court
Northern District of California

> [A] cryptographic algorithm is designed to work specifically with a
> particular, corresponding kind of cryptographic key. By contrast, a
> cryptographic algorithm is not designed to work only with a
> particular data input. Rather, such algorithms can be used with
> virtually any data input, allowing the algorithm to, e.g., encrypt,
> decrypt, or digitally sign whichever data or message is input.

*Id.* at 5. Put differently, Sonos argues that a key *controls* the algorithm (it *e.g.*, encrypts, decrypts, or signs a piece of data), while the data is the *object* of the algorithmic function (it is *e.g.*, encrypted, decrypted, or signed). *See id.* at 5-8 (citing Sherman Rpt. ¶¶51-53, Mot. Exs. N (description of digital signature algorithms), M (Expert Report of Dr. Wicker) ¶¶ 199-201, O-T (technical dictionary definitions), '187 Patent at 2:45-49, 6:60-62); Sonos Reply at 2, 6-10.

Google responds that a data input that is not designed to *control* the algorithm but is the *object* of the algorithm may also be a private key. To this end, Google argues: "a 'private key' should be properly construed as "any input into a cryptographic algorithm." Opp. at 7 (citing Sherman Supp. Rpt. ¶¶ 31-48). To support its position, it argues that: (1) multiple keys can be input into a cryptographic algorithm at one time; and (2) authentication and authorization keys, which are mere data inputs, are considered private keys. *See id.* at 7-10.

The Court rejects Google's assertion that a private key can be comprised of data input which never functions as the algorithm's required key that controls a cryptographic algorithm. Google's broad construction of "private key" is not supported by intrinsic or extrinsic evidence in the record.

### a. Intrinsic evidence

The '187 Patent specification provides, in the context of public-key cryptography, that: "[t]he private **key** is used for either **decrypting** data or **generating** digital signatures and the public **key** is used for either **encrypting** data or **verifying digital signatures**." Dkt. No. 185-3, Ex. A ('187 patent) at 2:45-49 (emphasis added). As used in this passage, a "key" is an input used to decrypt, encrypt, generate, and verify. The key is juxtaposed against (and thus in contradistinction with) "data"; the specification uses "data" to describe the input that is the object of the algorithm – it is encrypted and decrypted. Accordingly, the Patent's use of the term "key" appears to refer to a keyed algorithm's required key input, *i.e.*, the input that controls the algorithm (as opposed to the input data being *e,g,* decrypted, as illustrated below:

16

United States District Court
Northern District of California

Sherman Op. Rpt. ¶ 52 (red annotation added). Thus, this passage from the Patent's specification comports with Sonos's proposal that a private key is a non-public cryptographic key that is used as the key input (rather than as the data input) to a cryptographic algorithm, where a cryptographic key is a string of characters designed to control a cryptographic algorithm. Again, it is not the data that is the object of that algorithm.[9]

The specification also uses the term "key" in discussing a technique whereby a key is itself encrypted by another key[10]; the specification describes that: "[the] content encryption **key** is **encrypted** with the DRM public **key** so it can be **decrypted** only using the DRM private **key**. '187 Patent at 4:52-56, 6:57-62. Per this passage, the DRM key encrypts and decrypts the content encryption key. *See* '187 Patent at 4:52-56, 6:57-62 (describing that the DRM keys are used to decrypt the content encryption key). Thus, the passage indicates that the DRM key functions as the required key that controls the DRM algorithm; it encrypts/decrypts a piece of data (the content encryption key).

---

[9] The "unit private key," discussed in the '187 Patent specification, is an example of such a "private key" used in a public-key cryptographic technique. Namely, the specification describes that the device may "use its unit private key to respond to a challenge." '187 Patent at 4:20-24, 6:38-40. Dr. Sherman agrees that this "challenge" refers to the "challenge response protocol." Reply, Ex. V (Sherman Dep. Tr.) at 56:5-57:9. The challenge response protocol "involves the use of public-key cryptography." '187 Patent at 3:1-7. Put differently, the unit private key is used as a private key in the context of a public-key cryptographic algorithm; it is the required key input that *e.g.*, encrypts/decrypts, and is juxtaposed with the data input that is *e.g.*, encrypted/decrypted.

[10] Dr. Sherman calls this technique "wrapping keys." *See* Sherman Supp. Rpt. ¶ 25 (describing technique of "wrapping keys" or encrypting encryption keys).

Appx48

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Also per this passage, the content encryption key is the data input to the DRM algorithm;

2   it is the object of the algorithm that is encrypted/decrypted using the DRM keys.  *See id.*  But the

3   content encryption key, embedded in the input data of the DRM algorithm, also controls the

4   encryption and decryption of content in the content encryption algorithm.  *See* '187 Patent at 4:53-

5   56, 6:57-62 ("[the] encrypted encryption key (content encryption key) [is] needed to render

6   (execute) the digital content. . . .  "[i]n order to execute digital content . . . user equipment must

7   access DRM private key . . . and uses it to decrypt the content encryption key from the rights

8   object. . . Content is decrypted, and is rendered by application").   While this example shows that a

9   key can take the form of data input, even if it is found in such input, still, at some point, it controls

10  an algorithmic function.  Namely, the DRM key controls encryption/decryption of the content

11  encryption key.  *See id.* at 4:52-56, 6:57-62.  The content encryption key, in turn, controls the

12  encryption/decryption of content.  *See id.* at 4:53-56, 6:57-62.  In short, the fact that a key is

13  encrypted as part of data input does not change the fact that it is a key.

14    The specification is thus consistent with Sonos's position that a key is something that, in at

15  least one context, controls an algorithm; a data input — that *solely* functions as the object of such

16  an algorithm and does not control the algorithm — is not a key.

17    Accordingly, Sonos's definition of "private key" is supported by intrinsic evidence.  *See*

18  *Eon Corp. IP Holdings LLC*, 815 F.3d at 1320 ("A party is . . . not entitled to a claim construction

19  divorced from the context of the written description and prosecution history."); *Cont'l Circuits*

20  *LLC v. Intel Corp.*, 915 F.3d 788, 796 (Fed. Cir. 2019) ("the specification 'is always highly

21  relevant to the claim construction analysis … [and] it is the single best guide to the meaning of a

22  disputed term'") (quoting *Phillips*, 415 F.3d at 1315).  As discussed below, it is also supported by

23  extrinsic evidence.

24        b.    Extrinsic evidence

25    Extrinsic evidence in the record also supports the conclusion that a "private key" refers to a

26  string of characters that is designed to control a cryptographic algorithm — the required key to a

27  keyed cryptographic algorithm and not the data input that that serves solely as the object of a

28  cryptographic algorithm.

18

Dictionaries from the time of the invention distinguish between a "key" on the one hand and generic terms such as "data," "information," or "message" on the other, wherein the latter describes the object of the algorithm:

- Microsoft Computer Dictionary, 5th Ed. (2002) defines "cryptography" as "The use of codes to convert **data** so that only a specific recipient will be able to read it using a **key**." Mot., Ex. O at 135 (emphasis added).

