No. 25-1346

IN THE
# United States Court of Appeals for the Federal Circuit

GOOGLE LLC,

*Plaintiff-Appellant,*

*v.*

SONOS, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court for the
Northern District of California
No. 3:20-cv-03845-EMC, Hon. Edward M. Chen

## NON-CONFIDENTIAL RESPONSE BRIEF OF APPELLEE SONOS, INC.

Alyssa M. Caridis
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
355 S. Grand Avenue, Suite 2700
Los Angeles, CA 90071

Harmann P. Singh
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037

Elizabeth R. Moulton
Will Melehani
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700

Lauren A. Weber
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, WA 98101

*Counsel for Appellee*

# CLAIM LANGUAGE AT ISSUE

## U.S. Patent No. 7,899,187: Claims 1, 3, 4, 10, and 12

**1.** A method for registering a new device as part of a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system, the method comprising the steps of:

> receiving domain information corresponding to the domain of devices from a device existing within the domain of devices;

> providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices; and

> receiving the private key from the key issuer for use in accessing the protected digital content within the digital-rights management system.

**3.** The method of claim 1 wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving domain information for the device existing within a domain of devices, all devices within the domain sharing account information.

**4.** The method of claim 1 wherein the step of receiving the domain information from the device existing within the domain of devices comprises the step of receiving the domain information over a short range link.

**10.** An apparatus comprising:

> communication circuitry receiving domain information from a device existing within a domain of devices, which share rights

associated with a common account, for use in accessing protected
digital content within a digital-rights management system;

storage for storing the domain information; and

logic circuitry for providing the domain information to a key
issuer, which is separate from the domain of devices, causing the
key issuer to issue a private key for use in accessing protected
digital content to the apparatus, wherein the private key is based
on the domain information and is utilized by all devices within the
domain of devices.

**12.**  The apparatus of claim 10 wherein the domain of devices share
account information.

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number**    25-1346

**Short Case Caption**    Google LLC v. Sonos, Inc.

**Filing Party/Entity**    Sonos, Inc

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/01/2025          Signature:    /s/ Elizabeth R. Moulton

                          Name:        Elizabeth R. Moulton

iii

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Sonos, Inc. | | BlackRock Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

iv

FORM 9. Certificate of Interest

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☑  Additional pages attached

| See Attached | | |
|---|---|---|
| | | |
| | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐  Yes (file separate notice; see below)    ☑  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |

v

**Attachment**

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Orrick, Herrington & Sutcliffe LLP: Clement S. Roberts, Bas de Blank, Evan D. Brewer, Shane D. Anderson, Kristina D. McKenna

Lee Sullivan Shea & Smith LLP: George I. Lee, Sean M. Sullivan, Rory P. Shea, J. Dan Smith, Matthew J. Sampson, Cole B. Richter, David R. Grosby, Jae Y. Pak, Michael P. Boyea

# TABLE OF CONTENTS

**Page**

CLAIM LANGUAGE AT ISSUE ................................................................i

CERTIFICATE OF INTEREST .............................................................iii

TABLE OF AUTHORITIES ....................................................... x

STATEMENT OF RELATED CASES ...................................................xii

INTRODUCTION ........................................................................ 1

STATEMENT OF THE ISSUES ............................................................ 2

STATEMENT OF THE CASE ............................................................ 2

    Sonos's pioneering smart speakers can stream music and
        play music in sync in groups. ........................................................ 2

    The '187 patent describes a system in which devices share a
        private key across a "domain" to access protected
        content. ...................................................................... 9

    Google sues Sonos and raises two infringement theories. ............ 12

    The district court grants summary judgment of non-
        infringement to Sonos on Google's Strong-Encryption
        theory. ...................................................................... 16

    After additional briefing, the district court grants summary
        judgment of non-infringement to Sonos on Google's
        Authentication theory. ........................................................ 21

SUMMARY OF ARGUMENT ................................................................ 23

STANDARD OF REVIEW .................................................................. 26

ARGUMENT ................................................................................ 26

    I.    The District Court Correctly Granted Summary
        Judgment Of Non-Infringement Under The Strong-
        Encryption Theory Because Sonos Does Not Meet The
        "Utilized By All Devices" Limitation. ................................... 26

        A.    Google's expert conceded that Sonos's Controller
            is a device "within the domain of devices" but

CONFIDENTIAL MATERIAL OMITTED

does not "utilize" the private key to access protected content........................................................27

B.     When Sonos players are grouped for synchronous playback, they do not all "utilize" the ▮▮▮ Internal Technical Process private key.....................................................35

II.    The District Court Correctly Granted Summary Judgment Of Non-Infringement Under Google's Authentication Theory Because An AuthToken Is Not A Private Key. ........................................................46

A.     The plain meaning of "private key" refers to a key input to a cryptographic algorithm, not a data input. ..............................................................47

B.     Google misconstrues the district court's opinion and then attacks strawman arguments. .....................57

III.   The District Court Correctly Construed The Term "Based On," Consistent With The Claim Language, The Specification, And The Extrinsic Evidence. ........................63

A.     "Based on" requires a deterministic, rather than a merely causal, relationship between the domain information and the key that is issued.......................65

B.     Google's construction runs contrary to the evidence, rests on a distinction without a difference, and misconstrues the district court's order. ..........................................................68

CONCLUSION ....................................................................74

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF CONFIDENTIAL MATERIAL

## **Statement Regarding Confidential Material Omitted**

Pursuant to Federal Circuit Rule 25.1(e)(1)(B) and the Stipulated Protective Order (Dkt. No. 93), filed in the district court on May 5, 2021, material has been redacted from pages vii, 3-6, 8, 9, 14, 15, 17, 18, 21, 23-27, 35-37, 39-41, 44, 45, 47, 57, and 59-62 of this brief.  The redacted materials contain Sonos's internal technical process information.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Voip-Pal.com, Inc.*,
 976 F.3d 1316 (Fed. Cir. 2020) ................................................... 35, 45

*August Tech. Corp. v. Camtek, Ltd.*,
 655 F.3d 1278 (Fed. Cir. 2011) .............................................. 63

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
 512 F.3d 1338 (Fed. Cir. 2008) ........................................... 31

*Bicon, Inc. v. Straumann Co.*,
 441 F.3d 945 (Fed. Cir. 2006) ....................................... 41, 69

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*,
 631 F.3d 1279 (Fed. Cir. 2011) ........................................... 45

*Cioffi v. Google, Inc.*,
 632 F. App'x 1013 (Fed. Cir. 2015) .................................... 44

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
 438 F.3d 1374 (Fed. Cir. 2006) ........................................... 46

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
 29 F.4th 1365 (Fed. Cir. 2022) .......................................... 26

*Intellectual Ventures II LLC v. Commerce Bancshares, Inc.*,
 682 F. App'x 891 (Fed. Cir. 2017) ..................................... 43

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
 383 F.3d 1295 (Fed. Cir. 2004) ........................................... 26

*Lexion Med., LLC v. Northgate Techs., Inc.*,
 292 F. App'x 42 (Fed. Cir. 2008) ....................................... 43

*Masimo Corp. v. Sotera Wireless, Inc.*,
 No. 22-1415, 2023 WL 6307959 (Fed. Cir. Sept. 28, 2023) ................ 71

*Medrad, Inc. v. MRI Devices Corp.*,
  401 F.3d 1313 (Fed. Cir. 2005) ........................................................ 43

*Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*,
  122 F.4th 860 (Fed. Cir. 2024) ......................................................... 35

*Nevro Corp. v. Bos. Sci. Corp.*,
  955 F.3d 35 (Fed. Cir. 2020) ...................................................... 43, 71

*Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*,
  739 F.3d 694 (Fed. Cir. 2014) .......................................................... 73

*In re Papst Licensing Digit. Camera Pat. Litig.*,
  778 F.3d 1255 (Fed. Cir. 2015) ........................................................ 53

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
  952 F.3d 1336 (Fed. Cir. 2020) ........................................................ 48

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ....................... 38, 48, 49, 53, 58, 59, 66

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  904 F.3d 965 (Fed. Cir. 2018) ..................................................... 26, 57

*Power Mosfet Techs., LLC v. Siemens AG*,
  378 F.3d 1396 (Fed. Cir. 2004) ........................................................ 65

*Rexnord Corp. v. Laitram Corp.*,
  274 F.3d 1336 (Fed. Cir. 2001) ........................................................ 31

*Roku, Inc. v. Universal Elecs., Inc.*,
  No. 23-1019, 2024 WL 3042701 (Fed. Cir. June 18, 2024) ............... 44

*Wi-Lan, Inc. v. Apple Inc.*,
  811 F.3d 455 (Fed. Cir. 2016) .......................................................... 32

## Statutes

35 U.S.C. § 101 ............................................................................... 12

35 U.S.C. § 271(a) ........................................................................... 45

## STATEMENT OF RELATED CASES

No appeal from this civil action has previously been before this Court or any other appellate court. Counsel are not aware of any pending case that will directly affect or be directly affected by the outcome of this case.

# INTRODUCTION

After asserting five patents against Sonos at the start of this case, Google ultimately had to whittle its case down to just one patent when most of the others proved invalid. The sole remaining patent, U.S. Patent No. 7,899,187, is now expired. The '187 patent covers a very specific method of enforcing digital-rights-management policies across groups of devices. Here, Google asserted that this patent covered Sonos's wireless audio products and their music-streaming capabilities.

Google cannot contest that it loses under the governing claim constructions. Instead, Google tries to fight the district court's constructions by advancing interpretations of the relevant terms that contradict the asserted claims, the '187 patent's specification, and the extrinsic evidence. All of Google's arguments attempt to rewrite the claims to cover Sonos's products. The district court got the constructions right—just as it rightly recognized that Google had no viable path to proving infringement at trial. With no material factual disputes over how Sonos's products work, the district court correctly granted summary judgment that Sonos does not infringe the '187

patent under either of Google's infringement theories.  This Court should affirm.

## STATEMENT OF THE ISSUES

1.  Whether the district court correctly granted summary judgment under Google's Strong-Encryption theory because the accused "private key" in Sonos's system is not "utilized by all devices within the domain of devices."

2.  Whether the district court correctly construed "private key" to be a cryptographic key rather than any data input into a cryptographic algorithm, and thus correctly granted summary judgment of non-infringement to Sonos under Google's Authentication theory.

3.  As to both infringement theories, whether the district court correctly construed "based on," in the claim limitation reciting that the private key is "based on the domain information," to require that the domain information be used to determine the private key that issues.