- Microsoft Computer Dictionary, 5th Ed. (2002) defines "key" as "In encryption and digital signatures, a **string of bits** used for encrypting and decrypting **information** t be transmitted." Mot., Ex. P at 300 (emphasis added).

- Dictionary of Computer Science, Engineering, and Technology (2001) defines "key" as "in encryption, a value used to encrypt or decrypt **a message** according to the algorithm decrypt (key,encrypt(key,message))=message." Mot., Ex. Q at 266 (emphasis added)

- The New Penguin Dictionary of Computing (2001) defines "key" as "In cryptography, a piece of secret additional information that must be known in order to decode a encrypted **message**." Mot., Ex. S at 267 (emphasis added)

- Webster's New World Dictionary of Computer Terms, 8th Ed. (2000) defines key as "In cryptography, the procedure that is used to encipher the **message** so that it appears to be just nonsense. The **key** also is required for decryption. Public key cryptography uses two keys: a private key and a public key. A user makes the public key known to others, who use it to encrypt **messages**; these messages can be decrypted only by the intended recipient of a **message**, who uses the private **key to do so**." Mot., Ex. T at 306.

These definitions are harmonious with Sonos's reading of the term. The "message" or "information" referred to in these definitions is the data input; the "key" decodes, encrypts, etc. the message or information.

Moreover, expert testimony from **both** parties supports the conclusion that the term "private key" refers to a keyed algorithm's required key, a string of characters designed to control

19

**Confidential Material Redacted**

the algorithm.  Google's expert Dr. Sherman testified during the first round of claim construction:

> In my opinion, the term "private key" had a well-known meaning to those of ordinary skill in the art in the November 2002 time frame. *It* is a **cryptographic key**, or **string of characters**, that is kept private and can be used in asymmetric encryption systems, symmetric encryption systems or for some other purpose, such as for computing a digital signature.

Dkt. No. 69-5, Ex. 5, ¶ 56 (emphasis added). Moreover, Dr. Sherman testified:

> A cryptographic key is a key **sequence of characters** that is an input to a cryptographic algorithm where the algorithm is **designed** such that **if you don't know the key, you cannot compute its output**.

Sonos Reply, Ex. L (Sherman Dep. Tr.) at 16:5-9 (emphasis added).  Put differently, Dr. Sherman described that the key is bespoke, or uniquely tailored to work with a corresponding cryptographic algorithm ("designed") and controls the algorithmic function.  As Dr. Sherman put it, "if you don't know the key, you cannot compute its output"; the key is critical to the "computation" of the output – it has an operative effect.

While this comports with Sonos's definition, it is **not** conducive to Google's assertion that a private key includes an algorithm's data input; both parties describe such data input as something not specifically designed for an algorithm, as an algorithm can operate using virtually any data as an input.  *See* Dkt. No. 195, Ex. K (Sherman Dep.) at 102:16-103:16 (explaining that any digital data can be encrypted).[11]  Sonos's expert, Dr. Wicker, likewise testified that "the algorithm that a cryptosystem uses to map plaintext to ciphertext *is controlled by a key*, which may take the form of a relatively short string of letter and/or numbers" and which "is often called a 'private key.'" Mot., Ex. M (Wicker Rpt.) ¶57 (emphasis added).

Conversely, there is no persuasive support for Google's position that a person of ordinary skill in the art ("POSITA") in November 2002 would use the term private key to describe a "specified data input of a cryptographic algorithm, as is typically done for authentication and authorization (private) keys." Google Reply at 5 (citing Sherman Supp. Rpt. ¶¶ 37-39).  Dr.

---

[11] ████████████████████████████████████████ *See* Mot., Ex. M (Wicker Rpt.) at ¶¶199- 201; Sherman Op. Rpt. ¶¶232, 387, 403, 439, 665.

United States District Court
Northern District of California

1  Sherman points to two specific examples to support his position: (1) the October 2012 OAuth 2.0

2  Authorization Framework that uses Bearer Tokens.; and (2) the Kerberos authentication service

3  developed in 1988 at MIT.   Neither are persuasive.

4  **OAuth 2.0 Authorization Framework**. This first example pertains to the use of

5  authentication keys.  In this particular instance, Dr. Sherman opines that the OAuth 2.0

6  Authorization Framework uses a **"Bearer Token," which he describes as an example of**

7  authentication or authorization keys that function only as data inputs and that constitute private

8  keys.  *See* Sherman Supp. Rpt. ¶¶ 43-46.

9  This evidence is not germane; this protocol was introduced in October 2012, nearly a

10  decade after the time of the invention in November 2002.  *See* Sonos Reply, Ex. Z

11  (https://www.rfc-editor.org/rfc/pdfrfc/rfc6750.txt.pdf) (cited by Dr. Sherman at Sherman Supp.

12  Rpt.  ¶¶ 34-36) ("RFC Editor").  The evidence is **thus not probative to the claim term's meaning**.

13  *See, e.g.*, Manual of Patent Examining Procedure § 2141(II)(C) (**a POSITA is** "a hypothetical

14  person who is presumed to have known the relevant art *at the time of the invention*") (emphasis

15  added); *Phillips*, 415 F.3d at 1312-13 (similar).[12]

16  In any event, in explaining what a Bearer Token is, Dr. Sherman cites literature that

17  specifically distinguishes a Bearer Token from a key; it describes:

18  Any party in possession of a bearer token (a "bearer") can use it to
   get access to the associated resources (**without demonstrating**
19  **possession of a cryptographic key**). To prevent misuse, bearer
   tokens need to be protected from disclosure in storage and in
20  transport.

21  RFC Editor at 1 (Abstract) (emphasis added).   Indeed, this literature introducing the OAuth

22  protocol **uses the term "Bearer Token" on the one hand, and distinguishes it from a key on the**

23  other, by describing that the Bearer Token is something used to gain access to resources **without**

24  **possession of a key**.  *See id.*  Thus, even if the OAuth 2.0 framework were relevant despite its

25

26

---

27  [12] Google does not dispute that the definition of the term in November 2002 governs.  *See* Opp. at
   **7 (describing meaning of "private key" to a POSITA in November 2002 to supports its proposed**
28  construction); Sherman Supp. Rpt. ¶ 37 (opining upon the definition known to a POSITA in
   November 2002 by reference to the Kerberos protocol to illustrate the meaning of the patent term).

21

**Appx52**

United States District Court
Northern District of California

United States District Court
Northern District of California

1    timeframe, it appears that the Bearer Token is not considered a key as Dr. Sherman opines.