## STATEMENT OF THE CASE

***Sonos's pioneering smart speakers can stream music and play music in sync in groups.***

Sonos makes high-quality smart speakers that allow users to play music throughout their homes.  Among other things, Sonos makes

CONFIDENTIAL MATERIAL OMITTED

portable outdoor speakers, pairable speakers for surround sound, and sound bars typically used with televisions. Appx2667-2681. All Sonos devices are Wi-Fi-enabled, and Sonos users can control their speakers with an app on their smartphone. Appx2667-2681.

Many Sonos customers have multiple Sonos devices, or players, in their homes. When Sonos devices are on the same Wi-Fi network, they form what Sonos calls a "household." Appx2683. Users can group their Sonos devices together to play music in sync throughout their home. Appx2684. Users create and control groups of speakers, such as by adding or removing speakers from a group, adjusting the volume, and selecting songs, through the Sonos App installed on a smartphone. Appx2684-2685. For purposes of this case, the parties refer to a smartphone with the Sonos App installed as a Controller. Appx2681.

Sonos devices can stream music from both Sonos's own music service and third-party services like Spotify or Pandora. Appx2697. Using the Sonos App, or the third-party app, a user controls music playback on their Sonos devices. Appx2681.

When players in a household are grouped to play media in sync across different rooms, ███ player in the group serves as the

Internal Technical Process

3

CONFIDENTIAL MATERIAL OMITTED

Internal Technical Process

[REDACTED]    Appx2685.  As explained in relevant detail below, the

Internal Technical Process

[REDACTED]    device obtains music from streaming services, which often

Internal Technical Process

encrypt media content.  The [REDACTED] device decrypts the music and

then shares it with the other players in the group.

The technology at issue in this case relates to how Sonos devices
are added to a household, how they connect to third-party streaming
services, and how they decrypt music from third-party services.

**Adding a new Sonos device to a household:**  Every Sonos

Internal Technical Process

household has a unique household ID, or [REDACTED]  Appx2683.  When a
user adds a new Sonos player to an existing household, they need to set
up the player on their Wi-Fi network and register the player using the
Controller.  Appx2685-2686; Appx2690.  After the new player connects
to the Wi-Fi network, the Controller sends a message to Sonos's cloud-
based registration service.  Appx2691; Appx2813.  That message
contains, among other things, the household ID and the new player's
unique media-access-control (MAC) address.  Appx2691.  The
registration service performs two functions.  First, it returns a
registration token to the Controller, and the Controller passes the token
to the new player.  Appx2691.  Second, the registration service sends a

4

CONFIDENTIAL MATERIAL OMITTED

request to an on-demand [Internal Technical Process] service to create a unique private device key and device [Internal Technical Process] for the new player.  Appx2691; Appx2815-2817.

The [Internal Technical Process] service generates the private device key and stores it in secure cloud storage.  Appx2691.  To obtain the key, the new player sends its registration token to the registration service, which retrieves the key from the cloud storage and sends it to the player.  Appx2691. The player can then use its unique key to decrypt music from streaming services.

**Connecting a household to a streaming service:**  When a user connects the existing devices in their household to a streaming service like Spotify for the first time, one device in the household (either a player or the Controller) sends a request for an authorization token to the third-party service.  Appx2707-2713.  This request includes at least two pieces of information: a value called a "link code" and the Sonos household ID.  Appx2759-2767.  Sonos's documentation explains that third-party services should use the link code to "request[] authorization" from their internal "[a]uthentication service[s]."  Appx2766.  Beyond Sonos's documentation, the record does not reveal how any third-party

CONFIDENTIAL MATERIAL OMITTED

services handle these authorization requests or generate their responses, because Google did not take any third-party discovery. *See* Opening Brief (OB) 59 (admitting that Google had no information about what third parties do with the household ID). At some point after receiving the request for an authorization token, the third-party service sends back a value that Sonos calls an "authToken" to the communicating device. Appx2707-2713.

Players in the household then share that authToken with each other "such that each member of the household has the █████ AuthToken." Appx2715. When a Sonos player later communicates with the streaming service to access songs, the player authenticates itself by sending a message with a copy of the authToken to the streaming service. Appx2917-2918. Any new player that joins the household does not need to request an authToken from the streaming service, because the new player receives a copy of the household's authToken from an existing device in the household during the registration process discussed above. Appx2683-2684; *see also* Appx2392.

**Decrypting music from streaming services:** Streaming services typically encrypt their content to protect it from unauthorized access and copying. *See* Appx2696-2697.

Algorithms used for encryption share the same basic inputs: A cryptographic key and the data one wishes to encrypt are fed into the algorithm. The algorithm uses the cryptographic key and outputs data that is encrypted—basically, scrambled into something unreadable. *See* Appx1433. This scrambled "ciphertext" cannot be read without decryption. Appx1433.

Decrypting requires a key to reverse that scrambling; this key is usually called a "private key" because it "has to be kept secret to ensure the security of the cryptosystem." Appx1433. Encryption can occur symmetrically or asymmetrically, depending on whether the same or different keys encrypt and decrypt the data.

Symmetric encryption uses the same "private key" to both encrypt and decrypt data:

7

CONFIDENTIAL MATERIAL OMITTED



Appx2656.

Asymmetric encryption uses a "public key" to encrypt the data and a separate private key to decrypt the data later:



Appx2656.

In Sonos's system, the music service sends an encrypted stream of songs to the player that requests them. When players are grouped together for playback (the only scenario Google accuses of infringement), the encrypted stream goes to just ▮ player—the

CONFIDENTIAL MATERIAL OMITTED

Internal Technical Process ▌ *See* Appx2840.  The ▌Internal Technical Process uses its private device key "to decrypt an encrypted device session key."  Appx2840.  The ▌Internal Technical Process then "uses the device session key to decrypt an encrypted content key."  Appx2840.  After decrypting the content key, the ▌Internal Technical Process uses it "to decrypt protected digital content."  Appx2840.

The ▌Internal Technical Process then sends the decrypted content "to all group members for playback."  Appx2840.

Thus, only the ▌Internal Technical Process uses its private device key to decrypt the music stream.  To underscore the point:  It is undisputed that during group playback, only a ▌Internal Technical Process player (the ▌Internal Technical Process) ever receives and decrypts encrypted content; all other players in the group receive decrypted content from the ▌Internal Technical Process  Moreover, Sonos players *never* share their private device keys with each other or perform any operations using another player's private device key.  *See* Appx2387; Appx2389.

### *The '187 patent describes a system in which devices share a private key across a "domain" to access protected content.*

The '187 patent claims priority to an application filed in 2002; it issued in 2011 to Motorola Mobility, Inc.  Appx60-68.  Google acquired

the patent when it bought Motorola Mobility in 2012.  OB6.  The patent

expired in 2024.  *See* Appx60.

The '187 patent purports to provide an "easy and secure" way to

add new devices, such as speakers, to a "domain" of devices that share

user accounts to access content protected by digital-rights management

(DRM), such as songs provided by a streaming service.  Appx64 1:7-10.

A crucial claimed feature of the '187 patent's system is that *all* devices

in the domain obtain and use the same shared private key to access

protected content.  *See* Appx60 (Abstract); Appx64 1:38-47, 2:10-13.

When a new device joins the domain, it acquires the domain

information, such as the domain name and password, "from devices

already in the domain."  Appx64 2:2-6.  The new device then sends the

domain information to a key issuer outside of the domain, and the key

issuer returns the shared "DRM domain private key" associated with

that domain.  Appx64 2:6-12.  In simpler terms, a new device gets

information about which domain it belongs to from an existing device.

The new device then tells the key issuer:  "I am part of this domain;

here is the domain information as proof.  Please confirm and send me

the private key I need for my domain."  The specification explains that

having the new device obtain the private key from an external key issuer "greatly enhance[s]" security by allowing the key issuer to "actively enforce domain enrollment." Appx64 2:28-33. And the patent disparages other techniques that allow new devices to obtain the private key from an existing device in the domain as "not sufficiently secure." Appx64 2:24-28.

Claim 1 recites a method for registering a new device into a domain:

> A method for registering a new device as part of a domain of devices, which share rights associated with a common account, for use in accessing protected digital content within a digital-rights management system, the method comprising the steps of:
>
> receiving domain information corresponding to the domain of devices from a device existing within the domain of devices;
>
> providing the domain information to a key issuer, which is separate from the domain of devices, causing the key issuer to issue a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices; and
>
> receiving the private key from the key issuer for use in accessing the protected digital content within the digital-rights management system.

Appx67 7:60-8:8.

Claim 10 recites an apparatus with substantively identical limitations to claim 1.  Appx67-68 8:64-9:10.

***Google sues Sonos and raises two infringement theories.***

In 2020, Google sued Sonos and alleged that Sonos's smart speakers infringed the '187 patent and four others.  Appx1001-1028; Appx1029-1058.  The other patents gradually disappeared from the case.  Google withdrew its claims for one of them; the Patent Trial and Appeal Board canceled the asserted claims of two others after inter partes review (which this Court affirmed); and the district court held the asserted claims of the fourth patent invalid under 35 U.S.C. § 101.  Appx1-3.  Google does not challenge the § 101 decision, so this appeal concerns only the '187 patent.  *See* OB12 n.1.

Google ultimately asserted claims 1, 3, 4, 10, and 12.  *See* Appx6-7.  Claims 3 and 4 are method claims that depend from claim 1, while claim 12 is an apparatus claim that depends from claim 10.  Appx67-68 8:13-23, 9:13-14.  Google did not raise any infringement issues unique to any dependent claims.

During claim construction, the parties disputed the meaning of "private key" in the asserted claims.  *See* Appx2216-2220.  Specifically,

the parties disagreed over whether "private key" referred only to a key used in "asymmetric public key cryptography" or whether the term also encompassed "symmetric key techniques." Appx2220. The district court observed that the specification defines "public key cryptography" as a "[c]ryptographic technique that uses a pair of keys, a public and a private key," where the private key "either decrypt[s] data or generat[es] digital signatures" and the public key "either encrypt[s] data or verif[ies] digital signatures." Appx2216 (quoting Appx64 2:42-49). But the court also noted that the specification discloses that "alternate methods of securing the DRM system are possible using symmetric key techniques." Appx2219-2220 (quoting Appx67 7:54-57). After considering the specification, the court construed "private key" to mean "[a] non-public key that is used as an input to a cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be computed." Appx2216.

Google then advanced two theories of infringement: the Strong-Encryption theory and the Authentication theory.

The Strong-Encryption theory—so called because Sonos uses the term "strong encryption" to describe encryption that includes both

CONFIDENTIAL MATERIAL OMITTED

"Sonos player verification" and encrypted content keys,

https://tinyurl.com/4rk9bxmz—concerns the process for adding a new

player to an existing household and having the player access encrypted

content. During the device-registration process discussed above at 4-5,

the new player receives the household ID from the Controller and

obtains a unique private device key from Sonos's registration service.