2          Moreover, Dr. Sherman's testimony as to whether and when a simple password or pin (*i.e.*,

3    "authorization or authentication keys," *see* Sherman Supp. Rpt. ¶ 32) constitutes a private key is

4    inconsistent. *Compare* Dkt. No. 219-4 at 45:17-46:2 (opining that a simple password or pin

5    would constitute cryptographic key) *with* Dkt. No. 185-5, Ex C (Sherman Dep. Tr.) at 117:4-20

6    (testifying that looking up and matching data *i.e.*, checking if a password is correct, would not

7    qualify as a cryptographic technique). And Dr. Sherman acknowledges that a simple password or

8    pin would not so qualify as a key. For example, in one cryptography textbook that Dr. Sherman

9    cites as authoritative, Sherman Supp. Rpt. ¶¶ 20, 25, "cryptographic algorithm" is described as a

10   large set of transformations where "the particular transformation in effect depend[s] on the

11   cryptographic key being used" and where "each transformation changes sequences of intelligible

12   data (plaintext) into sequences of apparently random data (ciphertext)," Sonos Reply, Ex. W at 14.

13   This again reflects that the key controls the algorithm; a simple password or pin – without other

14   qualifiers – does not satisfy the definition. To the extent that Dr. Sherman's position is that any

15   and every password or pin constitutes a private key, he does not support to authority supporting

16   such a strikingly broad definition. Ultimately, Dr. Sherman's report is not clear as to precisely

17   when and in what context a password or pin would constitute a private key; his ambiguously

18   defined and ill-supported opinion as to the meaning of the term "private key" is insufficient to

19   overcome the substantial evidence (both intrinsic and extrinsic) supporting Sonos's reading of the

20   term.

21          **Kerberos protocol, MIT 1988.** Dr. Sherman opines that the Kerberos protocol developed

22   by MIT in 1988 exemplifies that a data input is a key, as shown by the function of a **ticket** in that

23   protocol, which he would name a private key. He explains:

24                In Kerberos, a client requests an access key (called a "ticket") from
25        a Ticket Granting Server (TGS). The TGS issues a ticket (a private
          access key) to the client and encrypts it with the Service Server Key.
26        In Kerberos, the Service Server is the server that provides the
          protected resource. Note that Kerberos uses the well-known and
27        commonly used strategy of protecting a key by encrypting it. The
          client presents the ticket to Service Server. The Service Server
28        verifies the ticket by decrypting it. In this verification step, the
          encrypted ticket (encrypted private access key) is the data input to

1          the verification algorithm. In Kerberos, this verification algorithm is
           decryption, with the specified decryption key being the Service
2          Server key.

3     Sherman Supp. Rpt. ¶ 37. But in reviewing the underlying literature, the Kerberos protocol does

4     not ever refer to the ticket as a "key" as Dr. Sherman opines. Instead, it uses the term "key" to

5     describe things that encrypt or decrypt other keys, authenticators, and tickets. *See* Dkt. No. 226,

6     Ex. AG ("Kerberos Protocol") at 2-3 (defining private keys), 4-6 (describing protocol). The term

7     "key" is never used to describe something that only functions as the data input, i.e., the object of

8     the algorithm, instead those inputs are referred to as "authenticators" and "tickets." *See id.* at 4-6.

9          The Kerberos protocol functions as follows. There are three main parts to the protocol. *Id.*

10    at 5. The client first engages with the Authentication Server to get items that will let it

11    authenticate itself with the Ticket-Granting-Server. *See id.* at 4-6. The Ticket-Granting-Server

12    gives it items to engage with the Service Server, allowing the client to access a given service. *See*

13    *id.*

14         The client first engages with the Authentication Server. It sends the Authentication Server

15    its user ID. *Id.* The Authentication Server will check if the user is in the database. If it is, the

16    Authentication Server will generate the **client's secret key**, which is a hash of the client password.

17    The Authentication Server send two messages back to the client. *Id.* Message 1 is a **TGS/session**

18    **key**, encrypted using the **client's secret key**. *Id.* Message 2 is the ticket. *Id.* The **ticket** is

19    comprised of: (1) the client ID; (2) the network ID; (3) the validity period for the ticket; and (4)

20    the client's **TGS/session key**. *Id.* The ticket is itself encrypted by the Authentication Server's own

21    secret key (the "TGS Secret key"). *Id.* The client can decrypt Message 1 using its **secret key**,

22    which is a hashed version of its password (which the client knows), thereby gaining access to the

23    client **TGS/session key**. *Id.* The client cannot decrypt Message 2 because that message is

24    encrypted using the **TGS secret key**, which the client does not have. *Id.*

25         Next, the client sends Message 3 to the Ticket-Granting Server ("TGS"), which is

26    comprised of Message 2, i.e., the **ticket** (which is still encrypted (wrapped) by the **TGS secret**

27    **key**) and a service ID, identifying the service it would like access to. *Id.* The client also sends

28    Message 4, which is called an **authenticator** and is comprised of the client ID, that is encrypted

23

**Appx54**

1    by the client's **TGS/session key**. *Id.* The TGS server then decrypts the client's **ticket** using its

2    own **TGS secret key**. *Id.* The TGS server now has access to the client's client ID, network ID,

3    and **TGS/session key** (which was in the ticket). *Id.* The TGS server decrypts Message 4 using the

4    **TGS/session key** that it just decrypted. *Id.* The TGS server then compares the client ID in

5    Message 4 with the client ID in the ticket from Message 2. *Id.* If both client IDs match, the client

6    is authorized to access the requested service. *Id.*

7         The TGS then sends back Message 5 which is the **CLS/ticket**, comprised of the client ID

8    and **CLS/session key**, encrypted using the **SS secret key**. *Id.* The TGS also sends the client

9    Message 6, which is the **CLS/session key** encrypted using the client's **TGS/session key**. *Id.*

10        The client sends Message 5 to the Service Server. It also sends Message 7 to the Service

11   Server which is an **authenticator** comprised of the client ID and a timestamp, encrypted with the

12   **CLS/session key**. *Id.* The Service Server decrypts Message 5 with the **SS secret key**, revealing

13   the client ID and the **CLS/session key**. *Id.* The Service Server uses the **CLS/session key** to

14   decrypt Message 7, which contains the client ID. *Id.* If the two client IDs match, then the Service

15   Server will send back Message 8, which is a timestamp encrypted using the **CLS/session key**. *Id.*

16   The client then decrypts Message 8 using its **CLS/session key**. *Id.* If the timestamp in Message 8

17   matches the timestamp in Message 7, then the client has confirmed the service it request is safe.

18   The protocol ends. *Id.*

19        In every instance the term "key" is used to describe something that, at some point, controls

20   the algorithmic function: it encrypts or decrypts something else. The term "key" is *never* used to

21   describe a data input that is solely the object of the algorithm (i.e., only ever encrypted or

22   decrypted by a key). To summarize:

23        • Client secret key: encrypts and decrypts the client's TGS/session key.

24        • TGS/session key: encrypts/decrypts the client's authenticator Message 4

25        • TGS Secret key: encrypts/decrypts the client's ticket.

26        • CLS/session key: encrypts/decrypts authenticator Message 7

27        • SS secret key: encrypts/decrypts CLS session key.