Appx2685-2691.

Google's Strong-Encryption theory applies only when a device is

grouped for playback with other devices in the same household. In such

groups, only ▮ Sonos device (the ▮▮▮▮▮▮) uses its unique private
<sup>Internal Technical Process</sup>      <sup>Internal Technical Process</sup>

device key to decrypt protected audio content before distributing the

decrypted audio content to the other players. Appx2701-2704;

Appx2859-2861.

For the Strong-Encryption theory, Google contended that a Sonos

household is the claimed "domain," the household ID is "domain

information," and the registration service is a "key issuer" issuing a

"private key" "based on the domain information." OB10. Google also

contended that, if every player in the household is configured as part of

CONFIDENTIAL MATERIAL OMITTED

a [REDACTED: Internal Technical Process] playback group, then "all devices within the domain of devices"

"utilize" the [REDACTED: Internal Technical Process]'s private device key to access content.  OB10.[1]

The Authentication theory concerns how users can add a new player to their household and at the same time add streaming services like Spotify.  When a Sonos user registers their household with a third-party service, either the Controller or a player in the household sends a message to the third-party service containing the household ID and other information, and the service responds with an authToken.  Appx2704-2715.  Players in the household then share that authToken with each other and use it to communicate with the service.  Appx2715.  If a new player joins the household later, it obtains the authToken from one of the existing players rather than contacting the third-party service directly.  Appx2392.

For this theory, Google again argued that the Sonos household is the claimed domain and the household ID constitutes domain information.  OB11.  Unlike for the Strong-Encryption theory, Google

---

[1] Google raised a doctrine-of-equivalents argument for the private-key limitation that the district court rejected at summary judgment as too "conclusory" to meet Google's "evidentiary burden."  Appx29-30.  Google does not challenge that ruling in its opening brief.

now argued that the third-party service was the key issuer, with the authToken constituting a private key that all the players in the household utilize.  OB11.  Google also asserted that authTokens are "based on the domain information," despite having no evidence of how any third party determines which authTokens to provide to Sonos players or whether that determination involves the household ID at all.

### *The district court grants summary judgment of non-infringement to Sonos on Google's Strong-Encryption theory.*

After discovery, Sonos moved for summary judgment of non-infringement on all asserted claims.  Appx2234-2264.

As to the Strong-Encryption theory, Sonos argued, among other things, that the claimed private key is not "utilized by all devices within the domain of devices."  Appx2252-2258.  Sonos explained that Google's expert, Dr. Sherman, had both opined that the Controller is a device within the domain of devices and conceded that it does not utilize the private key.  Appx2253-2254.  In particular, Dr. Sherman pointed to the Controller to contend that Sonos met the limitation of "receiving domain information corresponding to the domain of devices *from a device existing within the domain of devices*," but then he did not—in fact, could not—say that the Controller utilized the private key even though

16

CONFIDENTIAL MATERIAL OMITTED

the claims require that "all devices within the domain of devices" do so.

Appx2253-2254 (citing Appx2744-2747).  In response, Google tried to

divorce these two references to "the domain of devices" and declared

that the Controller does not need to utilize the private key because it

does not play protected content.  Appx2622-2623.

Sonos also argued that, even setting aside the Controller, Google

accused only grouped Sonos players of infringement, and in a group

only the [Internal Technical Process ████████] uses its private device key to decrypt content.

Appx2254-2256.  Google's response insisted that every player in a group

somehow utilizes the [Internal Technical Process ████████]'s private device key just by receiving

and playing *unencrypted* music that the [Internal Technical Process ████████] decrypted and sent

to the other players.  Appx2623-2626.  In other words, as Sonos

explained, Google argued for broadening the plain meaning of "utilized"

so far as to encompass any "indirect[] 'benefiting from' the existence of

the private device key."  Appx3345 (quoting Appx2389-2390).

The district court agreed with Sonos on both counts and rejected

Google's counterarguments.  It explained that Dr. Sherman "repeatedly

opined in his report that the Controller *is a device* within the domain of

devices," and that the claims require all devices within the domain to

CONFIDENTIAL MATERIAL OMITTED

utilize the private key. Appx28-29. The court also recognized that nothing in the "intrinsic or extrinsic evidence in the record" supported Google's view that "utilize" meant "passive[ly] benefit from"; the '187 patent's specification instead "contemplat[es] active use of" the private key. Appx29 (citing Appx64 2:24-28; Appx67 7:30-37). And for Sonos players in a group, "only ███ device"—the ████████—"uses the private key to decrypt music and transmits the decrypted music to the remaining devices." Appx29.

Internal Technical Process        Internal Technical Process

As to the Authentication theory, Sonos argued that the purported private key—the authToken—is not a cryptographic key. Appx2245-2250. The only evidence Google provided showing that authTokens could be used in conjunction with a cryptographic algorithm was a function in Sonos's code that could cryptographically sign authTokens, presumably so they could be sent to a third party and ███████ with a ███████ algorithm. Appx2247. (Again, however, Google had no evidence of what any third parties do with authTokens, because it took no third-party discovery.) But, as Sonos explained, for both signing and ███████ algorithms, the authToken (and ██████ authToken) are merely data to be signed or ██████ using a key. Appx2247-2248. In

Internal Technical Process        Internal Technical Process        Internal Technical Process        Internal Technical Process

other words, the authToken itself is not a key input into a cryptographic algorithm.

Separately, as Sonos explained, there was no evidence that the authToken is "based on" the domain information, because Google provided no evidence that the household ID plays any role in determining which authToken any third-party service issues. Appx2248-2250. In response, Google maintained that private keys need not be the key input into cryptographic algorithms and that "based on" requires only some association with the household ID. Appx2611-2618.

Sonos also argued that its players do not perform the preamble of the asserted method claims, which requires that the issuance of a private key be part of the "method for registering a new device as part of a domain of devices," not the process for adding a service like Spotify to the household. Appx2243-2245. In response, Google contended that Sonos players "are programmed to authenticate third-party content providers on a household-wide basis" during the process of adding a new player to the household. OB15-16; Appx2618-2622.

The district court granted Sonos's motion in part. The court agreed that Sonos players do not perform the preamble of the method

claims in most circumstances. Appx20-24. But it found a "triable issue" as to whether they perform the preamble in the "AppLink configuration," where a new player simultaneously joins an existing household that has not yet registered a third-party music service and registers with the music service. Appx25-26.[2] The court also agreed with Sonos that "based on" requires that "the domain information must be somehow used to determine which key is issued in the first instance," and the court authorized further briefing for the parties to address whether a triable issue existed under that construction. Appx17-18.

Likewise, the district court concluded that it needed further briefing on the construction of "private key" before deciding whether Sonos merited summary judgment of non-infringement under Google's Authentication theory. Appx20. As the court explained, its initial construction at the *Markman* stage determined only "the *type of the cryptographic algorithm* … that satisfies the limitation." Appx20. Now, however, the court needed to resolve "*which input* in the cryptographic

---

[2] Google's opening brief does not challenge the district court's ruling that Sonos players do not perform the method claims' preamble in the standard configuration. Thus, in the event of a remand, only the AppLink configuration remains at issue for the method claims under Google's Authentication theory. *See* Appx26.

CONFIDENTIAL MATERIAL OMITTED

algorithm the purported [private] key" was: whether it "must be" a cryptographic key or could be merely "*data* to be ██████ or ██████ using the key." Appx19-20.

### *After additional briefing, the district court grants summary judgment of non-infringement to Sonos on Google's Authentication theory.*

Per the district court's order, the parties filed supplemental briefs addressing the "based on" and "private key" limitations under Google's Authentication theory. Appx3407-3421; Appx3485-3498; Appx3605-3624; Appx3773-3780. The court ultimately "decline[d] to address the parties' dispute" over the "based on" limitation, because the "private key" limitation proved "dispositive." Appx58 n.13.

Sonos argued that a private key must be "a cryptographic key that is used as the key input (rather than as the data input) to a cryptographic algorithm." Appx3412. As Sonos explained, the '187 patent consistently distinguishes between the key input to a cryptographic algorithm and the different data inputs on which the algorithm acts. Appx3417-3418. For example, the specification teaches that "[t]he private key is used for either decrypting data or generating

digital signatures and the public key is used for either encrypting data or verifying digital signatures." Appx64 2:46-49.

Sonos also explained that Google's own expert had distinguished between cryptographic keys and data inputs, testifying that cryptographic algorithms generally require both a key and a data input. Appx3412-3413 (citing Appx2656-2658). Moreover, Google's expert agreed that "private key" was well-known in the art by the early 2000s to refer to a key input, not a data input, to a cryptographic algorithm. Appx3413 (citing Appx1192). And dictionary definitions from the same timeframe confirmed this understanding. Appx3416-3417. Google, however, maintained that the '187 patent's specification addressed other types of algorithms beyond public-key cryptography where a key could be a data input. Appx3489; Appx3494-3496.

Consistent with the intrinsic and extrinsic evidence, including dictionary definitions and testimony from both sides' experts, the district court construed "private key" as a "non-public cryptographic key that is used as the key input (rather than *solely* as the data input) to a cryptographic algorithm." Appx38; *see also* Appx46-56. Under that construction, as Google conceded before the district court, there was no

CONFIDENTIAL MATERIAL OMITTED

dispute that the authToken is not a private key.  Appx56; Appx3821.

Although authTokens might be "cryptographically ███ and ███," they are "used *only as the data input* (the input that is ███/███ and never as the key input designed to *control the algorithm*."  Appx57-58.  Thus, the district court granted summary judgment of non-infringement to Sonos under the Authentication theory.  Appx58.

Internal Technical Process

Internal Technical Process

## SUMMARY OF ARGUMENT

**I.**  For two separate reasons, Sonos does not infringe the claim limitation that the private key must be "utilized by all devices within the domain of devices," which defeats Google's Strong-Encryption theory.

First, Google's expert conceded repeatedly that the Controller is a device within the domain of devices but does not utilize the private key. The expert took that position to accuse Sonos of infringing a different claim limitation that also references "the domain of devices."  "Domain of devices" must have a consistent meaning every time it appears in the claims, so the Controller cannot be part of the domain only when it suits Google and then excluded at other times.  And nothing in the claims or

23

CONFIDENTIAL MATERIAL OMITTED

the specification cabins the "utilized by all devices" limitation to devices that play music.