28   The Kerberos protocol uses the distinct terms "authenticator" and "ticket" to describe the inputs

24

**Appx55**

United States District Court
Northern District of California

**Confidential Material Redacted**

1    that exclusively function as data to be encrypted or decrypted (i.e., the object of the algorithm):

2       • Authenticator: encrypted/decrypted by TGS/Session key, and CLS/Session key.

3       • Ticket: encrypted/decrypted by the TGS secret key and SS secret key.

4    Thus, if anything, the Kerberos protocol developed by MIT in 1988 further exemplifies the point

5    that the term "key" refers to an input into a cryptographic algorithm that *controls* the algorithm (it

6    encrypts/decrypts) and not something that functions solely as the *object* of the algorithm (a data

7    input that is encrypted/decrypted). The key *can* function as the data input in some circumstances,

8    but if an input *only* acts as a data input, ***it is not a key.***

9        In sum, the '187 Patent use of the term "key" aligns with Sonos's proposed definition of

10   "private key," and extrinsic evidence supports this reading. In contrast, Google cites little to no

11   support for is proposed reading of the term "private key". Accordingly, the Court adopts Sonos's

12   proposed construction of the term: **a "private key" is a non-public cryptographic key that is**

13   **used as the key input (rather than solely as the data input) to a cryptographic algorithm. A**

14   **cryptographic key refers to a string of characters that is designed to control a cryptographic**

15   **algorithm. A private key is distinguished from a data input that only functions as the object**

16   **of a cryptographic algorithm.**

17   B.    Summary Judgment: Private Key

18       As Google conceded at oral argument, the viability of Google's claim turns on the claim

19   construction issue. Under Sonos's proposed construction of the term "private key," adopted by

20   this Court, a reasonable jury could not find that the accused AuthToken is a "private key."

21   ███████████████████████████████████████████████

22   ███████████████████████████████████████████████

23   ███████████████████████████████████████████████

24   ███████████████████████████████████████████████

25   ███████████████████████████████████████████████

26   ███████████████████████████████████████████████

27   ████████████████████████████████████

28   ███████████████████████████████████████████████

25

**Confidential Material Redacted**



To illustrate, Google asserts the below process occurs:

Sherman Op. Rpt. ¶ 53 (red annotation added).

*See* MSJ Order at 16

26

**Confidential Material Redacted**



Thus, as the term "private key" is construed herein, this claim element is not met. Moreover, the parties agree that the private key element is limiting for all claims asserted against the accused products. Accordingly, Sonos is entitled to summary judgment in its favor. *See Bayer AG.*, 212 F.3d at 1247 (finding that if any limitation of the claim is not met, infringement is negated as a matter of law).[13]

## IV.    CONCLUSION

The Court adopts Sonos's proposed construction of the term "private key": **A non-public cryptographic key that is used as the key input (rather than solely as the data input) to a cryptographic algorithm. A "cryptographic key" is a string of characters designed to control a cryptographic algorithm. A data input that solely functions as the object of the algorithm does not qualify as a "private key."**

Under that construction, a reasonable jury could not find that the accused AuthToken is a "private key." Accordingly, the Court **GRANTS** Sonos's Motion for Summary Judgment, finding non-infringement of the '187 Patent pursuant to the Authentication Theory of Infringement.

Because this order contains materials designated for sealing by the parties, the Clerk of Court is ordered to file this order provisionally under seal. The parties are to file a proposed

---

[13] Because the "private key" issue is dispositive, the Court declines to address the parties' dispute regarding the "based on" claim element.

27

**Appx58**

*United States District Court*
*Northern District of California*

1  public version of this order within two weeks of the date of this order. Redactions must be
2  narrowly tailored.

3      The parties are also ordered to file a joint status report within two weeks of the date of this
4  order to address the status of the claims against the '586 Patent and '375 Patent, and the pending
5  Motion for Judgment on the Pleadings, Dkt. No. 127. The Court sets a status conference (by
6  Zoom) for Tuesday, November 5, 2024, at 2:30 p.m.

7

8      This Order disposes of Dkt. Nos. 185 and 212.

9

**IT IS SO ORDERED**.
10

11

Dated: October 2, 2024
12

13

14

EDWARD M. CHEN
15  United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

28

US007899187B2

(12) **United States Patent**
Messerges et al.

(10) **Patent No.:** **US 7,899,187 B2**
(45) **Date of Patent:** **Mar. 1, 2011**

(54) **DOMAIN-BASED DIGITAL-RIGHTS MANAGEMENT SYSTEM WITH EASY AND SECURE DEVICE ENROLLMENT**

(75) Inventors: **Thomas Messerges**, Schaumburg, IL (US); **Ezzat A. Dabbish**, Cary, IL (US); **Larry Puhl**, Dundee, IL (US); **Dean Vogler**, Algonquin, IL (US)

(73) Assignee: **Motorola Mobility, Inc.**, Libertyville, IL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 683 days.

(21) Appl. No.: **10/306,494**

(22) Filed: **Nov. 27, 2002**

(65) **Prior Publication Data**

US 2004/0103312 A1      May 27, 2004

(51) **Int. Cl.**
*H04L 9/00*            (2006.01)
(52) **U.S. Cl.** .................................... **380/279**
(58) **Field of Classification Search** ......... 380/277–279, 380/270, 281, 282, 283; 713/156, 155, 164, 713/167, 171, 172
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,452,925 | B1 | 9/2002 | Sistanizadeh et al. | |
| 6,463,534 | B1 * | 10/2002 | Geiger et al. | 713/168 |
| 6,694,025 | B1 * | 2/2004 | Epstein et al. | 380/279 |
| 6,912,657 | B2 * | 6/2005 | Gehrmann | 713/171 |
| 6,980,660 | B1 * | 12/2005 | Hind et al. | 380/282 |
| 7,068,789 | B2 * | 6/2006 | Huitema et al. | 380/277 |
| 2002/0065778 | A1 * | 5/2002 | Bouet et al. | 705/57 |
| 2002/0144116 | A1 * | 10/2002 | Giobbi | 713/168 |
| 2002/0157002 | A1 * | 10/2002 | Messerges et al. | 713/155 |
| 2003/0076955 | A1 * | 4/2003 | Alve et al. | 380/201 |
| 2003/0120920 | A1 * | 6/2003 | Svensson | 713/168 |

| | | | | |
|---|---|---|---|---|
| 2003/0174838 | A1 * | 9/2003 | Bremer | 380/270 |
| 2003/0196089 | A1 * | 10/2003 | Alve et al. | 713/172 |
| 2004/0003251 | A1 * | 1/2004 | Narin et al. | 713/172 |
| 2004/0006708 | A1 * | 1/2004 | Mukherjee et al. | 713/201 |
| 2004/0054923 | A1 * | 3/2004 | Seago et al. | 713/201 |
| 2004/0062400 | A1 * | 4/2004 | Sovio et al. | 380/286 |
| 2004/0096063 | A1 * | 5/2004 | Carroni et al. | 380/279 |
| 2004/0103312 | A1 * | 5/2004 | Messerges et al. | 713/201 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| RU | 2183561 C2 | 1/1998 |
| WO | 9833656 A1 | 1/1998 |
| WO | 0115397 A1 | 3/2001 |

OTHER PUBLICATIONS

Rene Struik, IEEE P802.15 Wireless Personal Area Networks, Security for the 802.15.3 Wireless Personal Area Network (Draft!), Dec. 3, 2001.*

(Continued)

*Primary Examiner*—Beemnet W Dada

(57) **ABSTRACT**

New devices (**101**) are added to an existing domain by obtaining domain information (e.g., domain name and private domain password) from devices (**101**) already in the domain that preferably are in close proximity. Once the domain information has been transferred from the device already in the domain to the device being added to the domain, the device being added to the domain contacts a key issuer (**105**) to complete its registration into the domain. The key issuer returns a DRM domain private key (**206**) as well as a DRM certificate (**202**). Both are utilized by the device to obtain and render digital content (**204**).