Second, when Sonos players are grouped for synchronous playback, only the ▮▮▮▮▮▮▮ [Internal Technical Process] utilizes its private device key to decrypt protected content; the ▮▮▮▮▮▮▮ [Internal Technical Process] then sends the decrypted content to the other players. The other players in the group do not "utilize" the ▮▮▮▮▮▮▮ [Internal Technical Process]'s private device key merely by receiving decrypted content from the ▮▮▮▮▮▮▮ [Internal Technical Process] Instead, the plain meaning of "utilizing" requires active use, and the '187 patent makes clear that—unlike how Sonos players operate—each device in the domain uses its own copy of the private key to decrypt protected content.

**II.** Google's Authentication theory depends on the authToken constituting a "private key" within the meaning of the asserted claims. But the plain meaning of private key, the '187 patent's specification, and the extrinsic evidence confirm the district court's construction of private key as a cryptographic key rather than a mere data input into a cryptographic algorithm. And "there is no dispute that the AuthToken is used *only as the data input* (the input that is ▮▮▮▮▮/▮▮▮▮▮ [Internal Technical Process] and never as the key input designed to *control the algorithm*." Appx58.

24

CONFIDENTIAL MATERIAL OMITTED

Plus, contrary to Google's argument that the district court's
construction did not account for signing and Internal Technical Process ████████ algorithms, the
court addressed these algorithms at length.  Google just ignores that
the court's construction of private key still allows for that type of
cryptographic algorithm.

    **III.**  The district court correctly construed "based on," in the claim
limitation reciting that the private key is "based on the domain
information," to require that the domain information be used to
determine the private key that issues.  The claims separately say that
"providing the domain information" causes the key issuer to issue the
private key, so "based on" must require something different from a mere
causal relationship.  And the specification confirms that the
relationship must be deterministic, because it describes using the
domain information as an input to decide *which* key gets issued.  To be
clear, the district court's construction does not require that the domain
information alone dictates the exact private key that issues; it simply
means that the domain information informs—to some extent—which
key issues.  Google's construction would improperly render the claims'
"as a consequence of" language superfluous.

CONFIDENTIAL MATERIAL OMITTED

## STANDARD OF REVIEW

This Court reviews de novo a grant of summary judgment. *See Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1371 (Fed. Cir. 2022) (applying Ninth Circuit law). Summary judgment of non-infringement is proper "when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1299 (Fed. Cir. 2004) (citation omitted). This Court also reviews claim construction de novo, "except for subsidiary facts based on extrinsic evidence," which this Court reviews for clear error. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 971 (Fed. Cir. 2018).

## ARGUMENT

**I.    The District Court Correctly Granted Summary Judgment Of Non-Infringement Under The Strong-Encryption Theory Because Sonos Does Not Meet The "Utilized By All Devices" Limitation.**

Google's Strong-Encryption theory accused the process for adding a new Sonos player to an existing household and having the ████████ use its private device key to decrypt music for other players in its group.

CONFIDENTIAL MATERIAL OMITTED

OB24-37.  The district court correctly recognized that Sonos's players do not infringe the "utilized by all devices" limitation for two independent reasons.  First, Google's expert admitted that Sonos's Controller is a device within the claimed domain, and everyone agrees that the Controller does not utilize the private device key because it never accesses or plays encrypted media content.  § I.A.  Second, when Sonos speakers play music in sync in a group, only ▮ player—the [Internal Technical Process] ▮—uses its unique private device key to decrypt protected content.  Other players in the group just receive decrypted content from the [Internal Technical Process] ▮ later and never utilize the [Internal Technical Process] ▮'s private device key.  § I.B.

### A. Google's expert conceded that Sonos's Controller is a device "within the domain of devices" but does not "utilize" the private key to access protected content.

The asserted claims require that "the private key is … utilized by *all* devices within the domain of devices."  *E.g.*, Appx67 8:4-8 (emphasis added).  There is no dispute that the Controller does *not* utilize the private device key.  *See* OB25-27.  Instead, in conflict with its own expert's opinion, Google disputes whether the Controller is "within the

domain of devices." Google also disputes whether the claims actually require that all devices utilize the private key.

Google's expert, Dr. Sherman, repeatedly and unambiguously pronounced that the Controller is a device "within the domain of devices." He took that position because the claims require "receiving domain information corresponding to the domain of devices from a device existing within the domain of devices," Appx67 7:65-67, and any new Sonos device joining a household receives the accused domain information (the household ID) from the Controller, *see supra* 14. Thus, the claims also require that the Controller—like every other device within the domain—utilizes the private key. But Google admits that the Controller does not do this, OB27, so the district court properly granted judgment of non-infringement under Google's Strong-Encryption theory.

**1.** Both in his expert report and his deposition, Dr. Sherman testified that the Controller is a device "within the domain of devices." In his report, Dr. Sherman pointed to the Controller to show that the accused products meet the "receiving" limitation:

- "[T]he '187 Accused Instrumentalities receive[] household ID (i.e., domain information) corresponding to the domain of

devices (i.e., household) from a device (i.e., the Controller or '187 Accused Instrumentality) within the domain of devices." Appx2739.

- "The 'receiving domain information … from a device existing with[in] the domain of devices' limitation is satisfied at least because the household ID (i.e., domain information) is received from the Controller, which is part of the household (i.e., domain of devices)." Appx2744.

- "[B]ecause the Controller itself receives the household ID and joins the household, the '187 Accused Instrumentality receives the household ID (i.e., domain information) from a device existing within the domain of devices." Appx2745.

- "Because the Controller and existing '187 Accused Instrumentality in the household are both devices existing within the domain of devices, the '187 Accused Instrumentality receives the domain information from a device existing within the domain of devices." Appx2747.[3]

During Dr. Sherman's deposition, Sonos's counsel asked Dr. Sherman point-blank: "[I]t's your opinion that a Sonos [C]ontroller is also part of the claimed domain of devices; is that right?" Appx2381. Dr. Sherman responded with an unequivocal "Yes." Appx2381. As the district court recognized, given these "concession[s] by Google's own

---

[3] These portions of Dr. Sherman's report referring to the Controller as a device within the domain of devices had nothing to do with his earlier discussion of one of Sonos's patents, where Google claims that Dr. Sherman merely quoted Sonos's "device" terminology for the Controller. *Cf.* OB28 (quoting Appx2721-2722).

expert, there is no genuine dispute that the Controller constitutes a 'device'" within the domain of devices.  Appx29.

**2.**  Google now tries to avoid Dr. Sherman's admissions about the Controller in various ways.

To start, Google says that Dr. Sherman "distinguished" the accused Sonos players "from the Controller software used to control those devices."  OB25-27.  So what?  What matters is that the claims require that the accused players "utilize" a private key that all other devices in the domain of devices also "utilize."  Given Dr. Sherman's consistent position that the Controller is a "device within the domain of devices" yet does not utilize the claimed private key, the accused players do not "utilize" a key that meets the claim requirements.  For the same reason, it does not matter that the Controller is software that runs on hardware (e.g., a smartphone), rather than hardware (e.g., a speaker) containing software.  *Contra* OB25.

As explained above, Dr. Sherman's primary argument was that when a Sonos player joins a household, it receives the household ID— the claimed domain information—from the Controller.  *See* Appx2738-2740; *see also* Appx2747.  In that scenario, the Controller must be

within the domain of devices for the accused players to infringe the "receiving domain information" limitation.

**3.** If the Controller exists within the domain of devices for the receiving limitation, then it also exists within the domain of devices for claim 1's later limitation that "the private key … is utilized by all devices within the domain of devices." Appx67 8:4-5; *see also* Appx68 9:8-10 (same limitation for claim 10). The term "domain of devices" appears five times in claim 1 and three times in claim 10, and it "should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). Google has not identified any reason to interpret "domain of devices" to refer to different devices in different limitations of the asserted claims.

Nor could it. The receiving limitation provides the antecedent basis for "the domain of devices" later in the claims. In other words, the later recitations of "the domain of devices" in each independent claim "are anaphoric phrases, referring to the initial antecedent phrase" of "a domain of devices." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008). As this Court has explained, "[s]ubsequent

31

use of the definite articles 'the' or 'said' in a claim refers back to the same term recited earlier in the claim." *Wi-Lan, Inc. v. Apple Inc.*, 811 F.3d 455, 462 (Fed. Cir. 2016) (citation omitted).  Thus, Google cannot place the Controller within the domain of devices for only one limitation while conveniently excluding the Controller from that same domain for another limitation.

Google tries to evade Dr. Sherman's concessions by adding an extratextual limitation to the asserted claims: that only devices that "access protected content" and "play back music" must utilize the private key.  OB28-30.  But the claims say no such thing.  They require that the "private key is … utilized by all devices within the domain of devices."  Appx67 8:4-5 (claim 1); Appx68 9:8-10 (claim 10).  "All" means all.  Nothing in that language restricts the requirement of utilizing the private key to devices within the domain that also access protected content or play back music.

Nor does Google identify any textual hook for confining the "utilized" limitation to such devices or any support in the '187 patent's specification for doing so.  At most, Google points to a statement in the district court's claim-construction order related to the construction of

"domain information" in a separate limitation.  OB27 (citing Appx2738 (Dr. Sherman's quotation of that statement)).  The court gave that term its plain-and-ordinary meaning and noted that "'domain information' is used in the context of an existing domain of devices which can access protected digital content."  Appx2211-2212.  Again, nothing in that language cabins the separate requirement of utilizing the private key to devices within the domain that access protected content.  The district court was addressing a different limitation, and it merely observed that the *domain* "can access protected digital content."  Appx2212.

**4.**  Despite Dr. Sherman's repeated admissions about the Controller, Google now claims that its "infringement argument did not depend on the Controller being a 'device existing within the domain of devices' that supplies domain information to a newly registering player."  OB30-31.  That argument simply does not square with Dr. Sherman's testimony from his deposition, where he unequivocally opined that the Controller *is* a device within the domain.  When Sonos's counsel asked Dr. Sherman if the Controller was "part of the claimed domain of devices," Dr. Sherman said "Yes" without qualifying his

answer in any way.  Appx2381.  If Dr. Sherman ever had a different

theory, he gave up on it by the time of his deposition.

Moreover, Google's only support for this argument is a single

paragraph in Dr. Sherman's report stating:  "To the extent the

Controller is not considered to be a 'device existing within the domain of

devices,' [Sonos] still literally infringe[s] because the Controller obtains

the domain information from the domain of devices before providing it

to a new '187 Accused Instrumentality."  Appx2745 (cited at OB30).

More specifically, Google says "the Controller receives the domain

information from another Sonos player within the domain" before

providing that information to the new player.  OB30.

This is hardly an argument that some other part of Sonos's system

besides the Controller provides the domain information, because Dr.