**17 Claims, 2 Drawing Sheets**



US 7,899,187 B2
Page 2

## OTHER PUBLICATIONS

Venkatraman et al., A Novel Authentication Scheme for Ad hoc Networks, Wireless Communication and Networking Conference, 2000. WCNC. 2000 IE, vol. 3, Sep. 23-28, 2000, pp. 1268-1273.*
Gehrmann et al., Enhancements to Bluetooth Baseband Security.*
Gehrmann et al., The Personal CA—PKI for a Personal Area Network.*
Rene Struik, IEEE P802.15 Wireless Personal Area Networks, Dec. 2001.*
"Secure Digital Music Initiative" SDMI Portable Device Specification, Part 1, version 1.0; PDWG Los Angeles, Jul. 8, 1999.

"IBM Response to DVB-CPT Call for Proposals for Content Protections & Copy Management : XCP Cluster Protocol", [Online] Oct. 19, 2001: Retrieved from the Internet: Url:http://www.almaden.IBM.com/Software/DS/contenentassurance/Papers/XCP_DVB.P> [retrieved on Oct. 19, 2001].
Heuvel Van Den S A F A et al.: "Secure Content Management in Authorised Domains", International Broadcasting Convention, XX, XX, Sep. 15, 2002, pp. 467-474.
European Patent Office, "Supplementary European Search Report", Application No. EP03786705, Oct. 28, 2010, 4 pages.

* cited by examiner



FIG. 1



FIG. 2



301

USER DECIDES TO ENROLL A SECOND DEVICE INTO AN EXISTING DRM DOMAIN

303

USER INITIATES THE TRANSFER OF DOMAIN INFORMATION FROM A FIRST DEVICE, WHICH IS ALREADY IN THE DOMAIN, TO THE SECOND DEVICE

305

THE FIRST AND SECOND DEVICES ESTABLISH A SECURE AUTHENTICATED CHANNEL OVER A SHORT-RANGE LINK

307

THE FIRST DEVICE USES THE SHORT-RANGE LINK TO COMMUNICATE ITS DOMAIN INFORMATION TO THE SECIND DEVICE

309

THE SECOND DEVICE AND THE KEY ISSUER ESTABLISH A SECURE AUTHENTICATED CHANNEL OVER THE NETWORK

311

THE SECOND DEVICE USES THE SECURE NETWORK CHANNEL TO COMMUNICATE ITS UNIT CERTIFICATE AND DOMAIN INFORMATION(OBTAINED FROM THE FIRST DEVICE) TO THE KEY ISSUER

313

THE KEY ISSUER USES THE RECEIVED DOMAIN INFORMATION TO REGISTER THE SECOND DEVICE INTO THE SAME DOMAIN AS THE FIRST DEVICE

315

THE KEY ISSUER COMPLETES THE REGISTRATION OF THE SECOND DEVICE INTO THE EXSISTING DOMAIN BY USING THE SECURE NETWORK CHANNEL TO COMMUNICATE A DRM PRIVATE KEY AND DRM CERTIFICATE TO THE SECOND DEVICE

*FIG. 3*



401

DETERMINE THAT DOMAIN INFORMATION IS BEING TRANSFERRED TO DEVICE

403

DETERMINE TRANSMISSION MEANS

407                    405                    409

DO NOT ACCEPT          SHORT-RANGE          ACCEPT
DOMAIN INFORMATION   NO  LINK UTILIXED  YES  DOMAIN INFORMATION
                           ?

*FIG. 4*

US 7,899,187 B2

**1**

# DOMAIN-BASED DIGITAL-RIGHTS MANAGEMENT SYSTEM WITH EASY AND SECURE DEVICE ENROLLMENT

## FIELD OF THE INVENTION

The present invention relates generally to digital-rights management and in particular, to a method and apparatus for performing domain-based digital-rights management with easy and secure device enrollment.

## BACKGROUND OF THE INVENTION

The ease at which valuable digital content (e.g., music, games, video, pictures, and books) can be copied and shared is worrisome to content owners. It is critical that content owners are fairly reimbursed. Because of this, it is a requirement that content distributors implement secure measures that help prevent piracy. Digital-Rights Management (DRM) is a popular phrase used to describe such protection of rights and the management of rules related to accessing and processing digital items. Content owners hope to protect their valuable digital content using a DRM system that is implemented by secure, tamper-resistant electronic devices.

One method of DRM protection allows content sharing among a domain of devices. Such a domain of devices, may for example share the same payment method/account information (e.g., share the same credit card number, account number, . . . , etc.), as well as sharing access to digital works. For example, a user may pay to access a certain digital work (e.g., a movie) a single time. Since all devices that are part of a domain share account information, any device may access the digital work. However, after any device accesses the work, all other devices will be prevented from accessing the work. Similarly, a user may choose to pay each time a digital work is accessed. Accessing the digital work by any device within the domain will cause the user's account to be charged accordingly.

While such a DRM system enables a user-friendly method for content sharing, such a system presents two problems. The first problem is that a user faces the potentially cumbersome task of registering all of his devices into a domain. The second problem is that the security of content in a domain is potentially threatened if users can remotely register devices into a domain over a long distance. Therefore a need exists for domain-based digital-rights management with easy and secure device enrollment that increases the security of content.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a digital-rights management system in accordance with the preferred embodiment of the present invention.

FIG. 2 is a block diagram of the user equipment of FIG. 1 in accordance with the preferred embodiment of the present invention.

FIG. 3 is a flow chart showing operation of the digital-rights management system of FIG. 1 in accordance with the preferred embodiment of the present invention.

FIG. 4 is a flow chart showing operation of the user equipment of FIG. 2 in accordance with the preferred embodiment of the present invention.