Sherman still asserts that the Controller  "obtains" and "provid[es]" the

domain information for the new player.  Appx2745.  Google never

articulates how the claims or the specification support the idea that the

domain information is "from" an existing player when the domain

information that a new Sonos player actually receives comes from the

Controller.  "It is well-established that unsupported expert opinions do

CONFIDENTIAL MATERIAL OMITTED

not create a genuine issue of material fact." *Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*, 122 F.4th 860, 875 (Fed. Cir. 2024) (citation omitted).

Google also never briefed this alternative argument to the district court, even after Sonos pointed out Dr. Sherman's concessions that the Controller is a "device within the accused domain." *See* Appx2253-2254 (Sonos's first motion for summary judgment); Appx2622-2630 (Google's opposition to summary judgment under the Strong-Encryption theory). Instead, all Google did below—citing different parts of Dr. Sherman's report than it cites here—was baldly assert that the Controller "does not play audio content" and so need not "use the private key." Appx2622-2623 (citing Appx2859-2861). Thus, Google forfeited the alternative argument about its domain-information theory that it raises for the first time on appeal. *See Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1324 (Fed. Cir. 2020).

## B. When Sonos players are grouped for synchronous playback, they do not all "utilize" the ██████ private key.

Internal Technical Process

Setting aside whether the Controller utilizes the private key, the district court also correctly granted summary judgment of non-

CONFIDENTIAL MATERIAL OMITTED

infringement under the Strong-Encryption theory because only ▊ [Internal Technical Process]

Sonos player utilizes the private key—the ▊▊ [Internal Technical Process] Thus, Sonos

does not infringe the limitation requiring that "the private key is …

utilized by all devices within the domain of devices."  Appx67 8:4-5.

    **1.**  The parties agree on how Sonos's accused players operate when

they belong to a group and play music in sync—the only scenario Google

accuses of infringement.  *See* OB31-32; Appx2839-2840.  ▊ [Internal Technical Process] player in

the group becomes the ▊▊ [Internal Technical Process] Appx2839.  While each player in

the group has its own unique private device key, Appx2387, only the

▊▊ [Internal Technical Process] uses its unique key "to decrypt an encrypted device session

key," Appx2840.  The ▊▊ [Internal Technical Process] then "uses the device session key to

decrypt an encrypted content key."  Appx2840.  Finally, the ▊▊ [Internal Technical Process]

uses the decrypted content key "to decrypt protected digital content,"

and the ▊▊ [Internal Technical Process] sends that decrypted content to the rest of the

players in the group.  Appx2840.  As Dr. Sherman acknowledged, Sonos

players never share their private device keys with each other or perform

any operations using another player's key.  *See* Appx2387; Appx2389.

    Google's problem is that the asserted claims are simply

incompatible with a scenario where speakers share decrypted content.

Instead, the claims require that "*the* private key" for accessing protected

content be "utilized by *all* devices within the domain of devices." *E.g.*,

Appx67 8:4-5 (emphases added).  The parties agree that "the private

key" refs to ██████████ [Internal Technical Process] key and that all devices within the domain

must utilize that ██████ [Internal Technical Process] key to access the protected content.  *See* OB33-

37 (arguing that other group members "indirectly" utilize the

██████████ [Internal Technical Process] 's key); Appx28-29.  In Sonos's system, however, only the

██████████████ [Internal Technical Process] utilizes its unique private device key to access encrypted

content and distribute a decrypted form of that content to the other

players in a group, and those players never receive or otherwise interact

with the ████████████ [Internal Technical Process] 's private device key.

    **2.**  The plain meaning of "utilize" requires actively using

something.  *See* Appx2552 (Oxford English Dictionary defining "utilize"

as "[t]o make or render useful").  As the district court observed, even the

dictionary definition that Google offered "defines the term as 'to make

use of.'"  Appx29 (quoting Appx3278-3282: *Utilize*, Merriam-Webster's

Collegiate Dictionary (11th ed. 2003)).  And active use aligns with the

'187 patent's disclosures about utilizing a private key.  In the context of

a cryptographic algorithm and the patent, "utilizing" a key means

inputting it into an algorithm to control the algorithm.

In the '187 patent, each device receives a copy of the private key

and decrypts its own music stream. *See* Appx60 (abstract); Appx30

(district court recognizing this fact). Specifically, the '187 patent

teaches that when a user adds another device to their domain, the key

issuer completes the registration process by sending "*the* DRM private

key 206 (utilized by every device within the domain)" to the new device.

Appx66 6:44-49 (emphasis added); *see also* Appx65 4:39-41 ("Key issuer

105 then sends equipment 101 … the DRM private key utilized by the

domain."). After receiving "the DRM domain private key," the new

device "utilize[s]" the key "to obtain and render digital content."

Appx64 2:10-13; *see also* Appx66 6:57-61 ("user equipment 101 must

access DRM private key 206 and uses it to decrypt the content

encryption key"); Appx65 4:51-56 (similar).

This evidence from the specification provides "the single best

guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415

F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (citation omitted). Under the

plain meaning of "utilize," and in the context of the '187 patent's

CONFIDENTIAL MATERIAL OMITTED

specification, Sonos does not infringe because it is undisputed that "only

Internal Technical Process

█ device" in a Sonos group—the █████ —"uses the private key to

Internal Technical Process

decrypt music and transmits the decrypted music to the remaining

devices." Appx29.

Google argues otherwise by stretching the meaning of "utilize"

beyond its breaking point. Google contends that "'utilizing' is a generic

term that covers all manners of making use of or turning to practical

use." OB34. But no player besides the █████ ever "makes use of"

Internal Technical Process

or "turns to practical use" the █████'s private key. Dr. Sherman

Internal Technical Process

admitted that players do not share their private device keys with each

other or perform any operations using another player's key. Appx2387;

Appx2389. All the other group members do is receive decrypted content

from the coordinator after the coordinator has finished utilizing its

unique key to decrypt that content. *See* Appx2839-2840.

Google suggests that Sonos might infringe because its system

"works similarly" to the '187 patent's preferred embodiment, where a

private key "decrypts a 'content extraction key'" that then decrypts the

protected content. OB32 (citing Appx66 6:58-60). But, critically, in the

patent's preferred embodiment, *every device* "access[es] DRM private

CONFIDENTIAL MATERIAL OMITTED

key 206 and uses it to decrypt the content encryption key." Appx66

6:57-60.  Whether Sonos's products use a nested decryption process is

irrelevant to the infringement inquiry.  What matters is whether

Sonos's products decrypt encrypted content using a key that is "utilized

by all devices within the domain of devices." Appx67 8:4-5.  And it is

undisputed that, in Sonos's products, only ▮ device—the ▮▮▮▮▮▮▮▮—
<small>Internal Technical Process</small>      <small>Internal Technical Process</small>

uses its private device key to decrypt content, and the other players do

not participate in the decryption process at all.[4]  *Supra* 36.

Google next tries to muddy the waters by saying that the claims

"simply require[] the private key to be 'for use in accessing the protected

content' and do[] not impose any restrictions on how such access is

accomplished." OB33 (quoting Appx67 8:3-8).  Even if Google's

characterization is right for the quoted claim language, other

limitations restrict how devices within the domain access protected

---

[4] Google complains that the district court "mistaken[ly]" said that the ▮▮▮▮▮▮▮ "uses the private key to decrypt music" when the private device key actually "does not decrypt music itself" and instead "decrypts a content-extraction key that decrypts the music." OB33 (quoting Appx29).  But the court just used "decrypt music" as shorthand for the longer process. *See* Appx29.  Google cannot explain why that shorthand matters where there is no dispute about how Sonos's system works. *See* Appx2623 (Google using the same shorthand in briefing).
<small>Internal Technical Process</small>

CONFIDENTIAL MATERIAL OMITTED

content.  Specifically, every single device must "utilize" "the private

key."  Appx67 8:4-5.  Contrary to Google's view, accessing the protected

content is not the same thing as utilizing the private key.  If it were,

"utilized by all devices" would be superfluous.  But "claim language

should not be treated as meaningless."  *Bicon, Inc. v. Straumann Co.*,

441 F.3d 945, 951 (Fed. Cir. 2006).

Here, no one speaking in ordinary English would say that other

group members "utilize" the ████████ 's private device key merely

because they receive decrypted content after the ████████ both uses

its private device key to decrypt a second key and then uses the second

key to decrypt the content.  As Sonos established during Dr. Sherman's

deposition, that would be like saying that passengers on a bus utilize

the bus's ignition key.  *See* Appx2389-2390.  To be clear, that was Dr.

Sherman's opinion:  He insisted that passengers utilize the bus's key

because "they benefit from the use of the key, and the riding the bus is

made practical through the use of the key."  Appx2389-2390.[5]

---

[5] Google says that Sonos's hypothetical has an "obvious flaw" because
"riders do not drive buses."  OB33.  Of course not, but both riders and
bus drivers ride the bus from point A to point B, just as both the
████████ and every other player in a group access protected content.

41

Google tries to walk back Dr. Sherman's opinion, claiming that he "stated in the same discussion that he 'would *not* characterize' 'utilized' as meaning 'benefited from.'" OB33 (quoting Appx2390). In fact, Dr. Sherman said: "I would not characterize it exactly that way. That's part of it, but I think maybe more on target would be made practical by." Appx2390. In short, Dr. Sherman applied (and Google relied on) an understanding of "utilize" that goes well beyond the plain-and-ordinary meaning of the term. Google's understanding is so broad as to have no meaning because it covers even the most "indirect or remote utilization." OB34. For example, under Dr. Sherman's interpretation, a homeowner utilizes the turbines at a hydroelectric power plant by turning on the lights in her living room. That goes well beyond the plain-and-ordinary meaning of "utilize" in the '187 patent.

**3.** To support its illogical definition of "utilize," Google points to cases construing other terms not found in the '187 patent and contends that this Court "has repeatedly refused to limit them to particular ways of performing those functions when the claim language recites no such limitations." OB34; *see* OB34-36. As an initial matter, "even the same" claim term "need not have the same meaning when used in an entirely

42

separate patent, particularly one involving different technology." *Nevro Corp. v. Bos. Sci. Corp.*, 955 F.3d 35, 42 (Fed. Cir. 2020) (quoting *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1318 (Fed. Cir. 2005)).  So cases construing different claim terms in unrelated patents that cover different technology have no bearing on the meaning of "utilize" in the '187 patent.