## DETAILED DESCRIPTION OF THE DRAWINGS

To address the above-mentioned need, a method and apparatus for performing domain-based digital-rights manage-

**2**

ment with easy and secure device enrollment is provided herein. In accordance with the preferred embodiment of the present invention new devices are added to an existing domain by obtaining domain information (e.g., domain name and private domain password) from devices already in the domain that preferably are in close proximity. Once the domain information has been transferred from the device already in the domain to the device being added to the domain, the device being added to the domain contacts a key issuer to complete its registration into the domain. The key issuer returns the DRM domain private key as well as a DRM certificate. Both are utilized by the device to obtain and render digital content.

Both the use of a key issuer and the forced-short-range communication greatly improve ease of use, as well as security. Once domain information has already been established (such as domain name, password, etc.) for an initial device, it is cumbersome for users to remember and reenter the same information when they want to add new devices to their DRM domain. It is especially difficult to enroll devices after a long period of time has elapsed since the initial device was added to the domain or to enroll devices that may have limited user interfaces, such as a cellular phone, car radio, or set-top box.

It is much easier for a user if this DRM information can be obtained directly from a device that is already in the domain. However, merely allowing a new device to obtain domain information from an existing device is not sufficiently secure for enrolling the new device into the domain. Security is greatly enhanced if the new device then needs to send this DRM information to a trusted server (i.e., a key issuer) to complete its enrollment into the domain. With this approach, the key issuer can actively enforce domain enrollment and help improve security. A further security improvement over this approach is to force the DRM information to be transferred over a short-range-communication channel, rather than make it optional. Forcing short-range transfer of DRM information helps ensure that devices in the same domain were at one time physically near each other, which is one way to help enforce a security policy that devices cannot be added to a domain over large distances (e.g., using stolen DRM information propagated over the Internet).

Prior to describing the DRM system in accordance with the preferred embodiment of the present invention the following definitions are provided to set the necessary background.

Public-Key Cryptography—Cryptographic technique that uses a pair of keys, a public and a private key. The private key is used for either decrypting data or generating digital signatures and the public key is used for either encrypting data or verifying digital signatures.

Certificate—A digital certificate is block of data issued by a trusted certification authority. It contains expiration dates and a copy of the certificate holder's public key and identification data (e.g., address or serial number). The certificate-issuing authority signs the digital certificate so that a recipient can verify that the certificate is valid and thereby authenticate the certificate holder. Some digital certificates conform to a standard, X.509.

Digital signature—A digital signature (not to be confused with a digital certificate) is an electronic signature that can be used to authenticate the identity of the sender of a message or the signer of a document, and possibly to ensure that the original content of the message or document that has been sent is unchanged.

Digitally-signed object—a digital object comprised of data that is digitally signed. The digital signature is attached to the object.

US 7,899,187 B2

3

Authentication—The process of determining whether someone or something is, in fact, who or what it is declared to be. Authentication of a device or user can entail the use of a digital certificate and a challenge response protocol that involves the use of public-key cryptography. Authentication of a certificate entails verification of the digital signature of the certificate.

Turning now to the drawings, wherein like numerals designate like components, FIG. 1 is a block diagram of DRM system 100 in accordance with the preferred embodiment of the present invention. As shown, DRM system 100 comprises user equipment 101, key issuer 105, rights issuer 103, and network 107. User equipment 101 comprises those devices such as computers, cellular telephones, personal digital assistants, . . . , etc. that are capable of running an application that renders digital content. For example, user equipment 101 may be a personal computer equipped with an application to "play" an MPEG Audio Layer 3 (MP3) file, with an application such as a standard MP3 player. Similarly, user equipment 101 may comprise a cellular telephone equipped to play an MPEG Video Layer 4 file with a standard MPEG video codec. Other possible embodiments for user equipment 101 include, but are not limited to, set-top boxes, car radios, networked MP3 players, Personal Digital Assistants, . . . , etc. Other possible embodiments for digital content include, but are not limited to music, games, video, pictures, books, maps, software, . . . , etc.

Regardless of the form that user equipment 101 takes, user equipment 101 is configured so that short-range communication between various user devices 101 can take place. In the preferred embodiment of the present invention short-range communication can utilize any physical connection (e.g., a cable, docking connector, etc.) or a number of over-the-air communication system protocols such as, but not limited to Bluetooth, 802.11, 802.15, infrared, . . . , etc. As shown in FIG. 1, short-range communication takes place over short-range communication link 108.

Key issuer 105 comprises an application that establishes authenticated communications with user equipment 101 and then provides user equipment 101 with a DRM certificate and a DRM private key. The authenticated communications between key issuer 105 and user equipment 101 comprise a challenge-response protocol whereby a unit certificate and domain information are exchanged. The manufacturer of equipment 101 installs the unit certificate into equipment 101. This certificate identifies user equipment 101 as a trusted DRM-enabled device. The domain information includes information such as the domain name, private domain password, and desired domain action (e.g., creates a new domain, register into an existing domain, leave a domain, etc).

The DRM certificate, which is obtained via the authenticated communications with key issuer 105, is utilized by user equipment 101 when obtaining rights objects (i.e., licenses to digital content) from rights issuer 103. Rights issuer 103 utilizes the DRM certificate to authenticate equipment 101 and pass rights objects (licenses) associated with digital content to user equipment 101. Particularly, the DRM certificate comprises a DRM public key (the corresponding DRM private key is securely stored in user equipment 101), identification information (e.g., the unique serial number or model number belonging to the user equipment 101), and a digital signature generated by key issuer 105.

In accordance with the preferred embodiment of the present invention all long-range communication between devices takes place over network 107. Network 107 may take various forms such as but not limited to a cellular network, a local-area network, a wide-area network, . . . , etc. For

4

example, user equipment 101 may comprise a standard cellular telephone, with network 107 comprising a cellular network such as a code-division, multiple-access communication system.

Regardless of the form of user equipment 101, key issuer 105, short-range communication link 108, network 107, and rights issuer 103, it is contemplated that these elements within DRM system 100 are configured in well known manners with processors, memories, instruction sets, and the like, which operate in any suitable manner to perform the function set forth herein.

As discussed above, it is necessary that content distributors implement secure measures that help prevent piracy. Therefore, in the preferred embodiment of the present invention when a user purchases equipment 101 the user must first register equipment 101 with key issuer 105. After executing a secure authentication protocol, key issuer 105 will grant equipment 101 a DRM certificate and a DRM private key, allowing equipment 101 to obtain rights to digital content from rights issuer 103. In order to obtain the DRM certificate and the DRM private key, user equipment 101 and key issuer 105 must first execute a secure authentication protocol utilizing a unit certificate and unit private key that was installed on the equipment by the manufacturer. Domain information, such as the domain name, private domain password and desired domain action (e.g., create a new domain, register into an existing domain, leave a domain, etc), is also exchanged during the protocol.

Key issuer 105 authenticates the unit certificate (belonging to equipment 101) and then checks the domain information. If the domain information indicates that equipment 101 is being added to a new domain, key issuer 105 creates a new DRM public/private key pair. If equipment 101 is being added to an existing domain, key issuer 105 looks up that domain's DRM public/private key pair in a database. Key issuer 105 then creates a DRM certificate that contains all necessary information (e.g., the DRM public key, serial number, model number, etc.) for equipment 101 to obtain rights to digital content from rights issuer 103. Key issuer 105 then sends equipment 101 the DRM certificate and the DRM private key utilized by the domain.