Even still, Google's cited cases do not support its position. *Intellectual Ventures II LLC v. Commerce Bancshares, Inc.*, for instance, held that "analyzing data" encompassed "analyzing information about the data," such as assessing "sample-size, mean, variance, or other information" sent by a computer that "examin[ed] the raw data."  682 F. App'x 891, 894 (Fed. Cir. 2017).  And *Lexion Medical, LLC v. Northgate Technologies, Inc.*, held that "sensing the temperature of the gas as it exits the chamber" did not require measuring with "sensors positioned at the exit" and instead covered "remote measurement" using sensors "embedded within the heater core."  292 F. App'x 42, 49 (Fed. Cir. 2008).  Those constructions do not support Google's stretched view of "utilizing" here, which would be more akin to saying that someone who just receives a summary of the data analysis "analyzes the data," or that

43

CONFIDENTIAL MATERIAL OMITTED

someone who just receives the temperature reading "senses the temperature of the gas." In Dr. Sherman's words, their receipt of the summary or the reading was "made practical by" the previous analysis or sensing. Appx2390.

As for *Cioffi v. Google, Inc.*, it held that the claimed "web browser process" did not require "'direct' access to the network" because a dependent claim recited "directly exchanging data with the network." 632 F. App'x 1013, 1019 (Fed. Cir. 2015). Thus, requiring direct access for the independent claim would have made that limitation in the dependent claim "entirely duplicative." *Id.* Here, by contrast, no such "direct" language appears in any of the '187 patent's dependent claims. And *Roku, Inc. v. Universal Electronics, Inc.*, which held that "'data that functions to identify a controllable function' permits the indirect use of such data" and "the use of additional data," has nothing to do with the debate here. No. 23-1019, 2024 WL 3042701, at *2 (Fed. Cir. June 18, 2024). The issue is not whether the private key must decrypt protected content without using other keys; everyone agrees that the ███████ 's

Internal Technical Process

private key first decrypts a second key that then decrypts the protected

CONFIDENTIAL MATERIAL OMITTED

content.  Appx2840.  Instead, the problem for Google is that no other

device "utilizes" the [Internal Technical Process]'s private key in any ordinary parlance.

*Centillion Data Systems, LLC v. Qwest Communications*

*International, Inc.*, which interpreted "use" in 35 U.S.C. § 271(a), also

does not help Google.  631 F.3d 1279 (Fed. Cir. 2011).  Although

*Centillion* noted that use does not require "physical control," it held that

"to 'use' a system for purposes of infringement, a party must put the

invention into service, *i.e.*, control the system as a whole."  *Id.* at 1284.

Here, there is no sense in which the other players in a group "control"

the [Internal Technical Process]'s private device key or the utilization of that key; they

merely receive decrypted content from the [Internal Technical Process]  *Supra* 36-37.

**4.**  Google says the district court's ruling "defies the principle of

claim differentiation" because claim 1 must have a broader scope than

dependent claim 6, which recites "utilizing the private key to decrypt a

second encryption key" that is "utilized to decrypt digital content."

OB36 (quoting Appx67 8:31-32).  But Google never raised this new

claim-differentiation argument to the district court.  *See* Appx2622-

2630.  Google thus forfeited the argument.  *See Voip-Pal.com*, 976 F.3d

at 1324.

In any event, the argument fails on the merits. Claim differentiation "refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006). Here, claims 1 and 6 differ only as to whether the shared private key can directly decrypt the protected content without involving another key (claim 1) or whether that private key must use a nested process to decrypt a second key that then decrypts the protected content (claim 6). Again, the possibility of such nested decryption is irrelevant, because claim 6 does not change claim 1's requirement that "all devices within the domain of devices" must utilize the private key. Appx67 8:4-5. And Google does not, and cannot, identify anywhere in the district court's ruling that the court construed claim 1 to require having the private key decrypt a second key that ultimately decrypts the protected content.

## II. The District Court Correctly Granted Summary Judgment Of Non-Infringement Under Google's Authentication Theory Because An AuthToken Is Not A Private Key.

Google's Authentication theory depends on the authToken constituting a "private key" within the meaning of the asserted claims.

46

CONFIDENTIAL MATERIAL OMITTED

The district court construed "private key" as "a non-public cryptographic key that is used as the key input (rather than solely as the data input) to a cryptographic algorithm," where "cryptographic key" means "a string of characters that is designed to control a cryptographic algorithm." Appx56. As the district court recognized, "there is no dispute that the AuthToken is used *only as the data input* (the input that is ▮▮▮▮/▮▮▮▮▮) and never as the key input designed to *control the algorithm*." Appx58.[6] So there is no dispute that Google's Authentication theory fails under the district court's construction. And that construction is consistent with the plain meaning of "private key," the '187 patent's specification, and the extrinsic evidence. The district court thus correctly granted summary judgment of non-infringement under the Authentication theory.

### A. The plain meaning of "private key" refers to a key input to a cryptographic algorithm, not a data input.

Cryptographic algorithms generally require two inputs: the key, which *controls* the algorithm (it encrypts, decrypts, or signs a piece of

---

[6] Google bafflingly says, without citation, that "Sonos did not dispute that its authorization tokens are … used as private keys in a cryptographic algorithm." OB5. The opposite is true. Appx58.

data); and the data, which is the *object* of the algorithm (it is encrypted, decrypted, or signed). *See* Appx2283-2285; Appx3510-3511. The term "private key" is well-known in the art to refer to the key input, rather than the data input, of cryptographic algorithms.

**1.** Start with the intrinsic evidence, as the district court did. *See* Appx47-49. "When construing claim terms, [courts] first look to, and primarily rely on, the intrinsic evidence, including the claims themselves" and "the specification." *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 (Fed. Cir. 2020) (citation omitted). The words in a claim generally receive their "ordinary and customary meaning" as "a person of ordinary skill in the art in question at the time of the invention" would have understood them. *Phillips*, 415 F.3d at 1313.

Claim 1 of the '187 patent describes a process in which a key issuer "issue[s] a private key to the new device, wherein the private key is based on the domain information and is utilized by all devices within the domain of devices" to "access[] the protected digital content." Appx67 8:3-7; *see also* Appx68 9:6-10 (substantively identical limitation in claim 10). The specification explains that "[t]he private key is used

for either decrypting data or generating digital signatures and the public key is used for either encrypting data or verifying digital signatures." Appx64 2:42-49. Critically, this disclosure distinguishes between the "key," which is used to decrypt, generate, encrypt, and verify; and the "data" and "digital signatures" that the key acts upon. And the specification provides the "single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (citation omitted).

The '187 patent repeatedly confirms the distinction between the key input and the data input. The claims require that the "private key" be used to "access[] the protected digital content," *e.g.*, Appx67 8:7-8; and the specification also teaches that the "private key" is used to "decrypt the content encryption key," Appx66 6:57-62; *see also* Appx65 4:52-56. By contrast, the specification uses the term "data" to describe the input that is an algorithm's object—i.e., that which is encrypted, decrypted, verified, or signed. *See* Appx64 2:65-66 (describing "data that is digitally signed"). Thus, the '187 patent makes clear that the claimed "private key" is a non-public cryptographic key that functions as the key input—not the data input—for a cryptographic algorithm.

True, the specification uses the term "key" in discussing a technique where one key is itself encrypted by another key: The "content encryption key is encrypted with the DRM public key so it can be decrypted only using the DRM private key." Appx65 4:54-56; *see also* Appx66 6:57-62. This explains that a generic cryptographic key (here, the content encryption key) can be the data input for a cryptographic algorithm. But the content encryption key is a cryptographic key because it functions to decrypt protected content in a different cryptographic algorithm. *See* Appx65 4:52-56 ("an encrypted encryption key (content encryption key) [is] needed to render (execute) the digital content"). Put another way, just because a cryptographic key *can* be a data input for a cryptographic algorithm does not mean that *all* data fed into the algorithm is a cryptographic key. As the district court recognized: "The specification is thus consistent with Sonos's position that a key is something that, in at least one context, controls an algorithm; a data input—that *solely* functions as the object of such an algorithm and does not control the algorithm—is not a key." Appx49.

Google insists, however, that the claim language supports its proposed construction. OB38-40. It contends that the district court's

initial construction of "private key" at the *Markman* stage—"[a] non-public key that is used as an input to a cryptographic algorithm designed such that, without the key, the output of the algorithm cannot be computed"—was "both correct and sufficient." OB38 (quoting Appx2216-2220). That is wrong twice over.

First, Google provides no relevant evidence in support of its construction. Google has no evidence, for instance, that any skilled artisan has used the term "private key" to refer interchangeably to either the data input or the key input of a cryptographic algorithm. Instead, Google tautologically breaks down "private key" into its component parts: something "non-public" (private) that "provides access" (a key). OB39. But as the district court recognized, the term must be understood in the context of cryptography, because "the '187 patent uses the term 'private key' in relation to public key cryptography." Appx2218. Google also tries to buttress its argument with quotes from the "surrounding claim language," coupled with a conclusory assertion that "[t]hose limitations align with Google's construction." OB39. But saying so does not make it so. Or as the

district court put it: "Google cites little to no support for [its] proposed reading of the term 'private key.'" Appx56.

Second, the district court's initial construction came about in response to a separate dispute between the parties and did not address whether data alone could be a private key. At the *Markman* stage, "the Court did not consider *which input* in the cryptographic algorithm the purported key must be, but only opined as to the *type of the cryptographic algorithm* (*e.g.*, hashing, encrypting, or signing) that satisfies the limitation." Appx20. Later, it became clear that the district court needed to revise the construction before determining whether an authToken could be a private key. Appx19-20. That was in part because Google's proposed construction would render almost any piece of data a private key, since "an algorithm can operate using virtually any data as an input." Appx51.

Though Google now contends that the district court "ignored the related limitations and the district court's original claim construction, both of which limit the private key to inputs designed to allow access to content," OB40, in reality, all cryptographic algorithms must have a data input to calculate an output. So Google's position amounts to

saying that anything that can be input to any authentication or authorization process could be a "cryptographic key." *See* Appx51. But as the district court recognized, the evidence demonstrates that a "cryptographic key" is an input that is "bespoke, or uniquely tailored to work with a corresponding cryptographic algorithm … and controls the algorithmic function." Appx51. As here, "a district court may (and sometimes must) revisit, alter, or supplement its claim constructions … to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact." *In re Papst Licensing Digit. Camera Pat. Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015).

**2.** Next consider the extrinsic evidence, just as the district court did after canvassing the intrinsic evidence. *See* Appx49-56. Courts may consider "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317-18. Here, dictionaries from the time of the alleged invention and testimony from both parties' experts confirm that "private key" refers to the key input while other terms,

such as "data" or "message," refer to the data on which the
cryptographic algorithm acts.