When a user wishes to purchase rights to digital content from rights issuer 103, it provides rights issuer 103 with a DRM certificate. Thus in accordance with the preferred embodiment of the present invention, a DRM certificate (which contains the DRM public key) must be provided to rights issuer 103 before any rights to digital content will be transferred to the user. Rights issuer 103 will verify the authenticity of the DRM certificate and then generate a rights object based on information (e.g. the DRM public key) in the DRM certificate. Rights issuer 103 will then digitally sign the rights object and provide it to equipment 101. The rights object contains an encrypted encryption key (content encryption key) needed to render (execute) the digital content. The content encryption key is encrypted with the DRM public key so it can be decrypted only using the DRM private key.

As discussed above many customers prefer to access their digital content with several devices 101 (domain of devices) they may own. For example, a user may own a cellular telephone and a personal computer, both equipped with an MP3 player. The user may wish to utilize the same account to purchase digital content for both devices. Prior art solutions have attempted to solve this problem by allowing users to register their devices into a domain where digital content can be freely shared. While such a domain-based DRM system enables a user-friendly method for content sharing, such a system presents two problems. The first problem is that the

US 7,899,187 B2

5

user faces the potentially cumbersome task of registering all of his devices into a domain. For example, the domain information (such as domain name and private domain password, credit card information, . . . , etc.), exchanged with key issuer **105**, needs to be manually entered into user equipment **101** before it can be added to an existing domain. The second problem is that the security of content in a domain is potentially threatened if users can remotely register devices into a domain over a long distance. For example, if domain information (e.g. domain name and private domain password) was public information (e.g. perhaps stolen and then propagated on the Internet), then anyone could register their device in the domain and have access to digital content bought for that domain. The key issuer can revoke the DRM domain certificate to minimize damage, but the ability to remotely register devices into an existing domain will always make this a vulnerability. If the only method to register devices into an existing domain was done via a close proximity channel with another device already in the domain, the opportunity for intruders to breach the domain is reduced.

In order to address these issues, in the preferred embodiment of the present invention new devices are added to an existing domain by obtaining domain information (e.g., domain name and private domain password) from devices already in the domain that preferably are in close proximity. In order to assure that devices are in close proximity, the domain information may be allowed to be shared only over a physical connection or a short-range connection, where the user has physical control over both the device being added to the domain and the device already in the domain. In a first embodiment, a touch pad is utilized as an interface between devices. The transfer of domain information from one device to another is automatically initiated when contact between the two touch pads is made. In another embodiment, each device can have a button that initiates the setup of the "close proximity" channel. Allowing the transfer of domain information only over a "close proximity" link creates added security since the two devices must be physically nearby and under the direct physical control of the owner of the devices.

Regardless of the transmission means, once the domain information has been transferred from the device already in the domain to the device being added to the domain, the device being added to the domain contacts key issuer **105** to complete its registration into the domain. For example, the device being added to the domain (i.e., equipment **101**) provides its unit certificate and the domain information (acquired from equipment **101** already in the domain) to key issuer **105** and executes the previously mentioned authentication protocol.

FIG. **2** is a block diagram of user equipment **101** of FIG. **1** in accordance with the preferred embodiment of the present invention. As shown, user equipment **101** comprises storage **211** for storing DRM certificate **202**, application **203**, digital content **204**, rights object **205**, DRM private key **206**, unit certificate **207**, unit private key **208**, and domain information **209**. As known in the art, storage **211** may comprise any number of storage means, including, but not limited to hard disk storage, random-access memory (RAM), and smart card storage (e.g., Wireless Identity Module used in cellular telephones), . . . , etc. User equipment **101** additionally includes logic circuitry **210**, which in the preferred embodiment of the present invention comprises a microprocessor controller such as but not limited to a Motorola MC68328 DragonBall integrated microprocessor or a TI OMAP1510 processor. Finally, user equipment **101** comprises short-range communication unit **213**.

6

FIG. **3** is a flow chart showing operation of the digital-rights management system of FIG. **1** in accordance with the preferred embodiment of the present invention. The description that follows assumes that a first device is already registered with an existing domain. That is, it has domain information (e.g., domain name and private domain password) and has already obtained a DRM certificate that enables it to acquire rights to digital content from rights issuer **103**.

The logic flow begins at step **301** where a user decides to enroll a second device into an existing DRM domain. At step **303** the user initiates the transfer of domain information **209** from the first device, which is already enrolled in the domain, to the second device. Although data may be transferred among devices in many ways (e.g., via floppy discs, via email, . . . , etc.), in the preferred embodiment of the present invention, domain information **209** will only be accepted by a device if it is transferred via a short-range communication link, however in alternate embodiments the transfer of domain information **209** can take place utilizing any method (short/long range) for transferring data between devices.

At step **305** the first and second devices establish a secure authenticated channel over a short-range communication link. This link may be authenticated by various means. For example authentication can be established by the fact that the user has physical control over each device (perhaps by pressing a button), or by entering a temporary PIN or password into each device. The security of the link is established using known protocols, such as the Wireless Transport Layer Security (WTLS) or Secure Sockets Layer (SSL). Once secure short-range link **108** is established, the first device communicates its domain information **209** to the second device at step **307**. At step **309**, the second device uses the network link **107** (e.g., the cellular network or Internet) to contact key issuer **105**. The second device follows the same protocol with key issuer **105** as the first device did when establishing the domain, as already described above.

At step **311**, the second device communicates its unit certificate **207** to key issuer **105** and may use its unit private key **208** to respond to a challenge. Once the channel is established it sends the domain information **209** to key issuer **105**. At step **313**, the key issuer receives the domain information **209**, validates it (e.g., determines if domain name and domain password are valid), and if valid, registers the second device into the same domain as the first device. Finally, at step **315**, key issuer **105** completes the registration of the second device into the existing domain by using the secure network channel **107** to communicate the DRM private key **206** (utilized by every device within the domain) and a newly created DRM certificate **202** to the second device.

As discussed above, once a DRM certificate **202** has been obtained, rights object **205** to digital content **204** can now be obtained from rights issuer **103**. This process begins with DRM certificate **202** being provided to rights issuer **103** along with a request for digital content. In response, user equipment **101** receives rights object **205**, which enables access to digital content **204**. Both are stored in memory **211**. In order to execute digital content **204**, user equipment **101** must access DRM private key **206** and uses it to decrypt the content encryption key from rights object **205**. Content **204** is decrypted, and is rendered by application **203**. Logic circuitry **210** controls these functions.

FIG. **4** is a flow chart showing operation of user equipment **101** of FIG. **3** in accordance with the preferred embodiment of the present invention. In particular, the following steps show those necessary to obtain domain information **209** from another device **101** over a short-range communication link.