To start, dictionaries from the early 2000s distinguished between
a "key" on the one hand and "data" or a "message" on the other.  Some
dictionaries, for example, defined "cryptography" as "[t]he use of codes
to convert data so that only a specific recipient will be able to read it
using a key."  Appx3463-3464 (*Cryptography*, Microsoft Computer
Dictionary (5th ed. 2002)).  And dictionaries defined "key" as the thing
that acts upon data, information, or a message.  *See, e.g.*, Appx3467-
3468 ("a string of bits used for encrypting and decrypting information to
be transmitted") (*Key*, Microsoft Computer Dictionary (5th ed. 2002));
Appx3471-3472 ("a value used to encrypt or decrypt a message
according to the algorithm") (*Key*, Dictionary of Computer Science,
Engineering, and Technology (2001)); Appx3478-3480 ("a piece of secret
additional information that must be known in order to decode an
encrypted message") (*Key*, The New Penguin Dictionary of Computing
(2001)); Appx3483-3484 ("the procedure that is used to encipher the
message so that it appears to be just nonsense") (*Key*, Webster's New
World Dictionary of Computer Terms (8th ed. 2000)).  These definitions

confirm that, in the context of cryptographic algorithms, the term "key" refers to the key input that controls the algorithm, not the data input.

Testimony from both Google's and Sonos's experts similarly establishes that "private key" refers to a "cryptographic key" used to control a cryptographic algorithm. Sonos's expert, Dr. Wicker, explained that "[w]ithin the field of cryptography, the term 'key' is commonly understood as a sequence of symbols that controls a cryptographic algorithm," and the "modifier 'private' indicates that the key is not publicly available." Appx1448. In his opinion, the '187 patent's references to using a private key for "'decrypting data' and 'generating a digital signature'" adhere to this common understanding, because "data is *decrypted* by applying an encryption algorithm to the data (using the key) and a digital signature is generated by *encrypting* data using a cryptographic algorithm (and its associated key)." Appx1448-1449. Putting this all together, Dr. Wicker testified that the "algorithm that a cryptosystem uses to map plaintext to ciphertext is controlled by a *key*, which may take the form of a relatively short string of letters and/or numbers" and is "called a 'private key.'" Appx3441.

During the first round of claim construction, Google argued that "the term 'private key' would have been understood by a person of ordinary skill in the art to mean a cryptographic key used in relation to a cryptographic algorithm." Appx1095. And Google's expert, Dr. Sherman, explained that "[a] cryptographic key is a key sequence of characters that is an input to a cryptographic algorithm where the algorithm is designed such that if you don't know the key, you cannot compute its output." Appx1515. Like Dr. Wicker, Dr. Sherman confirmed that "'private key' had a well-known meaning to those of ordinary skill in the art in the November 2002 time frame. It is a cryptographic key, or string of characters, that is kept private and can be used in asymmetric encryption systems, symmetric encryption systems or for some other purpose, such as for computing a digital signature." Appx1192.

Relying on this mountain of evidence, the district court concluded that "[e]xtrinsic evidence in the record also supports the conclusion that a 'private key' refers to a string of characters that is designed to control a cryptographic algorithm—the required key to a keyed cryptographic algorithm and not the data input" that "serves solely as the object of a

CONFIDENTIAL MATERIAL OMITTED

cryptographic algorithm." Appx49. This Court must review a district court's determinations about "subsidiary facts based on extrinsic evidence" for "clear error." *Power Integrations*, 904 F.3d at 971. Google cannot overcome that evidentiary standard here, and it does not even try to do so.

Google provides no examples in the field of cryptography referring to information that serves only as the data input to a cryptographic algorithm as a "private key" or "cryptographic key." The best Google can muster is its conclusory assertion that Dr. Sherman's testimony "was consistent with Google's construction." OB47. Even accepting that premise, Google makes no effort to explain how the district court clearly erred in finding that Dr. Wicker's testimony and the dictionary definitions discussed above support its construction of "private key."

## B. Google misconstrues the district court's opinion and then attacks strawman arguments.

According to Google, the district court erred in two main ways: (1) the court "started its analysis with extrinsic evidence" instead of intrinsic evidence; and (2) it ignored digital ███████ and ██████████

algorithms in construing "private key." OB45; *see also* OB40-45. The

district court did neither of those things, so Google's attacks fall far

short of identifying any reversible error.

First, Google contends that the district court "started with

extrinsic evidence about 'private keys' outside the context of the

specification and asked whether that extrinsic evidence covered

Google's construction." OB38. Not so, as discussed above at 48-50.

True, the district court included a "Background" section in its opinion,

noting that "[b]efore turning to the dispute at bar it is useful to

understand the difference between 'keyed' and 'non-keyed'

cryptographic techniques." Appx41; *see also* Appx41-44 ("Background").

This background section is what Google cites to claim that the "court

improperly elevated extrinsic evidence over the intrinsic record." OB45

(citing Appx41-43). But Google completely ignores that the district

court acknowledged that "[c]ourts first look to intrinsic evidence

because 'the claims themselves provide substantial guidance as to the

meaning of particular claim terms.'" Appx37 (quoting *Phillips*, 415 F.3d

at 1314). And the district court explained that only after addressing

intrinsic evidence may courts consider extrinsic evidence, which "is 'less

CONFIDENTIAL MATERIAL OMITTED

significant than the intrinsic record.'" Appx37 (quoting *Phillips*, 415 F.3d at 1317).

Following this guidance, the district court started its construction of "private key" with the intrinsic evidence. *See* Appx47-49. Then, after concluding that "Sonos's definition of 'private key' is supported by intrinsic evidence," the district court turned to extrinsic evidence and concluded that this evidence "also support[ed]" Sonos's construction. Appx49; *see also* Appx49-56. So Google's argument that "[t]he district court improperly used extrinsic evidence as its starting point," OB45, does not square with the district court's decision. And for that reason, the cases Google cites—each of which reaffirms the uncontroversial proposition that courts should not elevate extrinsic evidence over intrinsic evidence, *see* OB46-48—have no bearing here because the district court did no such thing.

Second, Google myopically focuses on ██████████ [Internal Technical Process] and ██████████ [Internal Technical Process] algorithms, claiming that the district court's construction (1) limited the "private key" to keys that are used for encryption and decryption algorithms; and (2) somehow ignored ██████ [Internal Technical Process] and ██████████ [Internal Technical Process] algorithms. *See* OB40-45. According to Google, the district court

59

CONFIDENTIAL MATERIAL OMITTED

"improperly read limitations from some embodiments in the specification into the claims" (by limiting "private key" to "encryption or decryption functions") and "improperly read other embodiments out of the claims" (by excluding private keys used for "generating or verifying digital ███████████s"). OB40. That matters, Google says, because, "[i]n contrast to an encrypted message, a signing-and-███████ process succeeds only if both inputs are correct." OB42.

A brief explanation of ███████ and ████████ algorithms debunks Google's criticisms. For ████████ algorithms, a message "is entered into the signing algorithm, along with a private required key," and that algorithm produces a ████████—which is effectively an encrypted version of the message. Appx43-44. The signer sends (1) the unencrypted message and (2) the ████████ to the recipient. Appx44. The recipient uses a "████████ algorithm" to "decrypt[] the ████████" with "the sender's public required key" and compares the decrypted ████████ to the message to confirm that they are the same. Appx44. Thus, the inputs to the signing algorithm are (1) the message and (2) the private key; the inputs to the ████████ algorithm are (1) the message, (2) the ████████, and (3) the public key. In that sense, the

CONFIDENTIAL MATERIAL OMITTED

Internal Technical Process

█████████ algorithm has two data inputs (the message and the

Internal Technical Process

█████████ ).  But consistent with all the evidence before the district

court, even in the context of signature and verification algorithms, the

term "key" still refers to the key inputs, not the various data inputs.

Google's focus on how this process requires "both inputs" to be "correct"

is beside the point, because there is no evidence that either the message

Internal Technical Process

or █████████ inputs are referred to as a "key."

Because Google raised this same argument below, the district

court expressly addressed signing and ████████ algorithms at length.

Internal Technical Process

The court rested its construction on intrinsic evidence describing "keys"

as being used for "*generating* digital signatures" and "*verifying*" the

same.  Appx47 (quoting Appx64 2:45-49).  The court also considered

dictionary evidence referring to a "key" as the "string of bits used for

encrypting and decrypting information" "[i]n encryption and digital

signatures."  Appx50 (quoting Appx3468).  And the court observed that

Google's own expert explained that the term "private key" had a "well-

known meaning" as the "cryptographic key, or string of characters" used

Internal Technical Process

for several functions, including "computing a digital ████████."  Appx51

(quoting Appx1192).

CONFIDENTIAL MATERIAL OMITTED

Thus, contrary to Google's assertions, the district court did not overlook ███ [Internal Technical Process] and ███ [Internal Technical Process] algorithms; it instead correctly determined that the term "private key" did not have a different meaning with regard to such algorithms. As the district court recognized, "there is no dispute that the AuthToken is used *only as the data input* (the input that is ███ / ███ [Internal Technical Process]) and never as the key input designed to *control the algorithm* (i.e., the keyed algorithm's required key)." Appx58. "Put differently, the AuthToken is the *object* of the digital ███ [Internal Technical Process] algorithm that signs and verifies [the AuthToken]— [the AuthToken] does not *control* the signing and ███ [Internal Technical Process]." Appx58. The district court's construction thus correctly distinguishes between something "used as the key input" and something that is "solely … the data input" to a cryptographic algorithm, regardless of whether that algorithm is designed to encrypt, decrypt, or generate or verify digital signatures. Appx58.

Anyway, even if Google were correct that the district court's construction does not cover certain embodiments from the specification, this Court's caselaw makes clear that a claim need not cover every embodiment: "The mere fact that there is an alternative embodiment

disclosed in the asserted patent that is not encompassed by our claim

construction does not outweigh the language of the claim, especially

when"—as here—"the court's construction is supported by the intrinsic

evidence." *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1285

(Fed. Cir. 2011) (citation omitted).

## III. The District Court Correctly Construed The Term "Based On," Consistent With The Claim Language, The Specification, And The Extrinsic Evidence.

In addition to granting summary judgment in Sonos's favor on the

"utilized" and "private key" limitations, the district court also construed

another limitation in Sonos's favor.

Google yet *again* asks for an overly expansive reading of the

claims.  Here, the claims require that the private key be "based on the

domain information." *E.g.*, Appx67 8:4.  Google asked the district court

to construe "based on" as "in consequence of the domain information."

Under that construction, in Google's view, the accused private keys are

"based on" domain information (the household ID) merely because that

information is included in the messages requesting the accused keys.

For the Strong-Encryption theory, Sonos pointed out that the

household ID is not even an input into the function that generates the

private device key.  *See* Appx2259-2260; Appx3347-3349.  And for the Authentication theory, Sonos explained that Google had no evidence of whether or how the domain information is used to determine the authToken.  Appx2248-2250; Appx3339-3341.  Google lacked such evidence because *third parties*, not Sonos, create and provide the authToken, and "Google did not pursue third-party discovery."  Appx56.