**Appx66**

US 7,899,187 B2

7

The logic flow begins at step **401** where logic unit **210** determines that domain information **209** is being transferred to device **101**. As discussed above, domain information **209** may be transferred among devices in many different ways. For example, domain information **209** may be received as an attachment to an email application (not shown), or may be received by a floppy disk drive (not shown). In this embodiment of the present invention logic circuitry **210** determines the transmission means for domain information **209** (step **403**), and at step **405** determines if the transmission means is a short-range transmission means. If at step **405** it is determined that the transmission means is a short-range transmission means, then the logic flow continues to step **409** where domain information **209** is accepted and stored in storage **211**, otherwise the logic flow continues to step **407** where domain information is not accepted.

As discussed above, prior art domain-based DRM systems allow devices to be enrolled into a domain by simply obtaining a user's domain information. This is potentially insecure if devices are allowed to enroll that may not be in physical possession of the same individual. For example, a user may add a new device into a domain by simply typing in the domain information, which could be obtained via email or the Internet. The above procedures would not allow new devices to be enrolled into a domain unless the steps of FIG. **3** and FIG. **4** were followed.

If all subsequent enrollments into the family of devices are forced to use short-range communication for enrollment, the newly added device is forced to be in direct physical control of the user, resulting in a more secure DRM system. Additionally, the use of key issuer **105** greatly improves security. For example, if a key issuer were not used then devices would need to share their DRM private keys and issue DRM certificates. Hackers would have an easier time breaching the security of such a system since they have physical access to their devices and can tamper with the hardware to try and create false DRM certificates. In the preferred embodiment of this invention, the key issuer is a trusted entity that is not physically accessible to the users to the DRM system. Hackers may attempt to breach the security of the key issuer, but since it cannot be physically attacked, security is improved.

While the invention has been particularly shown and described with reference to a particular embodiment, it will be understood by those skilled in the art that various changes in form and details may be made therein without departing from the spirit and scope of the invention. For example, although the above description was given with respect to receiving/transmitting domain information consisting of a domain name and domain password among devices, one of ordinary skill in the art will recognize that any data may be substituted for the domain information without varying from the scope of the invention. Also, for example, the above description was given with respect to using public and private keys. One of ordinary skill in the art would recognize that alternate methods of securing the DRM system are possible using symmetric key techniques or broadcast key encryption techniques. It is intended that such changes come within the scope of the following claims.

The invention claimed is:

**1**. A method for registering a new device as part of a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system, the method comprising the steps of:

receiving domain information corresponding to the domain of devices from a device existing within the domain of devices;

8

providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices; and

receiving the private key from the key issuer for use in accessing the protected digital content within the digital-rights management system.

**2**. The method of claim **1** wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving a domain name and a domain password from the device.

**3**. The method of claim **1** wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving domain information for the device existing within a domain of devices, all devices within the domain sharing account information.

**4**. The method of claim **1** wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving the domain information over a short range link.

**5**. The method of claim **1** further comprising the steps of:

determining if the domain information was received over a short-range link; and

not accepting the domain information if the domain information was not received over the short-range link.

**6**. The method of claim **1** further comprising the step of:

utilizing the private key to decrypt a second encryption key, the second encryption key utilized to decrypt digital content.

**7**. A method for registering a new device as part of a domain of devices, which share rights associated with a common account, for use in accessing protected digital content, within a digital-rights management system, the method comprising the steps of:

receiving domain information corresponding to the domain of devices from a device existing within the domain of devices;

determining if the information was received over a short-range communication link;

accepting the domain information only if the information was received over the short-range communication link from another device within the domain of devices;

providing the domain info to a key issuer causing the key issuer to issue a private key and a certificate to the new device, wherein the private key and the certificate are based on the domain information; and

receiving the private key and the certificate from the key issuer for use in accessing the protected digital content within the digital-rights management system.

**8**. The method of claim **7** further comprising the steps of:

providing the certificate to a rights issuer;

receiving an encrypted encryption key from the rights issuer; and

utilizing the private key to decrypt the encrypted encryption key.

**9**. The method of claim **8** further comprising the step of:

utilizing the encryption key to decrypt digital content.

**10**. An apparatus comprising:

communication circuitry receiving domain information from a device existing within a domain of devices, which share rights associated with a common account, for use

US 7,899,187 B2

**9**

in accessing protected digital content within a digital-rights management system;

storage for storing the domain information; and

logic circuitry for providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key for use in accessing protected digital content to the apparatus, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices.

**11**. The apparatus of claim **10** wherein the domain information comprises a domain name and a domain password.

**12**. The apparatus of claim **10** wherein the domain of devices share account information.

**13**. The apparatus of claim **10** wherein the logic circuitry determines if the domain information was received via short-range communication, and accepts the domain information only if the domain information was received via short-range communication from a device within the domain of devices.

**14**. The apparatus of claim **10** wherein the private key is utilize to decrypt a second encryption key, and the second encryption key is utilized to decrypt digital content.

**10**

**15**. The apparatus of claim **13** wherein the logic circuitry is adapted to accept the domain information only if the domain information was received from a device within the domain of devices, which is physically near the apparatus, when the domain information is received.

**16**. The method of claim **7** wherein accepting the domain information only if the information was received over the short-range communication link from another device within the domain of devices includes accepting the domain information only if the information was received from another device within the domain of devices, which is physically near the new device receiving the domain information, when the domain information is received.

**17**. The method of claim **5** wherein not accepting the domain information if the domain information was not received over the short-range link includes not accepting the domain information if the domain information was not received from a device within the domain of devices, which is physically near the new device receiving the domain information, when the domain information is received.

\*    \*    \*    \*    \*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

This brief complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared using a proportionally spaced typeface and contains 11,753 words (excluding portions excludable by the rules).

Dated: April 21, 2025                    /s/Dan L. Bagatell

                                Dan L. Bagatell

**CERTIFICATE OF AUTHORITY**

I declare under penalty of perjury under the law of the United States that I have the authority of my co-counsel David A. Nelson to include his electronic signature on this brief.

Dated: April 21, 2025                    /s/Dan L. Bagatell

                                Dan L. Bagatell

**CERTIFICATE REGARDING CONFIDENTIAL MATERIAL**

This brief contains 15 unique words (including numbers) marked confidential. This number does not exceed the maximum of 15 words permitted by Federal Circuit Rule 25.1(d)(1)(A).

Dated: April 21, 2025                      /s/Dan L. Bagatell

                                           Dan L. Bagatell

**CERTIFICATE OF SERVICE**

I certify that I served a copy of the confidential version of this brief on appellee's counsel by sending electronic mails to the following addresses:

| Person Served | Service Address |
| --- | --- |
| Elizabeth Moulton | emoulton@orrick.com |
| Alyssa M. Caridis | acaridis@orrick.com |
| Will Melehani | wmelehani@orrick.com |

Dated: April 21, 2025                      /s/Dan L. Bagatell

                                           Dan L. Bagatell