The district court addressed this issue as a claim-construction dispute over what "based on," in the context of the claims, required. The district court concluded that "[i]t is not enough that the key be produced 'in consequence' of the domain information"—Google's preferred construction—because the domain information must be "used to determine which key is issued in the first instance."  Appx17.  That construction is correct, and at minimum this Court should affirm the construction and remand if it does not affirm the judgment of non-infringement on the "utilized" and "private key" limitations.  *Contra* OB49-56; *see* Appx58 n.13.

**A.    "Based on" requires a deterministic, rather than a merely causal, relationship between the domain information and the key that is issued.**

The claim language and specification both confirm that the "domain information" must be used to determine the "private key" that issues.  The claims have three requirements for the issuance of the private key:

> [1] providing the domain information to a key issuer, which is separate from the domain of devices, [2] causing the key issuer to issue a private key to the new device, [3] wherein the private key is based on the domain information and is utilized by all devices within the domain of devices.

Appx67 8:1-5.  The first and second requirements show that the key itself, rather than the act of issuing it, must be "based on" the domain information.  That is because the claim already recites that "providing the domain information" causes the key issuer to issue the private key.  *See* Appx14.  Put differently, the claims say that the domain information must be provided to the key issuer to cause a private key to issue, so the additional limitation that the private key be "based on" the domain information cannot simply be redundant of that existing requirement.  To hold otherwise would render the "based on" portion of the claim language meaningless, which is "disfavored."  *Power Mosfet*

65

*Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004). And that is why the district court properly rejected Google's construction of "based on," which simply restates the requirement that providing the domain information causes or has the "consequence of" the key's issuing. Appx14-15.

The correct reading of the claims is that the phrase "based on the domain information" requires that the provided household ID is used to determine which particular private key is issued. This is consistent with the plain and ordinary meaning of "based on," and is likewise confirmed by the specification, which is often the "single best guide to the meaning of [the] disputed term." *Phillips*, 415 F.3d at 1315. The example given in the specification is of a look-up table in which the domain information determines which particular private key is issued: "If the domain information indicates that equipment 101 is being added to a new domain, key issuer 105 creates a new DRM public/private key pair. If equipment 101 is being added to an existing domain, key issuer 105 looks up that domain's DRM public/private key pair in a database." Appx65 4:30-41.

This disclosure demonstrates that the "contents of the domain information"—such as the fact that the domain already exists—"inform the key that is issued." Appx15. Which DRM public/private key pair the key issuer produces depends on the provided domain information—in other words, the private key is "based on" the domain information. Put another way, the domain information is used as an input to decide *which* key gets issued. As the district court recognized, the '187 patent's "purpose is to improve security of domain rights management systems when enrolling devices into a domain," so "the manner in which a key issuer provides the key … is particularly informative in understanding the patent and its terms." Appx16.

To be clear, and as discussed further below, the district court's construction does not require that the domain information alone dictates the exact private key that issues. Instead, consistent with the specification, "based on" means that a deterministic relationship exists between the domain information and the private key such that the domain information is used to determine—to some extent—the private key that issues. That stands in contrast to Google's proposed construction that "based on" means "associated with" or "produced in

consequence of." *See infra* 68-69.  As the district court recognized, the specification "does not comport with Google's definition of 'based on,'" because "either a new key is issued if the domain information shows the domain does not yet exist, or if the domain information shows an existing domain, the domain information is used to 'look up,' i.e., find a particular key in the database."  Appx15.

## B. Google's construction runs contrary to the evidence, rests on a distinction without a difference, and misconstrues the district court's order.

Google's proposed construction—that "based on" means "issued in consequence of the domain information"—is wrong several times over.[7]

To start, Google's construction would make the "based on" limitation superfluous because the asserted claims already require that the private key be issued "as a consequence of" providing the domain information to the key issuer.  *See supra* 65-66.  Google provides no

---

[7] As it did in the district court, Google continues to shift its proposed construction between "associated with" and "in consequence of."  *See* OB49-56; Appx15 ("Google alternatively, and briefly, argues that the domain information and key need only be 'associated with' one another.").  Google does not articulate any substantive difference between its theories, and they fail for the same reasons.  In all events, the district court rejected both:  "It is not enough that the key be produced 'in consequence' of the domain information, or that the two are 'associated' in the sense that they are stored together."  Appx17.

colorable argument that there is a difference between issuing a private key "in consequence of" the domain information, and the mere provision of domain information "causing the key issuer to issue" the private key. And "claim language should not [be] treated as meaningless." *Bicon*, 441 F.3d at 951.

Google responds with difficult-to-understand hypotheticals to avoid this superfluity. *See* OB53-54. The bottom line is that the linguistic gymnastics Google employs to avoid rendering superfluous parts of the claims show just how erroneous Google's construction is. For the Authentication theory, for instance, Google's infringement theory is that the private key is "based on" domain information because third parties require the domain information before they will issue the private key. Google believes this means the private key is somehow based on the domain information. That is like saying your driver's license number is "based on" your eye color because the DMV requires you to list your eye color on the application for a driver's license. Or that the flavor of your coffee order is "based on" your name because the barista asks for your name when taking your order. Merely providing

required information to get a response does not make the response "based on" the required information.

Google next attacks the court's deterministic construction as inconsistent with the various security concerns recited in the '187 patent's specification.  For example, Google contends that "[l]inking the content of the private key to a non-arbitrary, not-necessarily-private input would undermine" the fact that a private key is "both secret and arbitrary."  OB55-56.  But, as explained above, the district court's construction does not require pure one-to-one determinism, eliminating security concerns that a hacker who knows only the domain information could guess the private key.

Moreover, Google fails to recognize that, despite these alleged security concerns, the '187 patent describes this exact type of fully deterministic selection of private keys.  Specifically, as the district court explained, the specification gives two examples: one where new domain information causes the key issuer to issue a new key; and another where the key issuer recognizes the domain information and then provides a particular, existing key from its database.  Appx15.  Thus, Google's concern that having the domain information "determine

exactly which new key issues" would "*reduce* security," OB55, is one it
should raise with the '187 patent's inventors, and does not provide any
basis to construe the claims in a manner that would go against the
patent's express teachings.

Google's reliance on *Masimo Corp. v. Sotera Wireless, Inc.* fares no
better.  No. 22-1415, 2023 WL 6307959 (Fed. Cir. Sept. 28, 2023).  There
this Court concluded that the claim term "based on," as used in an
unrelated patent, had a "broad" definition.  *Id.* at *2.  Google's error,
however, is in artificially narrowing the district court's construction
here.  The district court merely required there to be some deterministic
relationship between the "domain information" and the "private key"—
but Google overreads that construction as demanding a "narrow
deterministic relationship."  OB52.  Because the district court adopted
no such "narrow" limitation, *Masimo*'s analysis is irrelevant.  In any
event, "even the same" claim term "need not have the same meaning
when used in an entirely separate patent, particularly one involving
different technology."  *Nevro*, 955 F.3d at 42 (citation omitted).

Google also suggests that the specification supports a causal
relationship between the domain information and the private key

because "the specification imposes no requirements about how the particular key is chosen." OB55. This is untrue for existing domains that already have a private key; for those domains, the key issuer returns the key previously assigned to that domain. *See* Appx65 4:30-35. For new domains, the "specification does not detail … the key-creation process," OB55, but it does explain *when* and *why* a new or existing key issues, as discussed above at 66-67. That exemplifies a deterministic relationship—i.e., the domain information informs when and why a particular private key issues.

With the district court's actual construction in mind, it becomes clear why Google's construction would lead to absurd results. Consider the hypotheticals in the opening brief. "[L]egal briefs typically make arguments 'based on' the record. Those arguments are associated with the content of the record, but the record evidence would not determine *exactly which* arguments appear in the brief." OB51. Again, no one contends that "based on" means dictating "exactly" the content of the private key. But it is troubling to think that arguments in legal briefs that are "based on" the record need only be "associated"—in any form or fashion—with the record. More faithful to reality is the district court's

conclusion that "the contents of the domain information inform the key that is issued," Appx15—just as the contents of the record inform the arguments in a brief.

Google's example about a movie "based on" *The Count of Monte Cristo* is inapposite for the same reasons. For one thing, everyone agrees that "[n]o one would think that the novel exactly determined the content of the movie." OB52. For another, anyone who watches the movie adaptation of a book surely hopes that "the contents of the [book] inform the [movie] that is [produced]." Appx15. Under Google's view of the claims, if someone sent a paperback of *The Count of Monte Cristo* to a director before she started filming *any* movie, then that movie would be "based on" the book.

Ultimately, the claim language and specification all provide for a deterministic relationship between the "domain information" and the "private key." Google's many hypotheticals suggesting otherwise do not compel any contrary result. Thus, if this Court reaches the issue, it should affirm the district court's construction of "based on" and remand for the district court to apply that construction to the record here in the first instance. *See Pac. Coast Marine Windshields Ltd. v. Malibu Boats,*

*LLC*, 739 F.3d 694, 705 n.6 (Fed. Cir. 2014) ("The district court did not

reach these issues, and neither do we."); *cf.* OB56-61 (Google arguing

that genuine factual disputes exist related to the "based on" limitation).

## CONCLUSION

For the reasons explained above, this Court should affirm the

district court's judgment.

Respectfully submitted,

*/s/ Elizabeth R. Moulton*

| | |
|---|---|
| Alyssa M. Caridis | Elizabeth R. Moulton |
| ORRICK, HERRINGTON & | Will Melehani |
| SUTCLIFFE LLP | ORRICK, HERRINGTON & |
| 355 S. Grand Avenue, Suite 2700 | SUTCLIFFE LLP |
| Los Angeles, CA 90071 | 405 Howard Street |
| | San Francisco, CA 94105 |
| Harmann P. Singh | (415) 773-5700 |
| ORRICK, HERRINGTON & | |
| SUTCLIFFE LLP | |
| 2100 Pennsylvania Avenue, NW | Lauren A. Weber |
| Washington, DC 20037 | ORRICK, HERRINGTON & |
| | SUTCLIFFE LLP |
| | 401 Union Street, Suite 3300 |
| | Seattle, WA 98101 |

*Counsel for Appellee*

August 1, 2025

## CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 13,954 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Elizabeth R. Moulton*
Elizabeth R. Moulton
*Counsel for Appellee*

## CERTIFICATE OF CONFIDENTIAL MATERIAL

This brief contains 0 unique words and numbers marked as confidential, not previously marked as confidential in this case's briefing.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Elizabeth R. Moulton*

Elizabeth R. Moulton
*Counsel for Appellee*